IN THE CIRCUIT COURT OF LOWNDES COUNTY, ALABAMA

| | | |
|---|---|---|
| KENNETH & DEBRA SCOTT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. CIV 05-10 |
| | ) | |
| WASHINGTON MUTUAL BANK, F.A., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT WASHINGTON MUTUAL'S MOTION TO DISMISS

Defendant Washington Mutual Bank ("WAMU"), formerly known as Washington

Mutual Bank, F.A., hereby files this Motion to Dismiss pursuant to Rule 12(b)(6) of the Alabama

Code of Civil Procedure, and requests that this Court dismiss the Complaint filed by Plaintiffs

Kenneth and Debra Scott ("Plaintiffs"), with prejudice.

## INTRODUCTION

In their Complaint, Plaintiffs contend that WAMU breached its contract with Plaintiffs

and violated state common and statutory law by charging a fee for providing payoff statements to

Plaintiffs at Plaintiffs' request. Plaintiffs contend that by charging a fee for providing these

payoff statements, WAMU breached a provision in Plaintiffs' loan agreement prohibiting

"prepayment charges" (Count I), suppressed material facts by not disclosing the fee "at the time

it acquired Plaintiffs' loan" (Count II), violated provisions of the Alabama Mini-Code (Count III)

and was unjustly enriched (Count IV).

Plaintiffs' claims must be dismissed. As a preliminary matter, the claims are all pre-

empted by federal law. As a federally chartered savings association, WAMU is subject to the

exclusive governance of federal law. Because the federal regulatory agency overseeing such

entities has expressly "occupied the field" with regard to the fees at issue here, Plaintiffs' state law claims, including its breach of contract claim, are preempted.

Even absent preemption, however, Plaintiffs' claims fail as a matter of law, for a number of independent reasons:

- In *Stone v. Mellon Mortgage Co.*, 771 So.2d 451, 456 (Ala. 2000),[1] the Alabama Supreme Court rejected claims that are indistinguishable from those made by Plaintiffs here. Under *Stone*, Plaintiffs' claims are barred by the voluntary payment doctrine because Plaintiffs did not object to the payoff statement fee or allege a mistake of fact. The *Stone* Court also determined that a similar fee (for faxing the payoff statement) is not prohibited by the contract, thus dooming Plaintiffs' breach of contract claim.
- Plaintiffs' claim alleging suppression of a material fact fails because Plaintiffs admit that the payoff statement fees were disclosed before they refinanced their home.
- Plaintiffs' claim under the Alabama Mini-Code fails because the Mini-Code expressly does not apply to WAMU.
- Because the parties' relationship is governed by contract, and because that contract does not address fees for providing a payoff statement, let alone prohibit such fees, Plaintiffs' unjust enrichment claim fails.

For all these reasons, WAMU respectfully submits that the Complaint should be dismissed, with prejudice.

## **BACKGROUND**

In October 1987, Plaintiffs entered into an agreement with Louis Shepherd Construction Co. for the construction of a home. (Cmplt. ¶ 6 (attached hereto as Exhibit 1).) The loan to pay for the construction was memorialized in a promissory note (the "Note," attached to the Complaint as Exhibit A) and secured by a mortgage (the "Mortgage," attached hereto as Exhibit 2). (*See also* Cmplt. ¶ 6.) Ultimately, WAMU succeeded Louis Shepherd Construction as the owner of the Note and the party-in-interest to the Mortgage. (Cmplt. ¶ 7.)

---

[1] Cases and regulations cited in this motion will be provided to the Court under separate cover.

Sixteen years later, in June 2003, Plaintiffs sought to refinance their loan. (*Id.* ¶ 8.) In connection with the refinancing, Plaintiffs requested a series of "payoff statements" from WAMU to determine the amount necessary to satisfy their obligations to WAMU under the loan. (*Id.* ¶ 19.[2]) On June 17, 2003, WAMU faxed to Plaintiffs the payoff statement at issue here. (A copy of the payoff statement is attached to the Complaint as Exhibit B.) In addition to stating the amounts required to pay the loan in full, the payoff statement advised Plaintiffs that "[t]he following amounts are additional loan servicing fees that are due and owing to Washington Mutual relating to this transaction." (*Id.*) Included among the amounts is a $180 "payoff statement fee." (*Id.*; Cmplt. ¶ 9.) This fee was due and owing irrespective of whether Plaintiffs ultimately decided to pay off their loan prior to maturity.

Plaintiffs apparently paid the $180 payoff statement fee, but they do not allege that they paid the fee under protest. Indeed, Plaintiffs do not allege that they ever complained to WAMU about the payoff statement fee prior to filing this lawsuit in February 2005.

## ARGUMENT

### I.    PLAINTIFFS' COMPLAINT MUST BE DISMISSED BECAUSE IT IS PREEMPTED BY FEDERAL LAW.

WAMU is a *federally* chartered savings association. *See, e.g., Rosenberg v. Washington Mutual Bank, FA*, 849 A.2d 566, 571 (N.J. Super. Ct. App. Div. 2004); *Haehl v. Washington Mutual Bank, FA*, 277 F. Supp. 2d 933, 935 (S.D. Ind. 2003); *Moskowitz v. Washington Mutual Bank, FA*, 768 N.E.2d 262, 264 (Ill. App. Ct.), *petition for leave to appeal denied*, 201 Ill. 2d 574 (2002). As such, it is governed solely and exclusively by regulations issued by the federal Office

---

[2] Plaintiffs suggest that this $180 fee is for the payoff statement attached to the Complaint at Exhibit B. In fact, Plaintiffs previously ordered payoff statements on February 18, 2003; April 29, 2003; and June 12, 2003. Plaintiffs were charged $60 each for three of these four payoff statements.

of Thrift Supervision (the "OTS"). *Id.* Congress granted the OTS the authority to craft regulations that might preempt state laws, and the OTS has promulgated regulations that expressly preempt *all* state laws – statutes and common law alike – affecting the imposition and disclosure of servicing fees such as the payoff statement fee charged by WAMU. Accordingly, Plaintiffs' Complaint must be dismissed in its entirety.

## A.    Congress Delegated Authority To Preempt State Law To The OTS.

Under the federal Home Owners' Loan Act of 1933, 12 U.S.C. § 1461, *et seq.* ("HOLA"), Congress expressly delegated authority to the OTS to preempt state laws as they apply to the lending operations of federal savings associations. The grant of preemptive authority, according to the United States Supreme Court, is clear:

> Congress plainly envisioned that federal savings and loans would be governed by what the [OTS] – not any particular State – deemed to be the "best practices." . . . *Thus, the statutory language [of HOLA's § 5(a)] suggests that Congress expressly contemplated, and approved, the [OTS] promulgation of regulations superseding state law.*

*Fidelity Fed. Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 161-62, 102 S. Ct. 3014, 3026-27 (1982) (citations omitted). As shown below, the OTS has preempted the state law claims asserted in Plaintiffs' Complaint.

## B.    The OTS Has Expressly Occupied The Entire Field Of Lending Regulation.

Using the authority Congress thus granted it, the OTS has expressly preempted the *entire field* of state lending regulations with respect to federal savings associations such as Washington Mutual:

> *Occupation of field* . . . To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), *OTS hereby occupies the entire field of lending regulations for federal savings associations.* OTS intends to give

4

> federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, *federal savings associations may extend credit* as authorized under federal law, including this part, *without regard to state laws purporting to regulate or otherwise affect their credit activities. . . .* For purposes of this section, "state law" includes *any state statute*, regulation, ruling, order or judicial decision.

12 C.F.R. § 560.2(a) (emphasis added).

The OTS' intent broadly to preempt state laws affecting federal thrifts could not be clearer:

> [I]nstead of being subject to a hodgepodge of conflicting and overlapping state lending requirements, *federal thrifts are free to originate loans under a single set of uniform federal laws and regulations.* This furthers both the "best practices" and safety soundness objectives of the HOLA by enabling federal thrifts to deliver low-cost credit to the public free from undue regulatory duplication and burden. *At the same time, the interests of borrowers are protected by the elaborate network of federal borrower protection statutes applicable to federal thrifts.*

61 Fed. Reg. 50951-01, 50965 (Sept. 30, 1996) (emphasis added). This preemption extends to any "state law," including laws of general application. 12 C.F.R. § 560.2(a). "State laws" are expressly defined to include "any state statute, regulation, ruling, order or judicial decision." *Id.*

Thus, it is widely recognized that the OTS accepted Congress' invitation to preempt *all* state laws affecting the loan operations of federal savings associations and regulated "comprehensively the operations of these [federal savings] associations, including their lending practices and, specifically, the terms of loan instruments." *de la Cuesta*, 458 U.S. at 166-67, 102 S. Ct. at 3029. *See also Kupiec v. Republic Fed. Sav. and Loan Ass'n*, 512 F.2d 147, 150 (7th Cir. 1975) (the OTS "has promulgated comprehensive rules and regulations concerning the powers and operations of every federal savings and loan association 'from its cradle to its corporate grave'") (citations omitted).

5

**C.     The OTS Has Expressly Extended Preemption To All State Laws Affecting The Imposition Of Payoff Statement Fees.**

Regulations promulgated by the OTS provide "[i]llustrative examples" of "the types of state laws preempted." 12 C.F.R. § 560.2(b). The non-exhaustive list includes all state laws "purporting to impose requirements regarding . . . (5) Loan-related fees, including . . . servicing fees," and "(9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations . . . [or] credit contracts." 12 C.F.R. § 560.2(b).

Payoff statement fees are "servicing fees," and, as such, are clearly subject to federal preemption. In 1999, the OTS issued an opinion letter concluding that California's Unfair Competition Act was preempted as applied to payoff statement and facsimile fees charged by a federal savings association. *See* OTS Opinion Letter, No. P-99-3 at 16-18 (Chief Counsel Mar. 10, 1999), attached hereto as Exhibit 3 (the "1999 OTS Opinion"). The OTS concluded that payoff statement fees are loan-related fees and "to the extent that [state law] is being used to regulate the imposition of loan-related fees that are part of the [a]ssociations' lending programs, the [state law] is preempted." *Id.* at 16.

The California statute was "inconsistent with one of the objectives of the HOLA and § 560.2(a), namely to allow federal savings associations to exercise their lending powers 'in accordance with a uniform scheme of federal regulation.'" *Id.* The OTS was troubled that "suits based on the charging of loan-related fees, could subject the [a]ssociations to different standards within California as well as in other states. *This result is inconsistent with, and violates the objectives set forth in, § 560.2(a).* This result is also particularly troubling in the areas of . . . loan-related fees, which the OTS has identified in its regulations as areas in which the OTS has

determined that federal thrifts should be able to exercise their lending powers in accordance with uniform federal standards of operation." *Id.* at 17 (emphasis added).

A year later the OTS had another opportunity to opine on its regulations' preempting the application of state laws to federal associations' assessment of statement fees. In a second letter, the OTS addressed a New York law that limited payoff statement fees, requiring, for example, that the initial payoff statement be issued free of charge. Addressing the law in the context of fax fees, the OTS concluded that a fee charged for faxing a payoff statement is a loan-related fee and the New York law is preempted as applied to a federal savings association. OTS Opinion Letter, No. P-2000-6 at 2-3 (Chief Counsel Apr. 21, 2000) (the "2000 OTS Opinion"), attached hereto as Exhibit 4. "The payoff statement is an integral part of the lending process," the OTS said, "as it provides the information necessary to satisfy the debt and extinguish the extension of credit." *Id.* at 2.

**D.     Plaintiffs' Claims Are Preempted.**

In light of both the regulatory language, and the OTS' opinion letters, any state law Plaintiffs seek to apply to the payoff statement fee WAMU charged is subject to federal preemption and must be dismissed. *See, e.g., Moskowitz*, 768 N.E.2d at 266 (breach of contract and consumer fraud claims against WAMU over issuance of payoff statement are preempted).

**1.     Plaintiffs' Contract Claim Must Be Dismissed As Preempted.**

Federal law does not place any restrictions on a federal savings association's ability to impose payoff statement fees, outside of requiring compliance with the terms of the particular note. As noted below, Plaintiffs' Note does not address payoff statements, let alone preclude WAMU from charging a fee for providing the service. Absent a bar in federal law or the express language of the Note, Plaintiffs must be relying on state law as imposing an implicit prohibition

on payoff statement fees. Any such state law claim must be preempted by federal law. The

1999 OTS Opinion clearly precludes the application of state law to regulate the imposition of

payoff statement fees by federal savings associations. *See Moskowitz*, 768 N.E.2d at 266 (breach

of contract claim against WAMU regarding payoff statement fees preempted).

### 2. Plaintiffs' Attempt To Impose A Substantive Duty Under State Law Regarding The Disclosure Of Payoff Statement Fees Is Preempted.

In Count II, titled "Suppression of Material Fact," Plaintiffs assert that "WAMU had a

duty to disclose to Plaintiffs, at the time it acquired Plaintiffs' loan or as soon thereafter as

WAMU commenced charging [payoff statement fees], that it would charge a [payoff statement],

including the amount thereof, to Plaintiffs in the event they paid off the Note before its

maturity." (Cmplt. ¶ 18.) Notably, Plaintiffs do not cite any federal law as imposing this

allegedly substantive duty on WAMU to disclose that a fee for the preparation and provision of a

payoff statement might be charged at some point in the future. Plaintiffs presumably are relying

on state law. Not only is this alleged duty nonexistent under state law, it is expressly preempted

under federal law.

The OTS has explicitly preempted all "state laws" that purport to govern or establish

disclosure requirements. 12 C.F.R. § 560.2(b)(9). Federal thrifts like WAMU already are

required to comply with "an elaborate network of federal disclosure laws, including the Truth-in-

Lending Act ('TILA') and Regulation Z," in addition to the Real Estate Settlement Procedures

Act. 1999 OTS Opinion at 14. None of these "elaborate" disclosure statutes imposes any

obligation on federal thrifts to disclose, in advance, that a fee may be charged for a payoff

statement that may (or may not) be requested by the borrower. Any disclosure obligation that

might be imposed under state law runs contrary to the overall federal statutory and regulatory

scheme.

8

The imposition of potentially 50 different state disclosure standards in addition to federal law would patently contravene both the letter and intent of HOLA's implementing regulations, which were expressly intended to replace the "hodgepodge of conflicting and overlapping state lending requirements" with "a single set of uniform laws and regulations." 61 Fed. Reg. 50951, 50965-66. In order to ensure a single set of uniform federal law, state common law claims such as those asserted by Plaintiffs are preempted. Federal law provides the exclusive remedy for any alleged impropriety. *See, e.g., Moskowitz*, 768 N.E.2d at 266 (finding preempted a contract claim premised on alleged failure to disclose an intent to charge a payoff statement fee in part because "[t]he effect of plaintiff's claim would be to impose, at the state level, a substantive requirement mandating when in the loan process such fees must be disclosed"). *See also Haehl*, 277 F. Supp. 2d at 942 (rejecting as preempted claim that reconveyance fee violated state law where "a decision in plaintiffs' favor would have the same effect as a direct regulation of the fees: to determine the circumstances under which Washington Mutual Bank may charge its customers a reconveyance fee, which is a loan-related fee."); *Rosenberg*, 849 A.2d at 572-73 (claims concerning disclosures in WAMU's billing statements "seek to insert a form of state regulation by compelling a different type of billing statement disclosure" and are preempted by federal law).

Here, Plaintiffs seek to impose a substantive duty of disclosure wholly absent from federal law. For the same reasons as expressed by the courts in *Moskowitz, Haehl*, and *Rosenberg*, Count II is preempted by federal law and should be dismissed.

### 3. Alabama's Mini-Code Is Preempted With Respect To The Issuance Of Payoff Statement Fees.

Plaintiffs contend that the charging of a payoff statement fee violates Alabama's Mini-Code either as a prepayment penalty or as "unconscionable and therefore in violation of section

5-19-16." (Cmplt. ¶ 25.) The payoff statement fee does not constitute a prepayment penalty, as discussed below.[3]  Moreover, WAMU's ability to impose such fees is regulated solely by federal law, rendering the Alabama Mini-Code wholly inapplicable.  As discussed above, the OTS had expressly preempted all laws purporting to affect "[l]oan-related fees, including . . . servicing fees."  The OTS has twice confirmed that payoff statement fees are encompassed within the term "loan-related fees" and are subject to federal preemption.  Plaintiffs' attempt to impose state statutory law must fail.  *See Haehl*, 277 F. Supp. 2d at 941-942 (Indiana Consumer Credit Code-Credit Sales may not be applied to regulate WAMU's imposition of "reconveyance fees" because such a fee "falls within the broad category of 'loan-related fees'"); *Moskowitz*, 768 N.E.2d at 266 (claim under Illinois' Consumer Fraud Act preempted).  Count III must, therefore, be dismissed as preempted by federal law.

### 4.    Plaintiffs' Unjust Enrichment Claim Is Similarly Preempted.

Plaintiffs' last contention, that WAMU "acquired money which in equity and good conscience belongs rightly to Plaintiffs" and has been "unjustly enriched," is equally preempted by federal law.  (Cmplt. ¶ 28.)  Although not specified in the Complaint, Plaintiffs presumably contend that WAMU's receipt of the payoff statement fee is "unjust" on one or more of the same theories underlying their other causes of action.  Namely, a theory that the payoff statement fee was (a) allegedly in breach of contract, (b) allegedly not disclosed as required by state law, or (c) was "unconscionable."  In any event, Count IV is preempted for the same reasons that Counts I through III are preempted.  Accordingly, Count IV must be dismissed.

---

[3] Even if it were a prepayment penalty (which it is not) federal law would still expressly preempt a claim under the Mini-Code.  Laws regulating prepayment penalties are among those fees identified in the OTS' illustrative examples of preempted state laws (12 C.F.R. § 560.2(b)(5)) and the OTS expressly allows federal savings associations to impose a fee for any prepayment of a loan.  12 C.F.R. § 560.34.

## II.    THE ALABAMA SUPREME COURT HAS MADE CLEAR THAT PLAINTIFFS' CLAIMS ARE BARRED BY THE VOLUNTARY PAYMENT DOCTRINE.

Payments voluntarily made to another party cannot be recovered absent a showing that the payments were made because of mistake of fact, fraud, duress, or extortion. *Stone*, 771 So.2d at 456; *Mount Airy Ins. Co. v. Doe Law Firm*, 668 So.2d 534, 537 (Ala. 1995). The Alabama Supreme Court's application of this doctrine in *Stone* requires dismissal of Plaintiffs' claims.

In *Stone*, the plaintiffs filed a putative class action suit against a mortgage company contesting fees charged in conjunction with the company's facsimile transmission of payoff statements (referred to as a "fax fee"). Addressing the voluntary payment doctrine, the Court held that "[b]ecause the [plaintiffs] did not object to the fax fee once their loan transaction had closed and their alleged duress had been lifted, and because they have shown no mistake of fact, the voluntary payment doctrine defeats their claims based on theories of unjust enrichment and money had and received." *Stone*, 771 So.2d at 458-59. The *Stone* court recognized that the doctrine is equally applicable to claims for breach of contract. *Id.* at 456.

The voluntary payment doctrine defeats Plaintiffs' similar claims here. Although the Complaint is silent on this point, given their claims that WAMU was unjustly enriched, Plaintiffs presumably contend that they paid the payoff statement fee. There is no allegation that Plaintiffs paid the fee under protest, or that they paid the fee because of mistake of fact, fraud, duress, or extortion. In sum, Plaintiffs failed to plead facts sufficient to avoid dismissal based on the voluntary payment doctrine. Accordingly, the Complaint should be dismissed.

## III.    PLAINTIFFS' BREACH OF CONTRACT CLAIMS SHOULD BE DISMISSED BECAUSE THE PAYOFF STATEMENT FEES ARE NOT PROHIBITED BY THE CONTRACT.

In Count I, Plaintiffs contend that WAMU breached its contract with Plaintiffs by charging the payoff statement fee. (*See* Cmplt. ¶¶ 13-16.) Plaintiffs apparently advance two

alternative theories for the breach of contract claim: (A) the payoff statement was "not authorized by the Note" and (B) the payoff statement constitutes a prohibited prepayment penalty. (*Id.* ¶ 15.) These arguments fail as a matter of law.

### A.    WAMU May Charge Fees Not Expressly Addressed In The Note.

Count I assumes that the Note and Mortgage prohibit the assessment of a payoff statement fee because they did not expressly allow for the assessment of such a fee. Such a claim was directly rejected by the Alabama Supreme Court in *Stone* and must be dismissed as a matter of law here. There, the plaintiffs similarly contended that "when they executed the note ... the parties did not contemplate fax fees when they entered into the loan contract" and that the charging of a fax fee therefore "violates the terms of the note." *Stone*, 771 So.2d at 455. Rejecting this argument, the Court adopted the rationale applied by an earlier federal court opinion:

> It would be difficult for form notes and mortgages that cover long time periods to anticipate and include each and every such incidental special request made by a borrower. Here the plaintiff was asking for faxed payoff statements in order to receive refinancing and take advantage of lower interest rates. To say that a borrower can make such requests for his or her own benefit, yet, under a principle such as *contra proferentum*, never allow the mortgage servicer to charge for the services unless they are specified in the loan documents would be an unreasonable interpretation of the contracts.

*Id.* (quoting *Cappellini v. Mellon Mortgage Co.*, 991 F. Supp. 31, 39-40 (D. Mass. 1997)). To the contrary, "it is not forbidden by the language of the Note and Mortgage to charge a fee for the extra services." *Id.*

Other courts have similarly held that the absence of express authority for charging a fee does not preclude a lender from charging the fee. "We do not believe that plaintiffs' mortgages and notes entitled them to receive free of charge any service not specifically referenced in the contract." *Krause v. GE Capital Mortgage Serv., Inc.*, 731 N.E.2d 302, 310 (Ill. App. Ct. 2000)

(fees charged for issuance of payoff statement and facsimile transmission of the statement are not in breach of contract). Applying *Krause*, the Illinois Appellate Court recently held that WAMU's imposition of a fee for payoff statements does not breach a note or mortgage agreement: "Although [plaintiff's] mortgage did not specifically permit payoff statement fees, it did not prohibit them either." *Pedroza v. Washington Mutual*, Case No. 1-03-2138, at 15 (Ill. App. Ct. Dec. 14, 2004) (attached hereto at Exhibit 5).[4] *See also Cain v. Source One Mortgage Servs. Corp.*, No. 43041-6-I, 1999 WL 674776, at *1 (Wash. Ct. App. Aug. 30, 1999) ("A lender who faxes a payoff statement at the borrower's request may charge a fax fee without violating the loan contract, even though the contract does not enumerate the fax fee as a responsibility of the borrower") (attached hereto at Exhibit 5); *Westfall v. Chase Lincoln First Bank, N.A.*, 258 A.D.2d 299, 300 (N.Y.A.D. 1999) (New York appellate court holding that mortgage did not prohibit charging fax fee).

Here, Plaintiffs' Note does not address the issuance of payoff statements or fees that may be charged for providing such a service. (Cmplt. Ex. A.) As in *Stone*, the mere absence of express authority to charge such a fee cannot form the basis of a breach of contract claim.

**B.    The Payoff Statement Fee Does Not Constitute A Prepayment Penalty.**

Plaintiffs alternatively contend that the imposition of a payoff statement violates an express provision of the Note. (Cmplt. ¶¶ 1, 15.) Although Plaintiffs do not specify any particular provision of the Note or Mortgage, they apparently contend that WAMU violated Section 4 of the Note, which provides:

---

[4] The Alabama Supreme Court has held that unpublished opinions from other jurisdictions may be relied upon as persuasive authority. *Stone*, 771 So.2d at 456 n.1.

13

4.  BORROWER'S RIGHT TO PREPAY.
I have the right to make payments of principal at any time before
they are due.  A payment of principal only is known as a
"prepayment." . . .

I may make a full prepayment or partial prepayments without
paying a prepayment charge. . . .

(*See* Cmplt. Ex. A, Note at 1.) Count I rests, therefore, on the proposition that the fee charged by

Washington Mutual for performing, at Plaintiffs' request, the additional service of preparing a

payoff statement constitutes a prohibited "prepayment charge."

This theory is hardly new, having been raised – and rejected – in many jurisdictions,

including in the context of payoff statement fees charged by WAMU.  For example, in *Stone*, the

Supreme Court cited the existence of a prohibition on prepayment penalties, *see* 771 So.2d at

453, but nonetheless held that charging a fee for transmitting a payoff statement did not violate

the parties' contract. *See also, e.g., Pedroza,* Case No. 1-03-2138, at 110-15 (payoff statement

fee charged by WAMU is not a prepayment penalty); *Krause,* 731 N.E.2d at 307-310 (fax fee

and payoff statement fees do not constitute prepayment penalties); *Colangelo v. Norwest*

*Mortgage, Inc.*, 598 N.W.2d 14, 17 (Minn. Ct. App. 1999) (fax fee was not prepayment penalty);

*Jerik v. Columbia Nat'l, Inc.*, No. 97 C 6877, 1999 WL 1267702, at *2-3 (N.D. Ill. Sept. 30,

1999) (payoff statement charges are not prepayment penalties) (attached hereto at Exhibit 5);

*Cappellini*, 991 F. Supp. at 38 (fax and payoff statement fees are not prepayment charges).

*Krause* is illustrative of these courts' reasoning.  There, as here, the loan documents

prohibited "prepayment charges." 731 N.E.2d at 304.  The defendant charged a fee for providing

a written payoff statement, and the plaintiffs alleged that this "charge" violated the mortgage's

prohibition of any prepayment charges. *Id.* at 304.  The Illinois Appellate Court rejected the

plaintiffs' position, concluding that the payoff statement fee was assessed for the service of

preparing the payoff statement and was not a penalty or charge for pre-paying the mortgage:

> A prepayment penalty is one that is peculiarly associated with prepayment alone, it is assessed at the time of prepayment, and it would not be charged if the loan was paid at maturity. Fees that could be imposed in connection with a payment in full at maturity, fees that are an addition to the loan principal, or fees that must be paid regardless of whether the loan is prepaid do not constitute prepayment penalties.

*Krause*, 314 Ill. App. 3d at 382-83, 731 N.E.2d at 307-08 (citations omitted).

Relying on *Krause*, the Illinois Appellate Court recently held that the fees charged by

WAMU for issuance of a payoff statement did not constitute "prepayment charges" under the

standard language Note. *Pedroza*, Case No. 1-03-2138, at 10-14. "The payoff statement fee that

Washington Mutual charged Pedroza was a fee assessed for a special service at the time the

service was rendered. It was not assessed because Pedroza paid off her loan early." *Id.* at 14.

This case is no different. The Complaint and its attachments make clear that Plaintiffs or

their agent requested the payoff statement from WAMU, and that WAMU performed the

requested service. (*See generally* Cmplt.) "The fax and statement fees are not prepayment

charges, but are rather charges for special services outside of the basic service agreement

provided to the borrower. . . . Simply because a fee is incurred during the prepayment of the

loan does not necessarily make it a prepayment charge or penalty for prepaying the loan."

*Capellini*, 991 F. Supp. at 38. The charge by WAMU was listed on the Payoff Statement and

would have been owed even if Plaintiffs had opted not to pay off the loan prior to maturity. (*See*

Cmplt. Ex. C, Payoff Statement at 1.)

The payoff statement, attached to Plaintiffs' Complaint, further evidences that the payoff

statement fee is not tied to the Plaintiffs' early payment of the loan. In one section, the statement

lists the amounts "required to pay this loan in full on 06/27/2003." The statement separately

advises that other amounts, including the payoff statement fee "are additional loan servicing fees that are due and owing to Washington Mutual relating to this transaction." (Cmplt. Ex. B.) Consequently, Plaintiffs cannot allege a breach of the Note simply by characterizing the payoff statement fee as a prepayment penalty.

This Court should rule as a matter of law that the payoff statement fee does not violate the Note and dismiss Count I with prejudice.

## IV.    COUNT II MUST BE DISMISSED FOR FAILURE TO ALLEGE THAT ANY FACTS WERE "SUPPRESSED."

It is axiomatic that a claim for "suppression of a material fact" must include actual suppression. *Davant v. United Land Corp.*, --- S.2d ---, 2004 WL 1909334, at *15 (Ala. Aug. 27, 2004) (attached hereto at Exhibit 5). "Where the record indicates that the information alleged to have been suppressed was in fact disclosed, and there are no special circumstances affecting the plaintiff's capacity to comprehend, the plaintiff cannot recover for suppression." *Id.* Here, Plaintiffs admit that WAMU disclosed the amount of the payoff statement fee "at the closing of the refinancing of the Note." (Cmplt. ¶ 19.) Given that WAMU disclosed the amount of the fee *before* Plaintiffs paid it, a claim for "suppression" can hardly be supported.[5] *Davant*, 2004 WL 1909334, at *15 ("plain disclosure to a person competent in intelligence and background to understand the disclosure is the legal antithesis of suppression, by definition").

## V.    COUNT III MUST BE DISMISSED BECAUSE THE ALABAMA MINI-CODE'S PROHIBITION OF PREPAYMENT PENALTIES DOES NOT APPLY TO WAMU.

In Count III, Plaintiffs assert that WAMU's imposition of a payoff statement fee violates the Alabama Mini-Code's prohibition on prepayment penalties. *See* Ala. Code §5-19-4(c).

---

[5] WAMU notes, and would establish if required, that Plaintiffs were aware of the payoff statement fee well before the refinancing, as Plaintiffs had requested three other statements in the four months before receiving the statement at issue.

However, in addition to the fact that the payoff statement fee is not a prepayment penalty (*see* Section III.B), by its own terms the Mini-Code does not apply to WAMU because WAMU is a federally chartered savings association.

The Mini-Code does not apply "where the creditor is exempt from licensing" under Alabama's rules regarding banks and financial institutions, Ala. Code § 5-19-31, and "banks chartered by the United States" are exempt from licensing. Ala. Code § 5-19-22. WAMU is a federally chartered savings association. *See, e.g., Rosenberg,* 849 A.2d at 571; *Haehl,* 277 F. Supp. 2d at 935; *Moskowitz,* 768 N.E.2d at 264. As a result, the Alabama Mini-Code's prohibition of prepayment penalties does not apply to WAMU, and Count III must be dismissed as a matter of law.

## VI.    COUNT IV MUST BE DISMISSED.

Count IV asserts that WAMU "acquired money" that "belongs rightly to Plaintiffs" and was "unjustly enriched." (Cmplt. ¶ 28.) Count IV is deficient foremost because a party cannot recover on a claim of unjust enrichment where there is an enforceable express contract between the parties. *See, e.g., Kennedy v. Polar-BEK & Baker Wildwood Partnership,* 682 So.2d 443, 447 (Ala. 1996) (implied contracts will not generally be recognized where parties' relationship is governed by express contract). Given that Plaintiffs acknowledge the existence of an express contract with WAMU, no claim for unjust enrichment may be had.

Separately, the Alabama Supreme Court had stated that "retention of a benefit is unjust if (1) the donor of the benefit . . . acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not

17

deemed to have been *unjustly* enriched." *Welch v. Montgomery Eye Physicians, P.C.*, 891 So.2d

837, 843 (Ala. 2004). Plaintiffs here have not alleged any facts establishing a mistake of fact or

misreliance on their part or that WAMU engaged in fraud, coercion or abuse of a confidential

relationship. Accordingly, Count IV must be dismissed.

## CONCLUSION

For all these reasons, Defendant Washington Mutual Bank, formerly known as

Washington Mutual Bank, F.A., respectfully requests that this Court dismiss Plaintiffs'

Complaint in its entirety.

Dated: April 27, 2005                              Respectfully submitted,

                                                   WASHINGTON MUTUAL BANK, F.A.

                                                   By: _____
                                                        One of Its Attorneys

P. Richard Hartley
Hartley & Hickman
415 East Commerce Street, Suite 101
P.O. Box 583
Greenville, Alabama 36037-0583
Telephone: (334) 382-6618
Fax: (334) 382-5183


OF COUNSEL:
Matthew M. Neumeier
Scott T. Schutte
Jenner & Block LLP
One IBM Plaza
Chicago, Illinois 60611
Telephone: (312) 222-9350
Fax: (312) 840-7301

## CERTIFICATE OF SERVICE

I hereby certify that I have this the 27TH day of April, 2005, mailed a copy of the foregoing Plaintiff's Notice of Discovery by placing the same properly addressed in the U. S. Mail, with sufficient postage to insure delivery, to the following:

    Randall K. Bozeman
    Bozeman & Bozeman
    P. O. Box 337
    Hayneville, AL 36040-0337

                    Of Counsel

# EXHIBIT 1

## IN THE CIRCUIT COURT OF LOWNDES COUNTY, ALABAMA

| | |
|---|---|
| KENNETH & DEBRA SCOTT, | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. _CW05-10_ |
| WASHINGTON MUTUAL BANK, F.A., | ) |
| Defendant. | ) |

### CLASS ACTION COMPLAINT

Come now the Plaintiffs, Kenneth & Debra Scott ("the Scotts" or "Plaintiffs"), and for their Complaint against Defendant Washington Mutual Bank, F.A. ("WAMU"), states as follows:

### INTRODUCTION

1.    This is an action against WAMU for the imposition of unconscionable, unauthorized, and excessive Payoff Fees ("PFs") in connection with the payoff and satisfaction of mortgage loans.  WAMU, which acquired the Scotts' mortgage loan, charged the Scotts **$180.00** in connection with the payoff of said mortgage loan, even though the Note does not authorize the charging of any such fee and prohibits any prepayment penalty.  WAMU has charged other mortgagees similar PFs to its other borrowers in connection with mortgage loans which WAMU owns, has acquired, or services, and has therefore acted willfully and intentionally in connection with the imposition of such PFs.

2.    Plaintiffs assert no causes of action arising under federal law, and Plaintiffs seek damages in this action on their individual claims of no more than $74,999 for all claims and causes of action asserted herein.

F:\wamu_COMPLAINT.doc

## PARTIES, JURISDICTION, AND VENUE

3.     Plaintiffs are resident citizens of Lowndes County, Alabama.

4.     WAMU is a bank chartered under the laws of a jurisdiction other than Alabama, with principal offices located in a state other than Alabama.

5.     Venue is proper in this Court.

## FACTUAL ALLEGATIONS

6.     On or about October 13, 1987, Plaintiffs contracted with Louis Shepherd Construction Co. ("Shepherd") for the construction of a house or home improvements to their house in Fort Deposit, Alabama. To pay for the construction work, Plaintiffs entered into an installment sales contract and security agreement ("Note") with Shepherd with a face amount of $49,700.00. A true and correct copy of the Note is attached as **Exhibit A** hereto.

7.     Shepherd sold the Note to Goldome Credit Corp. ("Goldome"), and ultimately, WAMU acquired the Note. Plaintiffs made their monthly payments, which were scheduled to be paid for 240 consecutive months (20 years).

8.     In June of 2003, Plaintiffs decided to refinance the remaining portion of the debt owed under the Note.

9.     On or about June 17, 2003, Plaintiffs refinanced their WAMU mortgage. WAMU sent a Demand/Payoff Statement ("Statement"), a true and correct copy of which is attached hereto as **Exhibit B,** which was used to calculate the payoff for closing. Without authorization, and without any contractual authority conferred in the Note, and in the face of a contractual prohibition on prepayment penalties in the Note, WAMU unilaterally charged Plaintiffs **$180.00** as a payoff fee.

## COUNT ONE – BREACH OF CONTRACT

13.    Plaintiffs reallege and adopt by reference all prior allegations of the Complaint, as if set forth fully herein.

14.    The Note is the only contract governing the business relationship between Plaintiffs and WAMU.  The Note does not authorize imposition of a PF.  The Note prohibits charging any prepayment penalty.

15.    By charging the PF to Plaintiffs, WAMU has breached the contract between Plaintiffs and WAMU.  WAMU had no colorable legal claim to the PF, because, among other reasons, the PF was not authorized by the Note, and because the imposition of the PF violates the provision in the Note prohibiting PFs.

16.    As a proximate result of said breach, Plaintiffs have suffered damage.

WHEREFORE, Plaintiffs demand judgment against WAMU in such amount as may be found at trial, together with attorneys' fees, interest and costs of this action.

## COUNT TWO – SUPPRESSION OF MATERIAL FACT

17.    Plaintiffs reallege and adopt by reference all prior allegations of the Complaint, as if set forth fully herein.

18.    WAMU had a duty to disclose to Plaintiffs, at the time it acquired Plaintiffs' loan or as soon thereafter as WAMU commenced charging PFs, that it would charge a PF, including the amount thereof, to Plaintiffs in the event they paid off the Note before its maturity.

19.    WAMU failed to disclose the amount of the PF until Plaintiffs requested the Statement, which was provided at the closing of the refinancing of the Note.

20.     Plaintiffs reasonably relied on WAMU's non-disclosure of the PF.

21.     As a proximate cause thereof, Plaintiffs were damaged in that Plaintiffs were forced to pay monies which were not lawfully required to be paid; they suffered mental anguish and aggravation; and such other damages as may be proven at trial.

22.     Because WAMU has consciously and deliberately engaged in the suppression of these PFs to Plaintiffs and other borrowers, WAMU is liable for punitive damages as well.

23.     WHEREFORE, Plaintiffs demand judgment against WAMU in such amount as may be proven at trial for compensatory damages, punitive damages, attorneys' fees, interest and costs of this action.

## COUNT THREE – VIOLATION OF ALABAMA MINI-CODE

24.     Plaintiffs reallege and adopt by reference all prior allegations of the Complaint, as if set forth fully herein.

25.     WAMU's imposition of the PF violates the Alabama Mini-Code, Ala. Code § 5-19-1, in that (1) section 5-19-4(c) prohibits the imposition of any prepayment penalty, and the $180.00 PF is a prepayment penalty; and/or (2) even if it is not a prepayment penalty, the imposition of a $180.00 PF is so excessive that, even if it were authorized by the contract (which it was not) or were otherwise recoverable under other law (which it is not), it is unconscionable and therefore in violation of section 5-19-16.

26.     Based on the averments in paragraph 23, Plaintiffs are entitled to recover actual damages under Ala. Code § 5-19-19, together with interest, costs, and attorneys fees.

WHEREFORE, Plaintiffs demand judgment against WAMU in such amount as may be proven at trial for all damages, fees, and costs under Ala. Code 5-19-19.

## COUNT FOUR - UNJUST ENRICHMENT & MONEY HAD AND RECEIVED

27.    Plaintiffs reallege and adopt by reference all prior allegations of the Complaint, as if set forth fully herein.

28.    WAMU has acquired money which in equity and good conscience belongs rightly to Plaintiffs. WAMU has thus been unjustly enriched at the expense of Plaintiffs, and equity demands that WAMU return the money to Plaintiffs which was wrongfully taken.

WHEREFORE, Plaintiffs demand judgment against WAMU on behalf of themselves and all putative class members in such amount as may be proven in equity, together with interest and costs.

## CLASS ACTION ALLEGATIONS

29.    Plaintiffs reallege and adopt by reference all prior averments in the Complaint, as if set forth fully herein.

30.    Pursuant to Ala. R. Civ. P. 23(b)(3), Plaintiffs bring this action on behalf of themselves and a putative class of persons defined as follows: all persons residing in the United States who, from six years prior to the filing of this action up to and including the date of final judgment herein, were charged a PF in any amount by WAMU or any affiliate bank or corporation of WAMU.

31.    Count Three is brought on behalf of a subclass consisting of all persons who, from two years prior to the filing of this action up to and including the date of final judgment herein, were charged a PF by WAMU or any affiliate bank or corporation of

WAMU in connection with the satisfaction of a mortgage encumbering property located in the State of Alabama.

32.    The elements of Rule 23(a) are met in this case, in that (1) the class is so numerous that joinder of individual members of the class is impractical; (2) there are questions of law and/or fact which are common throughout the class; (3) the claims of the Plaintiffs and defenses thereto are typical of the claims of the class members and defenses thereto; and (4) Plaintiffs and their counsel will adequately represent the interests of absent class members.

33.    The elements of Rule 23(b)(3) are also satisfied in this case, in that the common questions of law and fact predominate over individual questions. Among the common issues to be decided are as follows:

    a.    whether the Note and other contracts between WAMU and its mortgagees authorize imposition of a PF in any amount, including but not limited to the amount charged by WAMU for the PF;

    b.    whether the imposition of a PF which is unauthorized by the contract or Note constitutes a prepayment penalty under the Alabama Mini-Code, Ala. Code 5-19-4;

    c.    whether the charging of a PF which is not authorized by the Note or other contract is unconscionable under Ala. Code 5-19-16.


**PLAINTIFFS DEMAND TRIAL BY JURY AS TO COUNTS 1-3.**

Randall K. Bozeman
Attorney for Plaintiffs

**OF COUNSEL:**
Bozeman & Bozeman
P.O. Box 337
Hayneville, Alabama 36040-0337
(334) 548-2233

**SERVE DEFENDANT BY CERTIFIED MAIL AS FOLLOWS:**
Washington Mutual Bank, F.A.
1201 Third Ave WMT
Seattle, WA 98501

Washington Mutual Bank, F.A.
400 East Main Street
Stockton, CA, 95290

Washington Mutual Bank, F.A.
c/o THERESA M MARCHLEWSKI
9200 OAKDALE AVENUE N1107101
CHATWWORTH, CA 91311

E:\wamu_COMPLAINT.doc

7

# NOTE

OCTOBER 13 , 19 87                          FT. DEPOSIT     ALABAMA
                                                  [City]            [State]

[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 49,700.00   (this amount is called
"principal"), plus interest, to the order of the Lender. The Lender is LOUIS J. SHEPHERD CONST. CO., INC.
    DBA ACEDING HOMES                                               . I understand
that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to
receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a
yearly rate of  10.5    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in
Section 6(B) of this Note.

### 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the 1st    day of each month beginning on   FEBRUARY 1,
19 88    I will make these payments every month until I have paid all of the principal and interest and any other charges
described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on
    JANUARY 1  , 2008  , I still owe amounts under this Note, I will pay those amounts in full on that date,
which is called the "maturity date."

I will make my monthly payments at   4430-C GOVERNMENT BLVD. MOBILE, AL., 36609
                                      or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 496.19

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is
known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder
will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial
prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder
agrees in writing to those changes.

### 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest
or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any
such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums
already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make
this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces
principal, the reduction will be treated as a partial prepayment.

### 6. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    10    calendar
days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5    % of my
overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount
by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid
and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is
delivered or mailed to me.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described
above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the
right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable
law. Those expenses include, for example, reasonable attorneys' fees.

### 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given
by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the
Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the
Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different
address.

MULTISTATE FIXED RATE NOTE—Single Family—FNMA/FHLMC UNIFORM INSTRUMENT
Financial Law Forms
Form 1649                                                           Form 3200  12/83

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:
1.  **Payment of Principal and Interest; Prepayment and Late Charges.**  Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2.  **Funds for Taxes and Insurance.**  Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") equal to one-twelfth of: (a) yearly taxes and assessments which may attain priority over this Security Instrument; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard insurance premiums; and (d) yearly mortgage insurance premiums, if any. These items are called "escrow items." Lender may estimate the Funds due on the basis of current data and reasonable estimates of future escrow items.

The Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay the escrow items. Lender may not charge for holding and applying the Funds, analyzing the account or verifying the escrow items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing that interest shall be paid on the Funds. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Security Instrument.

If the amount of the Funds held by Lender, together with the future monthly payments of Funds payable prior to the due dates of the escrow items, shall exceed the amount required to pay the escrow items when due, the excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly payments of Funds. If the amount of the Funds held by Lender is not sufficient to pay the escrow items when due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as required by Lender.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 19 the Property is sold or acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Security Instrument.

3.  **Application of Payments.**  Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to late charges due under the Note; second, to prepayment charges due under the Note; third, to amounts payable under paragraph 2; fourth, to interest due; and last, to principal due.

4.  **Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5.  **Hazard Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 19 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6.  **Preservation and Maintenance of Property; Leaseholds.**  Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

7.  **Protection of Lender's Rights in the Property; Mortgage Insurance.**  If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

9. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

"CAUTION — IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT."

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

[Sign Original Only]

Washington Mutual IVR Payoff          JUN-18-03      03:13        Page:1

```
                        WASHINGTON MUTUAL
                      DEMAND/PAYOFF STATEMENT
                      ------------------------
                             06/17/2003
TO: KENNETH SCOTT            RE: Loan No. 9085927317213
KENNETH SCOTT                    KENNETH SCOTT
DEBRA SCOTT                      DEBRA SCOTT
PO BOX 324
FORT DEPOSIT      AL 36032
                                      OLD CALHOUN RD
                              FORT DEPOSIT           AL
                              Loan Type - Conventional
```

```
*****************************************************************
*PAYOFF FIGURES MUST BE VERIFIED WITHIN 24 HOURS PRIOR TO *
*PAYOFF. THE TOTAL AMOUNT NECESSARY TO PAY OFF THE LOAN IS*
*SUBJECT TO FINAL VERIFICATION FROM THE NOTEHOLDER. WE    *
*RESERVE THE RIGHT TO ADJUST THESE FIGURES AND REFUSE ANY *
*FUNDS THAT ARE NOT SUFFICIENT TO PAY OFF THE LOAN IN     *
*FULL. (THIS INCLUDES, BUT IS NOT LIMITED TO, DISHONORED  *
*PAYMENTS, DISBURSEMENTS OR ADJUSTMENTS MADE BETWEEN THE  *
*DATE OF THIS DEMAND/PAYOFF STATEMENT AND THE RECEIPT OF  *
*THE PAYOFF FUNDS.) FOR SAME DAY CREDIT, PAYOFF FUNDS MUST*
*BE RECEIVED BY 3:00 PM CST MONDAY THROUGH FRIDAY.        *
******* PLEASE CALL (800)282-4840 TO VERIFY AMOUNTS *******
```

The following amounts are required to pay this loan in full
on 06/27/2003. The next scheduled payment due on this loan
is the 06/01/2003 payment.

```
Current total unpaid Principal Balance    $    22269.55
Interest to 06/27/2003 at 10.500%              361.42

TOTAL TO PAY LOAN IN FULL ON 06/27/2003.  $    22630.97

IF NOT PAID IN FULL BY 06/27/2003, ADD
DAILY INT. (per diem)                     $        6.41
```

The following amounts are additional loan servicing fees
that are due and owing to Washington Mutual relating to
this transaction.

```
Unpaid Late Charges and/or other fees          49.62
PAYOFF STATEMENT FEE                           180.00
RECORDING FEE                                    9.50

TOTAL AMOUNT DUE TO WASHINGTON MUTUAL        22870.09
```

THIS LOAN HAS AN ESCROW ACCOUNT. ESCROW DISBURSEMENTS WILL
CONTINUE TO BE MADE AS SCHEDULED UNTIL LOAN IS PAID IN FULL

DEMAND/PAYOFF STATEMENT (Cont.)
Issued: 06/17/2003                    Loan no. 9085927317213

Issuance of this statement does not suspend the requirement
to make the loan payment when as due under the loan
contract. A late charge of $    24.81 will be assessed
and added to the total due if any payment is received 15
or more days after the due date of any payment.

It is the customer's responsibility to cancel any automatic
payment arrangement. Washington Mutual's AutoPay service
continues to withdrawl unless cancellation is requested and
received in this office at least 10 business days prior to
the withdrawl date. Do not stop payment on any payment
already made. Overpayments will be refunded within 15 days
of receipt of good payoff funds. If this property is sold
to another party, please provide the seller's forwarding
address.

Washington Mutual does not assume any liability for any
escrow shortage due to a disbursement made after the date
of this quote and according to the terms of the loan
contract.

If property taxes have been paid through an escrow account
for this loan, they will become the property owner's
responsibility after loan payoff. if a property tax bill
is not received, the property owner should contact the
local taxing authority for this information. Washington
Mutual will not be responsible for interest and penalties
if property taxes are not paid.

ALL REMITTANCES MUST BE MADE BY CASHIER'S CHECK, CERTIFIED
FUNDS OR WIRE TRANSFER. PAYOFFS OVER $1,000,000.00 MUST BE
WIRED. PLEASE DIRECT FUNDS TO:

OVERNIGHT DELIVERY              WIRE INSTRUCTIONS
------------------              -----------------
WASHINGTON MUTUAL BANK, FA      ABA Number: 0750-0002-2
ATTN: Payoff Unit - Ste 908    Beneficiary: WaMu Loan Payoff
11200 W. Parkland Ave.         Beneficiary Acct: 182380181590
Milwaukee, WI 53224            Borr: KENNETH SCOTT
(Ref Name & Loan # on Check)   Loan #: 9085927317213

The lien release will be mailed in accordance with
applicable laws and the loan documents. The lien will not
be release if: 1)any funds previously received are rejected
by the bank upon which it is drawn or 2)an insufficient
amount is received to pay off the loan in full.

For verification or update of figures, please call
Washington Mutual's Customer Care Center at
800-282-4840. In most cases, updated payoff amounts can be
obtained through our automated response system.
A Customer Care Specialist may be reached
Monday - Friday 7:00am - 8:00pm and
Saturday 8:00am - 1:00pm.

# EXHIBIT 2

06/04/2003 20:33 FAX  4807567289          US BANK                                    @021/028

6308727

224

FILED IN PROBATE OFFICE
LOWNDES COUNTY, ALABAMA

1587 OCT 29 AM 2:53

vol 28 X
PAGE 224-27
O.P. WOODRUFF, JUDGE

LOWNDES COUNTY, ALABAMA
I 24 55 hereby certify that
a _____ Privilege Tax
has been paid on the within
instrument as required by law.

_O.P. Woodruff_
Judge of Probate

59273/1743

[Space Above This Line For Recording Data]

# MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on    OCTOBER 13
19 87. The grantor is   KENNETH EARL SCOTT & WIFE DEBORAH T. SCOTT
                                                    ("Borrower"). This Security Instrument is given to LOUIS J.
SHEPHERD CONST. CO., INC. DBA ACCEDING HOMES                         , which is organized and existing
under the laws of     ALABAMA                , and whose address is  4430-C GOVERNMENT
BLVD.  MOBILE, AL. ,36609                                                            ("Lender").
Borrower owes Lender the principal sum of   FORTY NINE THOUSAND SEVEN HUNDRED DOLLARS
                          Dollars (U.S. $ 49,700.00      ). This debt is evidenced by Borrower's note
dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not
paid earlier, due and payable on   JANUARY 1, 2008                       . This Security Instrument
secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and
modifications; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this
Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and
the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and
assigns, with power of sale, the following described property located in   LOWNDES                County, Alabama:

    A parcel of land in Section 21, T12N, R15E, containing 5 acres
    more or less, in the Town of Port Deposit, Lowndes County, Alabama,
    being more particularly described as follows:  Commence at the NE corner,
    NW-¼, SW-¼, Section 21, T12N, R15E, thence S-01°-12'-49"E 491.81 feet
    to an iron, this being the point of beginning, continue S-01°-12'-49"E
    441.6 feet to a concrete monument, thence West 171.0 feet to an iron,
    thence South 252.08 feet to an iron on North ROW of paved street, thence
    S-76°-03'-21"-W 215.05 feet to a concrete monument on North ROW paved
    road, thence North 715.4 feet to a concrete monument, thence N-85°-22'-
    13"-E 371.6 feet to the point of beginning.

which has the address of   RT BOX 308                          LETOHATCHEE
                                          [Street]                                    [City]

Alabama      36047              ("Property Address");
              [Zip Code]

    TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all
the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties,
mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All
replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this
Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to
mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.
Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any
encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with
limited variations by jurisdiction to constitute a uniform security instrument covering real property.

This instrument was prepared by    JAMIE LOPER
                                          4430-C GOVERNMENT BLVD.
                                          MOBILE, AL., 36609

08/04/2003 20:34 FAX 4807567289          US BANK                                    022/028

225

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:

1.  Payment of Principal and Interest; Prepayment and Late Charges.  Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2.  Funds for Taxes and Insurance.  Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") equal to one-twelfth of: (a) yearly taxes and assessments which may attain priority over this Security Instrument; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard insurance premiums; and (d) yearly mortgage insurance premiums, if any. These items are called "escrow items." Lender may estimate the Funds due on the basis of current data and reasonable estimates of future escrow items.

The Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay the escrow items. Lender may not charge for holding and applying the Funds, analyzing the account or verifying the escrow items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing that interest shall be paid on the Funds. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Security Instrument.

If the amount of the Funds held by Lender, together with the future monthly payments of Funds payable prior to the due dates of the escrow items, shall exceed the amount required to pay the escrow items when due, the excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly payments of Funds. If the amount of the Funds held by Lender is not sufficient to pay the escrow items when due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as required by Lender.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 19 the Property is sold or acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Security Instrument.

3.  Application of Payments.  Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to late charges due under the Note; second, to prepayment charges due under the Note; third, to amounts payable under paragraph 2; fourth, to interest due; and last, to principal due.

4.  Charges; Liens.  Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5.  Hazard Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 19 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6.  Preservation and Maintenance of Property; Leaseholds.  Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Lender agrees to the merger in writing.

7.  Protection of Lender's Rights in the Property; Mortgage Insurance.  If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

08/04/2003 20:34 FAX 4807587289          US BANK                          ☐023/028

If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the insurance in effect until such time as the requirement for the insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

**8. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**10. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**12. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**13. Legislation Affecting Lender's Rights.** If enactment or expiration of applicable laws has the effect of rendering any provision of the Note or this Security Instrument unenforceable according to its terms, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument and may invoke any remedies permitted by paragraph 19. If Lender exercises this option, Lender shall take the steps specified in the second paragraph of paragraph 17.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note had no acceleration occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraphs 13 or 17.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**19. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraphs 13 and 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other

06/04/2003 20:34 FAX  4807567289        US BANK                                 ☐ 024/029

defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 19, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower in the manner provided in paragraph 14. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in _____ County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

20. Lender in Possession. Upon acceleration under paragraph 19 or abandonment of the Property, Lender (in person, by agent or by judicially appointed receiver) shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. Any rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Security Instrument.

21. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

22. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witness __Jamie Logan_____        _____Kenneth Earl Scott____ (Seal)
                                                                                        —Borrower
_____        _____Deborah T. Scott_____ (Seal)
                                                                                        —Borrower

---

INDIVIDUAL ACKNOWLEDGEMENT

STATE OF ALABAMA                )
COUNTY OF _____MOBILE_____  )

I, the undersigned, a Notary Public in and for said County, in said State, hereby certify that __KENNETH EARL SCOTT & WIFE DEBORAH T. SCOTT__ whose name(s) is/are signed to the foregoing conveyance and who is/are known to me, acknowledged before me on this day that, being informed of the contents of the conveyance he/she/they executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the __13th__ day of __OCTOBER__ , 19__87__

                                        ___Jane L Noble___
                                        Notary Public    MY COMMISSION EXPIRES 12-2-90
                                        My Commission Expires:

---

TRANSFER AND ASSIGNMENT

STATE OF ALABAMA                )
COUNTY OF _____MOBILE_____  )

For value received __LOUIS J. SHEPHERD CONST. CO., INC. DBA ACEDING HOMES__ hereby warrants, assigns and conveys unto GOLDOME CREDIT CORPORATION, all right, title, interest, powers and options in, to and under the within Mortgage, as well as to the land described therein and the indebtedness secured thereby.

In witness whereof the undersigned __LOUIS J. SHEPHERD AS PRESIDENT__ hereunto set HIS Hand and seal, this __13th__ day of __OCTOBER__ , 19__87__

                                        ___Louis J. Shepherd___ (Seal)
                                        PRESIDENT

---

CORPORATE ACKNOWLEDGEMENT

STATE OF ALABAMA                )
COUNTY OF _____MOBILE_____  )

I, the undersigned, a Notary Public in and for said County, in said State, hereby certify that __LOUIS J. SHEPHERD__ whose name as __PRESIDENT__ of __LOUIS J. SHEPHERD CONST. CO., INC. DBA ACEDING HOMES__ is signed to the foregoing conveyance and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, he/she as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal this the __13th__ day of __OCTOBER__ , 19__87__

                                        ___Jane L Noble___
                                        Notary Public    MY COMMISSION EXPIRES 12-2-90
                                        My Commission Expires:

---

INDIVIDUAL ACKNOWLEDGEMENT

STATE OF ALABAMA                )
COUNTY OF _____  )

I, the undersigned, a Notary Public in and for said County, in said State, hereby certify that _____ whose name(s) is/are signed to the foregoing conveyance and who is/are known to me, acknowledged before me on this day that, being informed of the contents of the conveyance he/she/they executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this the ____ day of _____ , 19___

                                        _____
                                        Notary Public
                                        My Commission Expires:

# EXHIBIT 3

**Date:** March 10, 1999.

**Summary Conclusion:** Federal law preempts the manner in which the California Unfair Competition Act ("California Laws") have been applied to impermissibly interfere with three aspects of a federal savings association's lending operations—advertising, the forced placement of hazard insurance, and the imposition of loan-related fees. Although the California Laws are the types of state laws that federal law generally does not preempt, these particular applications of the state laws are preempted because they have more than an incidental effect on lending, and are inconsistent with the objective of allowing a federal savings association to operate in accordance with a uniform federal scheme. The California Laws are not preempted in their entirety, but only to the extent they are used to (i) require a particular form of interest rate disclosure, (ii) limit loan fees, or (iii) limit the choice of hazard insurer or premium charged—three areas of lending that traditionally have been within the exclusive purview of federal law and regulations, and in which state law generally is preempted by federal law.

**Subject:** Home Owners' Loan Act/Savings Association Powers.



**Office of Thrift Supervision**
Department of the Treasury

**P-99-3**

*Chief Counsel*

1700 G Street, N.W., Washington, DC 20552 · (202) 906-6251

March 10, 1999

[

]

Re:   **California Unfair Competition Act**

Dear [            ]:

This responds to your inquiry submitted on behalf of [
], a savings and loan holding company, and its two wholly-owned federal savings
association subsidiaries, [                              ] ("Association A") and
[                      ] ("Association B"), located in [                    ]
(Association A and Association B are collectively referred to herein as the
"Associations"). You request that the Office of Thrift Supervision ("OTS") confirm
your conclusion that federal law preempts the application of provisions of the California
Unfair Business Practices Statute[1] and the California Deceptive, False and Misleading
Advertising Statute[2] (collectively, the "Unfair Competition Act" or "UCA") to the
Associations in three specific areas of their lending operations: (1) advertising; (2) the
forced placement of hazard insurance; and (3) the imposition of certain loan-related
fees.

In brief, we conclude that, in the narrow circumstances you describe, federal law
preempts the manner in which specified provisions of the UCA have been applied to the
Associations that interferes with the Associations' lending activities in the areas of
advertising, the forced placement of hazard insurance and the imposition of certain
specified loan-related fees.

---

[1]  Cal Bus. & Prof. Code §§ 17200 et seq.

[2]  Cal Bus. & Prof. Code §§ 17500 et seq.

2

## I.     Background

### A.     The Associations

The Associations are headquartered and conduct a substantial portion of their lending activities in California.  A significant portion of the Associations' business consists of originating residential and multi-dwelling mortgage loans and servicing the mortgage loans that they own.

### B.     The UCA

#### 1.     The UCA as written

Under § 17203 of the UCA, any "person" (which includes corporations) engaging in "unfair competition" may be enjoined in any court of competent jurisdiction and the court may order restitution of any interest in money or property acquired by means of such unfair competition.[3]  The UCA defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) . . . of the Business and Professions Code."[4]

You have advised us that California courts have interpreted other key terms left undefined in the statute.  For instance, under the UCA, a "practice" can be based on a pattern of behavior pursued in a course of business, and can include a single act if that act affects plaintiffs on a classwide basis.[5]  "Unlawful" business practices are those that violate any predicate law, state or federal, civil or criminal, even if the predicate law does not provide for a private cause of action.[6]  An "unfair" business practice is one whose harm to the victims outweighs its benefits to society.[7]  "Fraudulent" business

---

[3]  Cal. Bus. & Prof. Code §§ 17201, 17203.

[4]  Cal. Bus. & Prof. Code § 17200.

[5]  Allied Grape Growers v. Bronco Wine Co., 249 Cal. Rptr. 872, 884 (1988); People v. Casa Blanca Convalescent Hospital, Inc., 206 Cal. Rptr. 164, 174-75 (1987).

[6]  See, e.g., Committee on Children's Television v. General Foods Corp., 673 P.2d 660, 668 (Cal. 1983); Barquis v. Merchants Collection Ass'n., 496 P.2d 817, 829-31 (Cal. 1972); Podolsky v. First Healthcare Corp., 58 Cal. Rptr.2d 89, 98 (1996).

[7]  See, e.g., Motor's Inc. v. Times Mirror Co., 162 Cal. Rptr. 543, 546 (1980).  The court noted that this definition is intentionally broad in order to allow courts maximum discretion to prohibit new schemes to defraud.

3

conduct is any conduct by which the public is likely to be deceived; no actual deception, reasonable reliance, or damages are required.[8]

Section 17500 of the UCA forbids "untrue or misleading" advertising in connection with the disposition of real or personal property or services. This prohibition is very similar to the UCA's definition of "unfair competition" in § 17200 as "unfair, deceptive, untrue or misleading advertising."[9] The Supreme Court of California has noted that, under § 17500, an advertisement is "untrue or misleading" if it is likely to deceive the audience, and the intent of the disseminator and the knowledge of the customer are irrelevant.[10] You have informed us that alleged violations of the two statutes are generally pled and litigated as a single cause of action, and that California courts do not distinguish between the two.

California courts have noted that, under § 17200, violation of the UCA is a strict liability offense.[11] There is no need to show that the defendant intended to injure anyone.[12]

Under the UCA, the California Attorney General and county district attorneys have the express right to sue for unfair competition violations on behalf of the people of California or upon the complaint of any person, corporation or association.[13] An action also may be brought by any person acting for the interests of itself, its members or the general public.[14]

---

[8] Committee on Children's Television, 673 P.2d at 668-69.

[9] Indeed, as noted, § 17200 specifically incorporates acts that violate § 17500. Section 17500, however, appears to be narrower than § 17200 in three respects. First, § 17500 applies only to false advertising, whereas § 17200 also forbids "fraudulent business practices." Second, § 17500 is limited to advertising that concerns real or personal property or services or the circumstances of their disposition or performance, whereas § 17200 contains no such limitation. Third, a defendant violates § 17500 only if he knows the advertising is false or misleading or in the exercise of reasonable care should know it to be, whereas § 17200 imposes strict liability.

[10] Chern v. Bank of America, 544 P.2d 1310, 1316 (Cal. 1976).

[11] Podolsky, 58 Cal. Rptr.2d at 98.

[12] Id.; State Farm Fire and Cas. Co. v. Superior Court, 53 Cal. Rptr.2d 229, 233-34 (1996).

[13] Cal. Bus. & Prof. Code § 17204.

[14] Id.

4

The UCA authorizes a trial court to fashion a remedy to prevent unfair trade practices.[15]  The trial court can also make such orders and judgments as may be necessary to restore to a person any money or property that may have been acquired by means of unfair competition.[16]  Remedies under the UCA are cumulative to each other and to the remedies or penalties available under other state laws.[17]

In addition to injunctive relief, the UCA provides that public officials (but not private litigants) can sue for civil penalties for violations.[18]  Any civil penalties collected by state and local officials in prosecuting an unfair competition claim are required to be paid to the state and local entities bringing such suit.[19]

## 2.    The UCA as applied

You represent that the UCA has been broadly interpreted and applied and cite several aspects of the statute to support your position.  First, you maintain that the statutory terms in the UCA have been defined broadly.  For instance, you indicate that California courts interpreting the UCA have found that the UCA does not require a breach of contract, or a violation of real property, commercial or tort law, but rather merely a finding of "unfairness" to sustain a cause of action.[20]  As noted above, a business practice is "unfair" if its harm to the victims outweighs its benefits to society, and this term has been interpreted broadly to allow courts maximum flexibility to prohibit new schemes to defraud.[21]

---

[15]  Cal. Bus. & Prof. Code § 17203.

[16]  Id.

[17]  Cal. Bus. & Prof. Code § 17205.  This aspect of the UCA is borne out by the examples of UCA claims filed against the Association discussed infra at 7-9.  In two of those examples, UCA claims based on the forced placement of insurance and the imposition of loan-related fees, the complaints included a variety of other causes of action, such as breach of contract, conversion, RICO violations, and unjust enrichment.

[18]  Cal. Bus. & Prof. Code § 17206(a).

[19]  Id.

[20]  See, e.g., Motor's Inc. v. Times Mirror Co., 162 Cal. Rptr. 543, 546 (1980); Chern v. Bank of America, 544 P.2d 1310, 1316 (Cal. 1976).

[21]  See Motor's Inc., 162 Cal. Rptr. at 546.

5

You further represent that under the UCA's definition of "fraudulent conduct," i.e., any conduct in which the public is likely to be deceived,[22] there is no requirement that a person actually be deceived or suffer any damages as a result of fraudulent conduct or reliance thereon.[23] Even a true statement can constitute "fraudulent conduct" if it is likely to deceive the public.[24]

Similarly, you indicate that under the UCA § 17200, "unfair, deceptive, untrue or misleading advertising" is advertising by which a person is likely to be deceived.[25] California courts have defined "untrue or misleading" advertising under UCA § 17500 in the same way.[26]

These broad definitions are in contrast to another state unfair business practices statute that the OTS has reviewed, the Indiana Deceptive Acts and Practices Statute, and discussed in a December 24, 1996 OTS opinion ("1996 Opinion").[27] Unlike the open-ended terms to describe "unfair" business practices in the UCA, the Indiana statute reviewed in the 1996 Opinion set out a list of specific acts or representations that were deemed to be "deceptive" acts, thereby providing some certainty as to what types of activities violated the statute.[28] (We note that the California Civil Code contains a provision, § 1770 (part of the "Consumers Legal Remedies Act"[29]), that is structured

---

[22] Committee on Children's Television v. General Foods Corp., 673 P.2d 660, 668-69 (Cal. 1983) (construing § 17200 of the UCA).

[23] Id.

[24] Id. at 668, citing Chern v. Bank of America, 544 P.2d 1310, 1316 (Cal. 1976).

[25] Committee on Children's Television, 673 P.2d at 668-69.

[26] See, e.g., Chern, 544 P.2d at 1316.

[27] OTS Op. Chief Counsel (December 24, 1996), construing the Indiana Deceptive Acts and Practices Statute, Ind. Code §§ 24-5-0.5-1 et seq. (1995).

[28] Ind. Code § 24-5-0.5-3(a). Statutory examples of such "deceptive" acts included: representing that a specific price advantage exists as to the subject of a consumer transaction, if it does not and the supplier knows or should reasonably know that it does not; and representing that a consumer transaction involves or does not involve a warranty, a disclaimer of warranties, or other rights, remedies or obligations, if the representation is false and if the supplier knows or should reasonably know that the representation is false. Ind. Code at §§ 24-4-0.5-3(a)(6) and (8) (1995).

[29] Cal. Civ. Code §§ 1750 et seq. (West 1998).

6

like the Indiana statute.[30] You do not ask, however, about Civil Code § 1770, and therefore we do not consider its impact, if any, on your inquiry.)

You also indicate that the UCA's standing rules are extremely liberal and contrast sharply with the standing requirements of traditional areas of state jurisdiction, such as contract or tort law. For instance, under the UCA, any "person" (including corporations) may bring an action "for the interests of itself, its members, or the general public,"[31] and, in cases where a plaintiff sues on behalf of the general public, the plaintiff need not prove actual harm by the allegedly unfair business practices or personal dealings with the defendant.[32] Nor must the plaintiff bring the suit as a class action, where he must show he will fairly and adequately protect the interests of the class, and where other affected persons would be bound by the outcome.

As one commentator has noted, many states, like California, have extended to private consumers the right to sue for deceptive and unfair business practices, creating problems between enforcement of the Federal Trade Commission ("FTC") Act[33] and many state deceptive and unfair business practices statutes.[34] The UCA's allowance for actions by private litigants is in contrast to the enforcement mechanism in the FTC Act, on which the UCA is based.[35] The FTC Act requires that the FTC proceed only when it appears that doing so is in the public interest, and only the FTC may prosecute an

---

[30] Cal. Civ. Code § 1770 (West 1998 and Supp. 1999).

[31] Cal. Bus. & Prof. Code § 17204.

[32] You maintain that the private standing to remedy unfair practices on behalf of the general public does not require the numerosity, commonality, adequacy, typicality, manageability, or other requirements of class actions under the California or Federal Rules of Civil Procedure.

[33] 15 U.S.C.A. §§ 41 et seq. (West 1997).

[34] See Sovern, "Private Actions Under the Deceptive Trade Practices Acts: Reconsidering the FTC Act as Rule Model," 52 Ohio St.L.J. 437 (Spring 1991) at 437 ("While [extending private rights of action] has indeed aided injured consumers, it has also generated problems of its own") and 452 ("'Little FTC Acts' arm consumers with a powerful weapon against merchants, enabling consumers to prevail even when it may not be in society's interest for them to win").

[35] See, e.g., Rubin v. Green, 847 P.2d 1044, 1052 (Cal. 1993) (the UCA is one of the so-called "little FTC Acts" enacted by many states).

7

action under the Act.[36] Individual consumers have no recourse when the FTC declines to bring a case.[37] But once the FTC obtains a remedy, it would benefit all consumers.

You also claim that the UCA's remedial authority is sweeping.[38] You note that California appellate courts have found that a trial court in a UCA proceeding has broad authority to fashion a remedy that not only enjoins unfair trade practices, but requires specific actions designed to deter the defendant and others from engaging in such practices in the future.[39] You further represent that there is no requirement that penalties be tied to the actual harm suffered.[40] Moreover, once calculated, penalties may be imposed jointly and severally on all defendants.[41]

You argue that this combination of broad definitions, liberal standing requirements, and generous remedial provisions makes UCA claims extremely attractive for plaintiffs to pursue and nearly impossible for the Associations to defend or obtain finality as to acceptable practices. You indicate that the UCA has been increasingly used as a vehicle to challenge aspects of the Associations' and other federal thrifts' lending operations that historically have been within the purview of federal law.

### 3.    UCA claims filed against the Associations based on their lending activities

In support of your request, you inform us that the Associations have faced, or are currently facing, litigation brought under the UCA challenging certain aspects of the Associations' lending operations as "unfair." You argue that, although the UCA is

---

[36] Holloway v. Bristol-Meyers Corp., 485 F.2d 986 (D.C. Cir. 1973); Carlson v. Coca-Cola Co., 483 F.2d 279 (9th Cir. 1973). Compare 15 U.S.C. § 45(b) (FTC may issue a complaint if "it shall appear to the [FTC] that a proceeding by it in respect [to an unfair or deceptive business practice] would be in the interest of the public . . .") with Cal. Bus. & Prof. Code § 17204 (Actions may be brought "by any person acting for the interests of itself . . . ").

[37] Heckler v. Chaney, 470 U.S. 821 (1985) (Food and Drug Administration refusal to commence proceeding is not reviewable absent statute so providing).

[38] Cal. Bus. & Prof. Code § 17203.

[39] See McConnell v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 662 P.2d 916, 920 (Cal. 1983); People v. Toomey, 203 Cal. Rptr. 642, 654 (1984).

[40] People v. Toomey, 203 Cal. Rptr. at 657.

[41] People v. Bestline Products, Inc., 132 Cal. Rptr. 767, 794-96 (1976).

8

not directly aimed at federal savings associations, or lenders in general, it has been used by plaintiffs to challenge areas of the Associations' lending activities that have traditionally been governed by federal law.

You provide three examples of lending activities that have been challenged under the UCA—advertising, the forced placement of hazard insurance, and the imposition of loan-related fees—and the following information relating thereto.

### a.    Advertising

In 1994, the District Attorney's Office for the County of [          ], California, asserted an action against Association A in Superior Court alleging that Association A's advertising of one of its loan programs, which featured an adjustable rate mortgage loan with a bi-weekly payment, was misleading and constituted an unfair practice under the UCA. The District Attorney alleged, among other things, that the advertising and promotional material that Association A used in connection with the particular loan program violated the UCA because the advertising did not include an example disclosing the maximum permissible annual percentage rate for loans offered under the program.[42] Association A ultimately settled the case, agreeing to end the advertising program and to pay a civil penalty to the District Attorney's office, without conceding any wrongdoing.

### b.    Forced placement of insurance

Association A currently is defending a class action lawsuit alleging that during the course of force placing hazard insurance on behalf of its borrowers, as a result of the borrowers' failure to pay the insurance premiums under their existing policies, Association A did not mitigate avoidable costs that were then passed on to the borrowers.[43] Specifically, the complaint alleges that when the borrowers' hazard insurance coverages expired, Association A force placed alternative coverage from a different insurance company at a higher cost than the cost of the lapsed policy.[44] The

---

[42] People v. [          ], Superior Court, [          ] County, California ([          ]).

[43] [          ], Superior Court, [          ] County, California ([          ]). All the plaintiffs in the [          ] class action are private individuals who obtained mortgage loans from Association A; there are no governmental plaintiffs in the action.

[44] The complaint in [          ] alleges that the new policies, which Association A places pursuant to an arrangement it has with an unaffiliated insurance company, often cost two to five times more than the lapsed policies.

9

plaintiffs contend that Association A had an obligation to mitigate avoidable losses by maintaining the same policy in effect with the same insurance carrier at the same price (or even less). The plaintiffs allege that Association A's procedures for force placing hazard insurance constitute an "unfair business practice" in violation of § 17203 of the UCA.

Besides the UCA claim, the plaintiffs' complaint also asserts causes of action for breach of contract, breach of implied covenant of good faith and fair dealing, conversion, unjust enrichment and imposition of a constructive trust, and declaratory relief, all based on the forced placement of insurance.[45] You indicate that trial in this matter is currently scheduled for later this year.

### c.    Loan-related fees

You represent that Association A has faced several challenges to its imposition of certain loan-related fees. You specifically cite a legal challenge based on the UCA to two fees—"demand statement" fees and facsimile fees[46]—that Association A charges when a borrower pays off a mortgage loan.[47] In that lawsuit, the plaintiffs alleged that Association A charged impermissibly inflated demand statement and facsimile fees when borrowers refinanced their mortgage loans and that such practice constituted an "unfair business practice" under the UCA.[48] In addition to the UCA claim, the plaintiffs' complaint also asserted causes of action for breach of contract, RICO violations, and restitution.[49] You maintain that Association A has incurred substantial money and time defending such lawsuits.

---

[45] See Complaint, [                                                                ], Superior Court,
[        ] County, California ([                    ]).

[46] When a borrower refinances a mortgage loan, the existing mortgagee generates a statement, called a demand statement or payoff statement, setting forth all outstanding amounts on the current mortgage. The current mortgagee then normally transmits the demand statement to the new mortgagee by facsimile. Association A charges a fee for each of these services.

[47] See, e.g., [                                                                                                    ] (subsequently voluntarily dismissed). The named plaintiff, who resided in Illinois, filed a claim in federal court in Illinois against Association A based on an alleged violation of the UCA.

[48] Id.

[49] See Complaint, [                                                                                    ] (subsequently voluntarily dismissed).

10

## II.    Discussion

### A.    Analytical framework

Pursuant to §§ 4(a) and 5(a) of the Home Owners' Loan Act ("HOLA"),[50] the OTS is (and before it, the Federal Home Loan Bank Board ("FHLBB") was) authorized to provide for the safe and sound operation of federal savings associations and has exclusive plenary authority to regulate all aspects of the operations of federal savings associations. Extensive judicial and other authority supports the principle that HOLA § 5(a) and the OTS's implementing regulations preempt state laws that purport to regulate the activities or operations of federal savings associations because Congress conferred on the FHLBB, and now the OTS, exclusive authority to regulate the operations of federal savings associations.[51] Extensive authority also confirms that OTS (and formerly FHLBB) regulations preempt state law where the law in question conflicts with, or is otherwise an obstacle to, the achievement of the objectives of federal regulations.[52]

In 12 C.F.R. § 560.2(a) (1998), the OTS states its intention to totally occupy the field of the regulation of the lending activities of federal savings associations. One of the express purposes of § 560.2(a) is to allow federal savings associations "maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme

---

[50]  12 U.S.C.A. §§ 1463(a) and 1464(a) (West Supp. 1998).

[51]  See, e.g., Conference of Federal Savings and Loan Associations v. Stein, 604 F. 2d 1256, 1260 (9th Cir. 1979) ("[T]he regulatory control of the [FHLBB] over federal savings and loan associations is so pervasive as to leave no room for state regulatory control . . . . The broad regulatory authority over the federal associations conferred upon the [FHLBB] by HOLA does wholly preempt the field of regulatory control over these associations."), aff'd mem., 445 U.S. 921 (1980); FHLBB v. Empie, 628 F. Supp. 223, 225 (W.D. Okla. 1983) ("Congress intended the HOLA to preempt all state regulation over federally-chartered savings and loan institutions."), aff'd, 778 F.2d 1447 (10th Cir. 1985); People v. Coast Federal Savings and Loan Ass'n, 98 F. Supp. 311, 316 (S.D. Cal. 1951) ("The FHLBB has adopted comprehensive rules and regulations governing the powers and operations of every Federal savings and loan association from its cradle to its corporate grave."). See also OTS Op. Chief Counsel, (January 18, 1996) (state reporting requirements preempted); OTS Op. Chief Counsel (October 11, 1991) (deposit taking); FHLBB Op. General Counsel (April 28, 1987) (lending and examination).

[52]  Fidelity Federal Savings and Loan Ass'n v. de la Cuesta, 458 U.S. 141, 156, 159 (1982) (preempting state limitation on due on sale practices that conflicted with FHLBB regulation); see also First Federal Savings and Loan Ass'n of Boston v. Greenwald, 591 F. 2d 417, 425 (1st Cir. 1979) (preempting Massachusetts law requiring payment of interest on tax escrow account that conflicted with FHLBB regulation); Kupiec v. Republic Federal Savings and Loan Ass'n, 512 F.2d 147-50 (7th Cir. 1975) (preempting "common law" right to inspect and copy membership list that conflicted with FHLBB model by-law governing communication between members or depositors).

of regulation."[53]  The preamble to § 560.2 sets out the analytical framework to be used in determining whether a state law that affects lending is preempted by federal law.[54] Under this framework, state laws of the type listed in § 560.2(b) are preempted.  State laws of the types listed in § 560.2(c) are generally not preempted.  However, under subsection (c), a state law of the type traditionally left to the states or that the OTS finds furthers a vital state interest is nevertheless preempted if the law has more than an "incidental impact" on a thrift's lending operations or is otherwise contrary to the purposes of § 560.2(a).

Under § 560.2(b), the general types of state laws that federal law preempts based on this occupation of the field include state laws purporting to impose requirements regarding "[d]isclosure and advertising,"[55] "[t]he ability of a creditor to require private mortgage insurance, insurance for other collateral, or other credit enhancements,"[56] and "[l]oan-related fees."[57]  Under § 560.2(c), the specific types of state laws that generally are not preempted by federal law include contract and commercial law, real property law, tort law, certain homestead laws, and criminal law.[58]  Aggrieved consumers thus may use these types of laws to obtain relief.[59]

The OTS utilized this analytical framework in the 1996 Opinion, which examined whether federal law preempted the Indiana Deceptive Acts and Practices Statute.  The Indiana Deceptive Acts and Practices Statute prohibited specified acts and representations in connection with consumer transactions.  For example, the statute prohibited a person who regularly engages in consumer transactions from making representations that "a specific price advantage exists as to [the] subject of a consumer transaction, if it does not and the [person] knows or should reasonably know that it does not," and from making oral or written representations that a consumer transaction

---

[53]  12 C.F.R. § 560.2(a) (1998).

[54]  61 Fed. Reg. 50951, 50965-67 (September 30, 1996).

[55]  12 C.F.R. § 560.2(b)(9) (1998).

[56]  12 C.F.R. § 560.2(b)(2) (1998).

[57]  12 C.F.R. § 560.2(b)(5) (1998).

[58]  12 C.F.R. § 560.2(c) (1998).

[59]  Aggrieved customers of federal savings associations may also pursue relief through OTS's consumer complaint process.  See discussion, infra at 18.

12

involves "rights, remedies or obligations, if the representation is false and if the [person] knows or should reasonably know that the representation is false."[60]

The 1996 Opinion reviewed the state statute in the context of a proposed lending program and there was no suggestion that the state statute was being (or would be) applied in a manner that impermissibly affected lending. The 1996 Opinion concluded that the Indiana statute fell within the category of "contract and commercial law" under § 560.2(c)(1), that the law's impact on lending was incidental, that there was no indication that the law conflicted with any federal objectives identified in § 560.2(a) of the OTS's lending regulation, and, therefore, that the Indiana statute was not preempted by federal law.[61]

We will review the UCA, as it affects the Associations' lending practices regarding advertising, insurance requirements and loan-related fees, under the same analytical framework set forth in § 560.2. We note that the UCA, as drafted, is not directly aimed at federal savings associations, or lenders generally. The question is thus whether the UCA, as applied in the three circumstances you describe, has been and is being used by both private and governmental plaintiffs as a vehicle to improperly impose requirements on the Associations' lending operations regarding matters that have traditionally been within the exclusive purview of the OTS and federal law. A preemption analysis requires consideration of the relationship between federal and state laws as they are interpreted and applied, not merely as they are written.[62]

**B.     Section 560.2(c)**

As indicated above, § 560.2(c) provides that specified types of state laws, including contract and commercial laws or a law that the OTS finds furthers a vital state interest, generally are not preempted to the extent that the state law's effect on lending is only incidental and the state law is consistent with the objectives of § 560.2(a), including allowing federal savings associations to operate in accordance with uniform standards. However, if such a state law has a more than incidental impact

---

[60]  1996 Opinion at 2, citing Ind. Code § 24-4-0.5-3(6) and (8) (1995).

[61]  The 1996 Opinion also reviewed a separate Indiana statute that required specific lending disclosures by a federal savings association, and concluded that the Indiana statute was preempted under § 560.2(b)(9). Id. at 7-8.

[62]  Jones v. Rath Packing Co., 430 U.S. 519, 526 (1977); see also DeCanas v. Bica, 424 U.S. 351, 363-65 (1976).

13

on a federal thrift's lending operations or is inconsistent with the objectives of § 560.2(a), the state law may be preempted.

In the 1996 Opinion, we concluded that the Indiana Deceptive Acts and Practices Statute fell within the category of "contract and commercial law" under § 560.2(c). The UCA may also be viewed as a form of contract and commercial law under § 560.2(c). Nevertheless, in our view the situation faced by the Associations is distinguishable from the issues and facts addressed in the 1996 Opinion because the application of the UCA in the circumstances you describe seeks to set very particular requirements on the Associations' lending operations. As such, under § 560.2(c), the application of the UCA as described above has more than an incidental impact on the Associations' lending activities and is contrary to the purpose of uniform standards of operations.

### 1.    As applied, the UCA has more than an incidental impact on lending

Unlike the statute at issue in the 1996 Opinion, it appears, based on the information you have provided, that in this case the practical effect of the application of the UCA as a basis for alleging "unfair competition" creates more than an incidental impact on the Associations' lending operations.[63]

Even though the UCA, on its face, may appear to further a state's vital interest in regulating commercial transactions and is not specifically aimed at the lending practices of federal savings associations, the UCA has been and is being used, by private and governmental parties, in an attempt to set substantive standards for the Associations' lending operations and practices. You have identified specific lawsuits in which plaintiffs have used the UCA in attempts to require particular lending disclosures, limit the Associations' choice of insurers and cap certain fees. Advertising lending programs, protecting security property, and imposing certain loan-related fees

---

[63] By contrast, the Indiana Deceptive Acts and Practices Statute did not attempt to regulate the content of a federal savings association's advertising or the amount of a loan-related fee, but rather, sought only to protect the integrity of such representations and charges once made. A federal thrift, as part of a loan contract, could decide what fees to charge and would only run afoul of the Indiana statute if it did not abide by its agreements or representations regarding those fees. Here, the UCA is being used in a manner that attempts, indirectly through the regulation of "unfair" business practices, to establish state-imposed, substantive standards for the lending activities of federal thrifts.

14

are all integral components of the Associations' lending operations, and the UCA as applied would have a significant impact on those operations.[64]

There is little doubt that the three lending activities identified by the Associations—advertising, insurance requirements, and loan-related fees—are areas in which the OTS has made clear that federal law prevails over state law to enable federal thrifts to use uniform standards of operation.[65]  Thus, to the extent that the UCA is being used to affect these activities, such an application of the UCA (i) has more than an incidental effect on a federal thrift's lending operations and (ii) is inconsistent with the purposes of § 560.2(a).

### a.     Advertising

Under § 560.2(b)(9), state laws purporting to impose requirements regarding the advertising and disclosures of federal savings associations are the types of state laws that the OTS has identified as being preempted by § 560.2(a).  Moreover, there is a specific federal regulation governing advertising by federal savings associations. OTS's advertising regulation, 12 C.F.R. § 563.27 (1998), prohibits any savings association from using advertising or making any representation "which is inaccurate in any particular or which in any way misrepresents its services, contracts, investments, or financial condition."  This definition of prohibited advertising is similar to that of "unfair competition" in the UCA.  Federal thrifts are also subject to an elaborate network of federal disclosure laws, including the Truth-in-Lending Act ("TILA") and Regulation Z, which require certain methods of interest rate disclosure.[66]  In this regard, the 1996 Opinion concluded that federal law preempted the application of a state statute requiring specific lending disclosures to a federal savings association.[67]

A state law that, on its face, purported to regulate the advertising of a federal savings association would be preempted under § 560.2(b).  Accordingly, to the extent

---

[64]  We emphasize that our conclusion as to such undue impact applies only with respect to the three areas of the Associations' lending operations described herein.

[65]  OTS regulation § 560.2(b) presupposes that state laws regarding advertising, insurance requirements and loan-related fees have a more than incidental and impermissible impact on the lending operations of federal savings associations, and provides that such laws are preempted.  See 12 C.F.R. §§ 560.2(b)(2), 560.2(b)(5) and 560.2(b)(9); 61 Fed. Reg. 50951, 50966 (September 30, 1996) ("[Section] 560.2 is based on the premise that any state law that affects lending is preempted unless it clearly falls within the parameters of paragraph (c).")

[66]  15 U.S.C.A. §§ 1601 et seq. (West 1998); 12 C.F.R. Part 226 (1998).

[67]  1996 Opinion at 7-8.

that the UCA is being used, directly or indirectly, to require a particular form of interest rate disclosure in advertising the Associations' lending programs in order to be considered "fair" or not "misleading," the UCA is preempted.[68] We note that at least one California appellate court has ruled that 12 C.F.R. § 563.27, the OTS's advertising regulation, preempts a state UCA claim based on allegedly false and misleading advertising.[69]

### b.    Force-placed insurance

The OTS has stated that lending practices designed to protect the property securing a borrower's mortgage loan are an integral part of a federal savings association's lending operations.[70] Under § 560.2(b)(2), state laws regarding the ability of a federal savings association to require insurance for its collateral are preempted by federal law. Moreover, OTS regulations require a federal savings association to adopt real estate lending practices that reflect prudent underwriting standards.[71] Such standards must reflect, inter alia, "additional collateral or credit enhancements (such as guarantees, mortgage insurance or takeout commitments)."[72]

Until 1996, an OTS policy statement provided that a savings association was required to include in its loan documents provisions requiring a borrower to maintain hazard insurance to protect the association from loss in the event the property securing the loan was damaged or destroyed.[73] In removing that policy statement as unnecessary, the OTS stated that the general requirement that an association maintain safe and sound lending practices by following the required prudent underwriting standards, and standard business practices in the mortgage lending industry, were

---

[68] The UCA essentially permits an open-ended, county-by-county determination of what information must be contained in an advertisement for it to be "fair." This contrasts sharply with the approach of the Indiana Deceptive Acts and Practices Statute examined in the 1996 Opinion, which sets forth specific acts or representations that would violate the statute. See discussion, supra at 5, n.29 and 11, n.60.

[69] [                                                                    ] (unpublished opinion) (UCA claims based on fraud and misrepresentation preempted by 12 C.F.R. § 563.27).

[70] OTS Mem. Chief Counsel (Sept. 2, 1997) at 6-8.

[71] 12 C.F.R. § 560.1(b) (1998).

[72] See Interagency Statement on Real Estate Lending, Appendix to 12 C.F.R. § 560.101 (1998).

[73] 12 C.F.R. § 571.4 (1996).

16

sufficient to authorize a federal savings association to force place hazard insurance.[74] As noted, _supra_, lending practices designed to protect the collateral that serves as security for a loan are an integral part of a federal savings association's lending operations. Accordingly, to the extent that the UCA is being used either to limit the Associations' ability to force place insurance on properties securing loans, or the Associations' choice of insurers or premiums to be charged on the forced placement of insurance, the UCA is preempted as an impermissible interference with the Associations' lending programs.[75]

### c.     Loan-related fees

Section 560.2(b) also presupposes that state laws imposing requirements on a federal savings association's charging of loan-related fees are preempted by federal law. The fees at issue in the example provided by the Associations, demand statement fees and facsimile charges, are loan-related fees.[76] Accordingly, to the extent that the UCA is being used to regulate the imposition of loan-related fees that are part of the Associations' lending programs, the UCA is preempted.

### 2.     As applied, the UCA violates the objectives of § 560.2(a), including the objective of allowing federal savings associations to exercise their lending powers in accordance with uniform standards of operation

Moreover, as you have described the manner in which the UCA is being applied and used in these three areas, the effect of that application and use is inconsistent with one of the objectives of the HOLA and § 560.2(a), namely to allow federal savings associations to exercise their lending powers "in accordance with a uniform scheme of federal regulation."[77]

Because the statutory terms defined in the UCA are vague and there is no single enforcement body to set standards for applying the UCA, it is difficult for the

---

[74]  61 Fed. Reg. 60173, 60175-76 (November 27, 1996).

[75]  Indeed, the OTS has already found that a state law that impedes a federal savings association's ability to protect the collateral securing its loans has more than an incidental effect on lending operations.  OTS Mem. Chief Counsel (Sept. 2, 1997) at 7.

[76]  _See_ discussion, _supra_ at 9, n.46.

[77]  12 C.F.R. § 560.2(a).

Associations and other federal savings associations to know with any certainty what lending practices will be acceptable under the UCA in any particular county in California at any particular time.  As a result of how governmental and private plaintiffs have used the UCA, the Associations have been exposed or subjected to varying standards of acceptable practice in their lending operations rather than being able to operate under uniform federal standards within California as well as nationwide.

For instance, the Associations' advertising, while perhaps acceptable to one county attorney in California, might be viewed as impermissible in the eyes of another county attorney in California.[78]  Similarly, UCA suits based on the Associations' efforts to protect their security interests in property by force placing insurance when borrowers allow their hazard insurance to lapse, and suits based on the charging of loan-related fees, could subject the Associations to different standards within California as well as in other states.  This result is inconsistent with, and violates the objectives set forth in, § 560.2(a).[79]  This result is also particularly troubling in the areas of advertising, security property, and loan-related fees, which the OTS has identified in its regulations as areas in which the OTS has determined that federal thrifts should be able to exercise their lending powers in accordance with uniform federal standards of operation.

The manner in which the provisions of the UCA have been applied to the Associations in these three areas results in a great deal of uncertainty in how the lenders should structure and operate their lending programs to comply with the UCA.  As such, it violates the objective of allowing federal savings associations to conduct their lending operations in accordance with uniform standards of operation.  Accordingly, as applied, the UCA does not meet the requirements of § 560.2(c) to be considered a type of state law that is not preempted by federal law.

## III.  Conclusion

Based on the foregoing, we conclude that federal law preempts the UCA as it has been applied in these instances to the Associations' advertising, forced placement of hazard insurance, and charging of loan-related fees in connection with their lending

---

[78] We do not here address the merits of the challenge to Association A's advertising in [        ] (see n.42, supra) and do not suggest that the advertising is immune from challenge; we merely find that such a claim cannot be pursued under the UCA.

[79] As with the claims based on Association A's advertising, we do not here address the merits of the plaintiffs claims regarding force-placed insurance and loan-related fees (see discussion, supra at 8-9).  We merely find that such claims cannot be pursued under the UCA.  For example, in instances where the placement of insurance and charging of fees are addressed in the loan agreement (as they were in the UCA claims against Association A discussed herein), plaintiffs could bring claims based on those practices as traditional breach of contract claims.

18

activities. More specifically, federal law preempts application of the UCA to the Associations in a manner that (i) has more than an incidental affect on the Associations' lending activities, or (ii) is inconsistent with the objectives set forth in § 560.2(a), including the objective of allowing federal savings associations to operate in accordance with uniform standards of operation.

The practical effect of the application of the UCA to the Associations here has resulted in significant interference with the Associations' lending operations by purporting to set standards in these three areas. The Associations have been subjected to varying standards of acceptable lending practices based on allegations regarding integral components of the Associations' lending operations. A state law purporting on its face to regulate these areas of a federal savings association's lending operations would be preempted; the UCA cannot be used to accomplish indirectly what a state could not accomplish directly.

We wish to emphasize the extremely limited nature of our preemption determination here. Our finding of preemption is only based on how the UCA has been used by private and governmental plaintiffs to set standards in the three specific areas of a thrift's lending operations discussed herein, areas that have traditionally been governed by federal law. We do not preempt the entire UCA or its general application to federal savings associations in a manner that only incidentally affects lending and is consistent with the objective of allowing federal savings associations to operate in accordance with uniform standards.

We further emphasize that preempting application of the UCA in these three areas should have little practical effect on an allegedly aggrieved party's ability to seek and obtain relief. In instances of perceived "unfair" or "misleading" advertising, an aggrieved party can invoke the OTS's advertising regulation (and, where appropriate, Regulation Z) and initiate the OTS's consumer complaint process by contacting the nearest OTS Regional office or calling the OTS's toll-free consumer number, (800) 842-6929.[80] The plaintiffs' claims described herein based on the forced placing of insurance or the charging of loan fees may still be brought in state court based on traditional contract claims or other causes of action, such as those alleged by plaintiffs in the lawsuits against Association A discussed herein.[81]

---

[80] See A Guide to Consumer Assistance (December 1996), available from the OTS Consumer Programs Office, 1700 G St., N.W., Washington, D.C. 20552 and on the OTS's website: www.ots.treas.gov/consass.html.

[81] See discussion, supra at 8-9.

19

    In reaching the foregoing conclusions, we have relied on the factual information, representations, and materials you submitted to us in writing and in subsequent conversations with OTS staff, as summarized herein. Any material differences in facts or circumstances from those described herein could result in different conclusions.

    If you have any questions regarding this matter, please feel free to contact Timothy P. Leary, Counsel (Banking & Finance), at (202) 906-7170 or Vicki Hawkins-Jones, Assistant Chief Counsel, Regulations and Legislation, at (202) 906-7034.

Very truly yours,

Carolyn J. Buck
Chief Counsel

cc.    Regional Directors
       Regional Counsel