# EXHIBIT 4

**Date:** April 21, 2000

## State Law Limiting Payoff Statement Fees

Federal law preempts the application to a federal savings association of provisions of a New York law that limits the imposition of fees for providing mortgage loan payoff statements.

**Subject:** Home Owners' Loan Act/Savings Association Powers.

**P-2000-6**

**Office of Thrift Supervision**
Department of the Treasury

**P-2000-6**

*Chief Counsel*

1700 G Street, N.W., Washington, DC 20552 • (202) 906-6251

April 21, 2000

[


]

**Re:  State Law Limiting Payoff Statement Fees**

Dear [          ]:

This responds to your inquiry submitted on behalf of [
              ] ("Association") located in [                              ].  You request that
the Office of Thrift Supervision ("OTS") confirm your conclusion that federal law
preempts the application of provisions of a New York law that limits the imposition of
fees for providing mortgage loan payoff statements.  In brief, we conclude that federal
law preempts application of the New York law to the Association.

The Association engages in residential mortgage lending.  You indicate that upon
request, the Association will prepare and provide its residential mortgage loan borrowers
with loan payoff statements showing the balance owed on their mortgage loans, including
principal and accrued interest as of a specific date, and the per diem interest charges
accruing after such date.  If the borrower requests that the payoff statement be prepared
and sent by fax, the Association charges a fee of $[  ]; otherwise the Association will
prepare and mail the payoff statement to the borrower free of charge.

You have provided us with a copy of § 274-a of the New York Real Property
Law.[1]  Section 274-a(2) requires that under certain circumstances, the mortgagee of
certain residential real property deliver within 30 days of a "bona fide written demand"
certain "mortgage-related documents," defined to include a loan payoff statement to an
authorized individual.[2]  Section 274-a(2) also prohibits the mortgagee from charging

---

[1]  N.Y. Real Prop. Law 274-a (Consol. 1999).

[2]  Section 274-a(2)(b)(iii) defines "bona fide written demand" as "a written demand made by an authorized individual in
connection with a sale or refinancing of the mortgaged property or some other event where the mortgage is reasonably
expected to be paid off or assigned."  The term "mortgagee" is defined to include banking institutions chartered or licensed
by the United States.

2

borrowers for the mortgage-related documents pursuant to an initial request, but a mortgagee "may charge not more than twenty dollars, or such amount as may be fixed by the banking board, for each <u>subsequent</u> payoff statement provided . . . ." (Emphasis added.)

While it is not entirely clear from the face of the statute that it would bar charging for the service of faxing a payoff statement to a borrower,[3] you advised us that a recent New York state court decision indicates that such a charge would be barred. On November 5, 1999, a New York state appellate court found that a borrower who alleged that a mortgagee charged a fax fee to provide a payoff statement to borrower upon an oral request stated a cause of action for violation of §274-a(2).[4] The court allowed the borrower to proceed with a cause of action challenging the imposition of the fee by the lender. You are concerned that the Association might be found liable for its practice and ask whether the limitation on charging fees in §274-a(2) applies to the Association.

OTS regulations are clear that federal law preempts state laws that restrict loan-related fees. Section 560.2(b)(5) expressly provides that state laws purporting to impose requirements regarding loan-related fees are preempted.[5] On numerous prior occasions, the OTS and its predecessor agency have interpreted and applied § 560.2(b)(5) in the context of state laws restricting particular types of fees.[6]

Here, the fee the Association charges for faxing loan payoff statements, at the borrower's request, is a loan-related fee. The Association charges this fee for providing its loan customers the convenience of rapid receipt of a payoff statement containing information concerning all outstanding amounts on, and the payoff value of, their loans.[7] The payoff statement is an integral part of the lending process as it provides the information necessary to satisfy the debt and extinguish the extension of credit.

---

[3] Discussions with a legal representative in the New York Banking Department concerning § 274-a(2) did not clarify the ambiguity.

[4] <u>Negrin v. Norwest Mortgage, Inc.</u>, 700 N.Y.S.2d 184 (N.Y. App. Div. 1999).

[5] 12 C.F.R. § 560.2(b)(5) (1999).

[6] <u>See e.g.,</u> OTS Op. Chief Counsel (November 22, 1999) (certain ATM-fees); OTS Op. Chief Counsel (March 10, 1999) (fax fees for payoff statements); OTS Op. Chief Counsel (December 24, 1996) (appraisal and credit insurance fees); FHLBB Op. Chief Counsel (June 29, 1988) (late payment charges).

[7] OTS has noted in the past that institutions are not required to provide services free of charge. <u>See</u> OTS Op. Chief Counsel (Nov. 22, 1999) at 10.

3

Therefore, under § 560.2(b)(5), to the extent § 274-a(2) would prohibit the Association from charging a borrower for faxing a loan payoff statement requested by the borrower, § 274-a(2) does not apply to the Association.

In reaching this conclusion, we have relied on the information, representations, and materials you submitted to us in writing and in subsequent conversations with OTS staff, as summarized herein. Any material differences in the facts or circumstances from those described herein could result in different conclusions.

If you have any questions regarding this matter, please contact Teresa A. Scott (Counsel, Banking and Finance) at 202-906-6478.

Very truly yours,

Carolyn J. Buck
Chief Counsel

cc: Regional Directors
    Regional Counsel

# EXHIBIT 5

Westlaw.

Not Reported in P.3d
97 Wash.App. 1014, 1999 WL 674776 (Wash.App. Div. 1)
(Cite as: 1999 WL 674776 (Wash.App. Div. 1))

Page 1

C

NOTE: UNPUBLISHED OPINION, SEE RCWA 2.06.040

Court of Appeals of Washington, Division 1.
Michael CAIN, Individ. & on Behalf of Class, Appellant,
v.
SOURCE ONE MORTGAGE SERVICES CORP., a
foreign corporation, Respondent.
No. 43041-6-I.

Aug. 30, 1999.

Appeal from Superior Court of King County, docket No
97-2-31552-2, judgment or order under review, date filed
06/19/1998; Michael J. Trickey, Judge.

Roblin J. Williamson and Williamson & Williams, Seattle,
WA, for Appellant(s).

Stephen M. Rummage and Davis Wright Tremaine, Seattle,
WA, for Respondent(s).

UNPUBLISHED OPINION

BECKER.

*1 A lender who faxes a payoff statement at the borrower's
request may charge a fax fee without violating the loan
contract, even though the contract does not enumerate the
fax fee as a responsibility of the borrower.

Source One Mortgage Services Corporation is a successor in
interest to the holder of a note and deed of trust signed by
appellant Michael Cain in May, 1991 to obtain a home loan.
Upon Cain paying "all sums secured" by the note and deed
of trust, Source One was obligated by the terms of its loan
contract to release Cain from the note and deed of trust, and
to reconvey the property "without charge" to Cain.

Cain sought to refinance his home loan in May 1993. Old
Republic Title, Ltd., the escrow agent in the transaction,
obtained Cain's signature upon a release of information
form. The word "RUSH" was stamped in boldface on the
form. On May 8, Old Republic sent to Source One a
"Request for Payoff/Demand Statement". That document,
accompanied by Cain's authorization to release information,
requested a faxed response from Source One disclosing

information about Cain's account with Source One as "soon
as possible". In response, Source One faxed a copy of a
"Payoff Statement" to Old Republic, and mailed a copy to
Cain's home address. The payoff statement itemized, as part
of the total amount owed, "Fax Fees" in the amount of $15.
Cain had not previously been advised he would be charged a
fee for faxing. He paid the fax fee without inquiry or
objection in the course of refinancing his loan. In July 1996,
Cain filed a class action lawsuit against Source One. His
primary allegation was that Source One, as a condition of
releasing its clients, improperly charged them fees not
specifically mentioned in the note and deed of trust. Cain
asserted claims of breach of contract, violation of the
Consumer Protection Act, and unjust enrichment. In
November 1997, he obtained a voluntary dismissal of his
suit without prejudice. He refiled the same suit in
December, 1997. The trial court granted Source One's
motion for a summary dismissal of all claims. Cain appeals.

We apply the usual de novo standard review on appeal from
summary judgment. See Green v. A.P.C., 136 Wash.2d 87,
94, 960 P.2d 912 (1998). Unjust enrichment claims have a
three year statute of limitations. RCW4.16.080(3). CPA
claims have a four year statute of limitations.
RCW19.86.120. A cause of action accrues "when the
plaintiff knows or should know the relevant facts, whether
or not the plaintiff also knows that these facts are enough to
establish a legal cause of action." Allen v. State, 118
Wash.2d 753, 758, 826 P.2d 200 (1992). Cain knew all the
relevant facts in this case when Source One imposed the fax
fee in May 1993. Because Cain did not file his second
lawsuit until November 1997, his consumer protection act
and unjust enrichment claims are time barred, and the trial
court properly dismissed them.

*2 The breach of contract claim, subject to a six year statute
of limitations period under RCW 4.16.040, is not time
barred. Cain contends that the imposition of the fax fee
breached Source One's promise to reconvey the property
"without charge" upon payoff of the loan, and required him
to pay more than "all sums secured" by the note and deed of
trust. He argues there are material issues of fact regarding
breach of contract because the deed of trust and note do not
enumerate the $15 fax fee as the borrower's responsibility.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in P.3d
97 Wash.App. 1014, 1999 WL 674776 (Wash.App. Div. 1)
(Cite as: 1999 WL 674776 (Wash.App. Div. 1))

A federal district court in *Cappellini v. Mellon Mortgage Co., 991 F.Supp., 31, 39-40 (D.Mass.1997),* disposed of the same argument in the same circumstances. A plaintiff, seeking to refinance his house, paid fees totaling $40 for faxes of payoff reports from the servicing company having to do with the plaintiff's prior mortgage. The closing attorney, selected by the new lender, ordered the payoff reports and passed the fax fees through to the plaintiff. *Cappellini,* 991 F.Supp. at 35. The plaintiff argued that charging fax fees breached the contract because the contracts did not expressly permit the imposition of fax fees. The court concluded that even upon construing the contracts against the lender, as drafter of the contract, the lender could still charge the fees:

It would be difficult for form notes and mortgages that cover long time periods to anticipate and include each and every such incidental special request made by a borrower. Here the plaintiff was asking for faxed payoff statements in order to receive refinancing and take advantage of lower interest rates. To say that a borrower can make such requests for his or her own benefit, yet, under a principle such as contra proferentem [FN1], never allow the mortgage servicer to charge for the services unless they are specified in the loan documents would be an unreasonable interpretation of the contracts.

> FN1. The rule of "contra proferentem" means that in written documents "an ambiguous provision is construed most strongly against the person who selected the language." Black's Law Dictionary, 327 (6th ed.1990).

*Cappellini v. Mellon Mortgage Co., 991 F.Supp. at 39-40.*

We adopt the reasoning of Cappellini. Through his escrow agent, Cain requested an expedited delivery of the payoff statement by fax. Faxing the statement was an accommodation of Cain's special request. Charging for the service was not a breach of contract.

*Cain relies on Rumford v. Countrywide Funding Corp.,* 287 Ill.App.3d 330, 335- 36, 678 N.E.2d, 222 Ill.Dec. 757, appeal denied, 174 Ill.2d 594, 227 Ill.Dec. 17, 686 N.E.2d 1173 (1997). There, the court found an issue of fact concerning whether certain fees charged by a mortgage

company were fees for processing a special request for a statement, as claimed by the company, or extra fees charged for reconveying the property, over and above the borrower's payment of all sums secured. There is no similar issue of fact here. The payoff statement lists the added fees charged as "Fax Fees", and Source One has never claimed they were anything else.

*3 Cain argues that listing the fax fee on the payoff statement gives the misleading impression that Source One will not release the loan unless that fee is paid. He fails, however, to show, by argument or citation to authority, how listing the fax fee on the payoff statement is a breach of contract. Whether it is an unfair or deceptive practice is an issue we do not reach because Cain's consumer protection act claim is barred by the statute of limitations.

Source One did not breach its loan contract with Cain by charging him for an extra service that he requested. The trial court properly dismissed the breach of contract claim.

Affirmed.

BAKER & GROSSE, JJ., concur.

97 Wash.App. 1014, 1999 WL 674776 (Wash.App. Div. 1)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- So.2d ----

--- So.2d ----, 2004 WL 1909334
(Cite as: --- So.2d ----)

c
Only the Westlaw citation is currently available.
Supreme Court of Alabama.
Robert M. DAVANT, Jr., as trustee of The Farrell
1986 Trust
v.
UNITED LAND CORPORATION et al.
1021419.
Aug. 27, 2004.

**Background:** Lessor of underground coal mining lease, as trustee of trust to which lessor conveyed his interest in land, brought action against lessee's apparent successor and successor's corporate affiliate that mined the coal, asserting claims for breach of contract, fraudulent suppression, an accounting, and unjust enrichment. Lessor also sought to rescind and cancel lease. The Tuscaloosa Circuit Court, No. CV-01-1171, Charles R. Malone, J., granted summary judgment for defendants. Lessor appealed.

**Holdings:** The Supreme Court, Harwood, J., held that:
(1) summary judgment motion was sufficient with regard to requirement that the motion contain a narrative statement of undisputed material facts;
(2) breach-of-contract claims were barred by six-year statute of limitations;
(3) claims for an accounting and unjust enrichment were barred by statute of limitations;
(4) no suppression or nondisclosure of fact of post-January 1986 mining occurred; and
(5) fraudulent suppression claim was barred by two-year statute of limitations.

Affirmed.

**[1] Appeal and Error 30 ☞712**
30k712 Most Cited Cases
An appellate court is limited to the facts as established by the record.
**[2] Judgment 228 ☞183**
228k183 Most Cited Cases

Motion for summary judgment filed by the apparent successor of lessee of underground coal mining lease and successor's corporate affiliate that mined the coal was sufficient with regard to requirement that a summary judgment motion contain a narrative statement of undisputed material facts, in lessor's action asserting claims for breach of contract, fraudulent suppression, an accounting, and unjust enrichment, where motion set forth in clear narrative form the relevant material facts it deemed to be undisputed, attaching as exhibits the supporting documents that were not on file, motion included citations to statutory provisions and one decision of Supreme Court establishing applicable statutes of limitation, and motion clearly stated that, because the attachments established that coal-mining operations had ceased on premises by end of 1989, lessor's claims relating to nonpayment of royalties were barred by applicable statutes of limitation. Rules Civ.Proc., Rule 56(c)(1).

**[3] Limitation of Actions 241 ☞46(6)**
241k46(6) Most Cited Cases
**Mines and Minerals 260 ☞70(6)**
260k70(6) Most Cited Cases
Breach-of-contract claims based on alleged nonpayment of royalties pursuant to underground coal mining lease were subject to a six-year statute of limitations that began running on date of cessation of coal-mining operations on the leased premises.
Breach-of-contract claims based on alleged nonpayment of royalties pursuant to underground coal mining lease were subject to a six-year statute of limitations that began running on date of cessation of coal-mining operations on the leased premises.

**[4] Appeal and Error 30 ☞863**
30k863 Most Cited Cases
In reviewing disposition of a motion for summary judgment, Supreme Court utilizes the same standard as trial court in determining whether evidence before it made out a genuine issue of material fact and whether movant was entitled to a judgment as a matter of law. Rules Civ.Proc., Rule 56(c).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1909334
(Cite as: --- So.2d ---)

**[5] Judgment 228 ⟜185(5)**
228k185(5) Most Cited Cases
When the summary judgment movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Rules Civ.Proc., Rule 56(c).

**[6] Judgment 228 ⟜185(5)**
228k185(5) Most Cited Cases
Evidence creating a genuine issue of material fact is substantial for summary judgment purposes if it is of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved. Rules Civ.Proc., Rule 56(c).

**[7] Appeal and Error 30 ⟜934(1)**
30k934(1) Most Cited Cases
In reviewing the disposition of a motion for summary judgment, Supreme Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Rules Civ.Proc., Rule 56(c).

**[8] Limitation of Actions 241 ⟜170**
241k170 Most Cited Cases
Statute of limitations for breach-of-contract claims based on alleged failure or refusal of coal lessee's apparent successor to provide lessor with information or access to information relating to coal mined, removed, and sold from premises accrued more than six years prior to lessor's filing of action, thus barring action on limitations grounds; no coal was mined, removed, or sold pursuant to the underground coal mining lease after January 1989.

**[9] Limitation of Actions 241 ⟜170**
241k170 Most Cited Cases
Statute of limitations for coal lessor's claims for an accounting of coal taken and sold and for unjust enrichment expired prior to lessor's filing of action against the apparent successor of coal lessee and successor's corporate affiliate that mined the coal, thus barring action on limitations grounds; no coal was mined, removed, or sold pursuant to the underground coal mining lease after January 1989.

**[10] Appeal and Error 30 ⟜1078(1)**
30k1078(1) Most Cited Cases
Coal lessor waived for appeal any contention that the summary judgment was erroneously entered as to its claim for rescission of underground coal mining lease, where lessor devoted no argument in

its briefs to claim for rescission, but rather argued persistently that the lease continued in full force and effect.

**[11] Appeal and Error 30 ⟜1078(1)**
30k1078(1) Most Cited Cases
Matters not argued in an appellate brief are deemed waived.

**[12] Fraud 184 ⟜16**
184k16 Most Cited Cases
Coal lessee and mining company did not suppress fact that coal mining took place on leased premises after January 1986, thus precluding coal lessor's claim of fraudulent suppression, despite claim that two letters to lessor, in the absence of reconciliation statements, indicated that no coal was being mined and represented conflicting and inconsistent correspondence; letters advised lessor about expected tonnage to be mined, included maps reflecting coal mining activity, explained adjustments to credit balance, and reflected three minimum monthly royalty payments, and other letters sent to lessor included projected production for 1986 through 1988, maps depicting area from which coal had been mined in 1986 and 1987, and invitations for further inquiry by lessor.

**[13] Limitation of Actions 241 ⟜104(1)**
241k104(1) Most Cited Cases
Coal lessor received sufficient disclosures from lessee and mining company of post-January 1986 mining on leased premises to trigger the running of two-year statute of limitations for claim of fraudulent suppression; despite the information about mining operations contained in letters written to lessor during 1986 and 1987, lessor, either in his individual capacity or subsequently in his capacity as trustee of trust to which he transferred his property interest, never inquired of the defendants about the status of coal mining on leased property.

**[14] Fraud 184 ⟜16**
184k16 Most Cited Cases
To sustain a claim of fraudulent suppression a plaintiff must prove, among other elements, concealment or nondisclosure of material facts by defendant.

**[15] Fraud 184 ⟜16**
184k16 Most Cited Cases
Where record indicates that information alleged to have been suppressed was in fact disclosed, and there are no special circumstances affecting

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1909334
(Cite as: --- So.2d ----)

plaintiff's capacity to comprehend, plaintiff cannot recover for fraudulent suppression.
[16] **Fraud 184** ⚖ **16**
184k16 Most Cited Cases
Plain disclosure to a person competent in intelligence and background to understand the disclosure is the legal antithesis of fraudulent suppression.
[17] **Fraud 184** ⚖ **38**
184k38 Most Cited Cases
Claims alleging fraudulent suppression are subject to a two-year statute of limitation.
[18] **Limitation of Actions 241** ⚖ **104(1)**
241k104(1) Most Cited Cases
Limitations period begins to run on claim of fraudulent suppression when plaintiff was privy to facts which would provoke inquiry in the mind of a person of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud.

Victor L. Hayslip and Howard Burchfield III of Burr & Forman, LLP, Birmingham, for appellant.
Philip J. Carroll III of Bradley Arant Rose & White, LLP, Birmingham, for appellees Jim Walter Resources, Inc., and United Land Corporation.

HARWOOD, Justice.
*1 On September 12, 2001, Robert M. Davant, Jr., as trustee of the Farrell 1986 Trust ("the Trust"), sued United Land Corporation ("United Land") and Jim Walter Resources, Inc. ("JWR"), in the Tuscaloosa Circuit Court alleging breach of contract, fraudulent suppression, and unjust enrichment, and seeking an accounting. In addition to monetary damages, the Trust sought to rescind and cancel a coal-mining lease executed August 14, 1984, between Davant, as lessor, and United States Pipe and Foundry Company ("U.S. Pipe"), as lessee ("the lease"). The Trust appeals from summary judgments entered in favor of the defendants. We affirm.
The lease authorized U.S. Pipe to mine underground coal from Davant's undivided one-half interest in an 11.75-acre parcel and a contiguous 40-acre parcel in Tuscaloosa County. Subsequently, Davant created the Trust and conveyed his interest in the land to the Trust on December 31, 1987. The Trust alleged in its complaint that "[p]rior to 1988

[United Land] was known as United States Pipe and Foundry Company," and that the other undivided one-half interest in the leased premises was owned by the Hortense E. Davant Trust, which separately leased its interest to U.S. Pipe. Although not evident from the record, the involvement of JWR is stated in its and United Land's joint brief to be that " JWR is a corporate affiliate of United [Land] and is the company that actually mined coal from the Property." (Brief of Appellees, pp. 2-3. n. 1.) The complaint stated that the August 14, 1984, lease required the lessee to pay the lessor a three and one-half percent royalty for all coal mined; the royalty payments were due by the 20th day of each month and were to be accompanied by a reconciliation statement showing the exact amount of coal removed during the preceding month. The Trust averred that, although Davant had received three royalty payments through January 1986, after that neither he nor the Trust had received royalty payments or reconciliation statements and that Davant had assumed that mining operations had ceased on the property. The Trust asserted that it now had reason to believe that coal had been mined "from 1985 to the present" and that "[b]y failing to pay all of the royalties due under the Lease, the defendants have breached the Lease." The complaint asserted other instances of breach relating to the alleged failure or refusal of the defendants to provide information required to be provided under the terms of the lease.
On October 10, 2001, the defendants filed a motion to dismiss the action pursuant to Rule 12(b)(6), Ala. R. Civ. P ., or, in the alternative, for a summary judgment pursuant to Rule 56, Ala. R. Civ. P. The summary-judgment motion was granted as to all of the claims except the fraudulent-suppression claim. The defendants subsequently filed a second summary-judgment motion directed toward the fraudulent-suppression claim; that motion was granted, and the action was dismissed with prejudice.
*2 The defendants asserted in their motion to dismiss or for a summary judgment that the action represented an effort by the Trust to relitigate claims previously litigated in a federal district court action in Texas and that, because the last coal had been mined from the property in 1989, all claims asserted by the Trust were barred by applicable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1909334
(Cite as: --- So.2d ---)

statutes of limitation, including the six-year statute governing breach-of-contract claims. In support of the motion, the defendants attached a copy of the complaint filed in the Texas action, a copy of an affidavit filed in that action, and copies of the order and the judgment in that action. Those materials reflected that Davant had sued "United States Pipe and Foundry Company" on January 27, 2000, asserting that it had breached the lease by failing "to pay Plaintiff a royalty for all the coal that Defendant has mined from Plaintiff's property." Subsequently, the original and then trustee of the Farrell 1986 Trust was added as a plaintiff, the court noting that Davant had "transferred his 50 percent mineral interest regarding the August 14, 1984, mining lease to the Farrell Trust." (Davant later became the trustee of the Trust, at a time he could place during his October 25, 2002, deposition only as having been "within five years" of the deposition.)

U.S. Pipe filed a motion for a summary judgment in the Texas action, supported by the affidavit of Charles A. Dixon, vice president of mining engineering for JWR, stating that he had been its vice president of mining engineering between 1984 and 1989 and that he had personal knowledge of U.S. Pipe's mining of coal from the acreage in question. The affidavit stated further:

"In 1984, Davant represented that he owned a 50% interest in the mineral rights to 51.75 acres in Section 3 of Township 20 in Tuscaloosa County, Alabama. On August 14, 1984, Davant leased this land to United States Pipe and Foundry Company for coal mining.

"Between 1975[sic] and 1989, United States Pipe and Foundry Company mined coal from this acreage in Section 3 and made royalty payments to Davant.

"United States Pipe and Foundry Company completed mining activities on this property in 1989. United States Pipe and Foundry Company has not removed any coal from this property since 1989.

"If there was any mispayment of royalties to plaintiffs, which United States Pipe and Foundry Company denies, the error occurred in or before 1989.

"Throughout the time period involved, 1984-1989, the tonnage of coal mined by United States Pipe and Foundry Company was subject to

review by Robert Davant or his representative or agent. The lease specifically authorized Davant and his engineers, agents, or attorneys, to examine and survey the mined premises and; to examine and verify United States Pipe and Foundry's books, accounts, sales records, maps and plans to determine the amount of coal taken from the premises and to verify the selling price."

On July 13, 2000, the federal district court entered a summary judgment for U.S. Pipe, specifically finding and declaring as follows:

*3 "The undisputed facts in the record of this case establish that on August 14, 1984, the plaintiff Robert M. Davant, Jr., executed a mining lease with United States Pipe and Foundry Company wherein Mr. Davant retained a 50 percent mineral interest. Thereafter or at the same time, Mr. Davant entered into a lease agreement concerning the same property with the Estate of Hortense Davant (Mr. Davant was a beneficiary of this estate). On December 31, 1987, Mr. Davant transferred his 50 percent mineral interest regarding the August 14, 1984, mining lease to the Farrell Trust.

"United States Pipe and Foundry Company began mining coal under the August 14, 1984, lease in 1985, but completed all mining operations and vacated the property in 1989.

"The August 14, 1984, lease was for a twenty-year term and expires on August 14, 2004. It provided for royalty payments to be paid on the 20th day of each month with an accompanying reconciliation statement showing the exact amount of coal removed in the preceding month. The lease also expressly included when no coal was mined and/or sold, there was no necessity for the presentation of a reconciliation statement. The plaintiffs received no royalty payments nor reconciliation statements after January 1986. At all times, the August 14, 1984, lease specifically authorized plaintiffs or their agents to examine and survey the mined premises and to examine and verify United States Pipe and Foundry Company's books, accounts, sale records, maps, and plans to confirm the accuracy of the royalty payments.

"The plaintiffs allege that in 1999 the Hortense E. Davant Trust was scheduled to terminate and the plaintiff Davant became interested in purchasing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1909334
(Cite as: --- So.2d ----)

the trust's interest in the land in question. During the examination of this interest, the plaintiff Davant and, subsequently, the Trustee of the Farrell Trust concluded that they had not receive[d] appropriate payments prior to United States Pipe and Foundry Company's completion of mining activities in 1989.

"United States Pipe and Foundry Company filed this motion for summary judgment based upon the applicable statute of limitations. The plaintiffs allege that the 'discovery rule' is applicable and tolls the statute of limitations and that summary judgment is not appropriate. They primarily rely on *Houston Endowment, Inc. v. Atlantic Richfield Co.,* 972 S.W.2d 156 [ (Tex.Ct.App.1998) ]. The defendant United States Pipe and Foundry Company relies upon *HECI Exploration Co. v. Neel,* 982 S.W.2d 881 (Tex.1998). The undisputed factual recitals in this order as well as the Texas Supreme Court case persuade the undersigned the motion for summary judgment based on limitations is good. Since January of 1989 (according to the defendant's pleadings) or January of 1986 (according to the plaintiffs' pleadings), no royalty payments or reconciliation statements have issued and mining operations had completely stopped with the vacation of the premises by 1989. The plaintiffs had contractual rights to discover any inappropriate conduct under the contracts and obviously the contracts would have been breached by January 1989, if breached at all."

*4 Davant and the Trust did not appeal the summary judgment.

On November 16, 2001, the Trust filed in the Tuscaloosa Circuit Court action its response to the defendants motion to dismiss or for a summary judgment, arguing with respect to the summary-judgment aspect of the motion that, among other things, the motion was deficient because it did not include a narrative statement of undisputed material facts as required by Rule 56(c)(1) and that none of the claims were barred by the expiration of a statute of limitation. Specifically, the Trust argued that the lease remained in effect and that the Trust was not alleging "a breach dating back to the 1980s," but rather was alleging "among other things a continuing breach that is ongoing as of the present date, as well as a breach that occurred

on or about August 4, 2001," relating to a written request made that date by the Trust to the defendants for access to information regarding coal mining conducted pursuant to the lease.

The Trust did not in its response object to or move to strike any of the exhibits to the defendants' motion, did not seek a continuance of the hearing scheduled on the motion for November 20 and did not suggest that any discovery was needed as to the statute-of-limitation issue. Also on November 16, the defendants filed a five-page "submission" in support of their motion. Although untimely, given the scheduled November 20 hearing date, the submission amounted to nothing more than a " rehash" of the matters already presented by the motion to dismiss or for a summary judgment. No evidentiary materials were offered in connection with this submission, no new facts were presented, and no new defenses or legal arguments were advanced. Rather, as pertinent to the subsequently entered summary judgment, the submission simply reiterated the defendants' contention that all claims asserted by the Trust were barred by the expiration of the applicable statutes of limitation. The trial judge conducted the hearing as scheduled and on November 28 entered an order finding that

"[t]here is no dispute of a material fact.... The causes of action pled in the complaint are all based on the mining operations which ceased in 1989. The applicable statute of limitations and laches bar recovery or relief under any cause of action except the fraudulent suppression claim. At this point, considering the evidence before the court or lack thereof, there is a factual dispute as to when the plaintiff should have discovered the facts that would have put him on notice of the fraud claim."

Consequently, the trial judge entered summary judgment against the Trust "on all claims except the fraudulent suppression claim."

### I. Sufficiency of First Motion for Summary Judgment

The Trust argues on appeal that the trial court erred in entertaining the summary-judgment motion because it did not contain a narrative summary of undisputed material facts, as required by Rule 56(c)(1), Ala. R. Civ. P., and because the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1909334
(Cite as: --- So.2d ----)

defendants' November 16 submission in support of the motion was untimely. We have already stated that the November 16 submission was untimely and was therefore due to be disregarded by the trial court; however, nothing in the record shows that the trial court considered it.

*5 Concerning the requirement that a summary-judgment motion contain a narrative summary of undisputed material facts, Rule 56(c)(1) states:

"(1) *Form of Motion and Statement in Opposition Thereto.* The motion shall be supported by a narrative summary of what the movant contends to be the undisputed material facts; that narrative summary may be set forth in the motion or may be attached as an exhibit. The narrative summary shall be supported by specific references to pleadings, portions of discovery materials, or affidavits and may include citations to legal authority. Any supporting documents that are not on file shall be attached as exhibits. If the opposing party contends that material facts are in dispute, that party shall file and serve a statement in opposition supported in the same manner as is provided herein for a summary of undisputed material facts."

In its response to the motion, the Trust took the position that, because the summary-judgment motion did not contain a formally identified narrative summary, it was due to be denied. In its brief to this Court, the Trust argues that the trial court should have treated the motion exclusively as one for a dismissal, and "refrain[ed] from considering the Defendants' Motion in the Alternative, until [the Trust] had been given an opportunity to develop and present its own evidence in opposition." The Trust asserts that it argued to the trial judge at the November 20 hearing that because the defendants' "submission in support" was untimely the Trust intended to address its arguments only to the motion to dismiss, requesting that before the court "converted" the motion to dismiss into one for a summary judgment, the Trust be given an opportunity to submit evidentiary materials in opposition. The Trust complains that it was never informed that the trial court was going to treat the motion to dismiss as one for summary judgment and that it was therefore deprived of any opportunity to respond to the defendants'

evidentiary material before the trial court entered the partial summary judgment on November 28, 2001.

As support for those assertions, the Trust cites only its "Motion to Reconsider Partial Grant of Summary Judgment" filed January 29, 2002, and its April 2, 2002, reply to the defendants' response to its motion to reconsider. The motion to reconsider was not heard by the trial judge who entered the partial summary judgment, the Trust having successfully sought the recusal of the initial trial judge. The trial judge hearing the motion to reconsider, therefore, could not take judicial notice of anything supposedly stated at the hearing on the summary-judgment motion. At any rate, the Trust simply argued in its motion to reconsider that because the defendants' untimely submission in support of the summary-judgment motion contained the first expressly identified statement of undisputed facts, "the defendants' statement of fact was not timely tendered and should not have been considered by the Court," and that had the submission been timely the Trust "would have filed a Rule 56(f) affidavit in response, averring to the need for further discovery in order to oppose the 'facts' proffered by the defendants." In its April 2, 2002, reply, the Trust expanded this argument as follows:

*6 "The defendants also make the false and misleading assertion that their motion for summary judgment was fully argued before the [the initial trial judge]. In fact, what was argued before [initial trial judge] was the defendants' motion to dismiss. The [Trust] informed the Court at the November 28, 2001 hearing that in light of the fact that the defendants' supporting materials had not been timely filed as required by Alabama law, the [Trust] intended to argue the Motion as a motion to dismiss. The [Trust] specifically requested that before the Court convert the motion to dismiss into a motion for summary judgment that the [Trust] be informed of the Court's intention and that the [Trust] be given a reasonable opportunity to submit evidentiary materials in opposition. The Court, however, never informed the [Trust] that it was treating the Motion as one for summary judgment, and did not give the [Trust] any opportunity to respond to the defendants'

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ---

--- So.2d ---, 2004 WL 1909334
(Cite as: — So.2d ——)

untimely-filed evidentiary material prior to entering its Order. As a consequence, the [Trust] has not been heard in opposition to the defendants' motion for summary judgment, and the impression created by the defendants that the [initial trial judge] heard 'extended arguments' on the same is incorrect."

[1] Even if these assertions were sufficient, in the abstract, to establish error on the part of the initial trial judge, we could not base a reversal on them because they are unsupported by the record. That is not to impugn in any way the integrity or credibility of counsel for the Trust; it is simply to acknowledge a restriction of appellate review-an appellate court is limited to the facts as established by the record. *Cooper v. Adams,* 295 Ala. 58, 61, 322 So.2d 706, 708 (1975). The proper method on appeal for submitting a record of unreported matters occurring at a hearing is stated in Rule 10(d), Ala. R.App. P. As noted from the excerpt quoted above from the Trust's reply to the defendants' response to its motion to reconsider, the Trust and the defendants disputed before the second trial judge what had actually been argued before the initial trial judge. In their response to the Trust's motion to reconsider, the defendants asserted that "[t]his matter was fully briefed and argued before [the initial trial judge]," and that the Trust had no valid argument that "[i]t was deprived of a reasonable opportunity to present material in opposition to summary judgment and [was] not given adequate notice of the defendants' argument in support of summary judgment."

Finally, even if we accept at face value the Trust's " after the fact" description in its reply of what transpired at the November 20 hearing, at most it appears that the Trust requested that before the trial court "converted" the motion to dismiss into one for a summary judgment, the Trust be given notice so that it could submit evidentiary materials in opposition. The Trust did not, and does not, assert that the trial judge agreed to that request. Further, there was actually no "conversion" of a motion here because a duly identified motion for a summary judgment was pending at the hearing. The fact that the Trust unilaterally took the position at the hearing that the summary-judgment motion would have to be ignored because it lacked a formally specified narrative summary of undisputed material facts would not bind the trial judge.

*7 [2] We turn then to the question whether the motion for a summary judgment, considered completely apart from the subsequently filed and untimely submission in support of the motion, was deficient with regard to the requirement that a summary-judgment motion contain a narrative statement of undisputed material facts. The Trust cites *Northwest Florida Truss, Inc. v. Baldwin County Commission,* 782 So.2d 274 (Ala.2000) , along with *Tucker v. Morgan,* 833 So.2d 68 (Ala.Civ.App.2002) ; *Moore v. ClaimSouth, Inc.,* 628 So.2d 500 (Ala.1993) ; *Thompson v. Rehabworks of Florida, Inc.,* 727 So.2d 807 (Ala.Civ.App.1997) ; and *Hale v. Union Foundry Co.,* 673 So.2d 762 (Ala.Civ.App.1995), in support of its contention that granting a motion for a summary judgment that does not contain a formally designated narrative statement of undisputed material facts is reversible error.

In *Northwest Florida Truss,* the summary-judgment motion simply stated in a conclusory fashion that there was no genuine issue as to any material fact and that the movant was entitled to judgment as a matter of law, " 'based upon the previous filings and briefings made in connection with,' " 782 So.2d at 276, an earlier motion for a summary judgment filed by an entirely different party. This Court noted that a party moving for a summary judgment "always bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that it argues demonstrates the absence of a genuine issue of material fact." 782 So.2d at 276. The Court concluded that Rule 56(c) "does not allow a party to file a simplistic motion devoid of a narrative summary and specific references to those portions of the record demonstrating that no genuine issue of material fact exists." 782 So.2d at 277.

Likewise, in *Moore,* supra, we condemned a summary-judgment motion that "did not contain anything close to a narrative summary of what [the movant] contended to be the undisputed material facts"; rather, the motion simply stated that there was no genuine issue of material fact and that the movant was entitled to judgment as a matter of law based on the pleadings and depositions, but made " no specific reference to any of those documents." 628 So.2d at 501. The cases from the Court of Civil Appeals cited by the Trust involved similarly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ---

--- So.2d ----, 2004 WL 1909334
(Cite as: --- So.2d ----)

Page 8

seriously deficient motions for a summary judgment. This Court held in *International Fidelity Insurance Co. v. Gilliam*, 659 So.2d 24 (Ala.1995), however, that a converted motion for a summary judgment that did not contain a separately identified narrative summary of undisputed material facts was nonetheless procedurally sufficient under the provision of Rule 56(c)(1) that allowed the narrative summary to "be attached as an exhibit." The Court held that "[t]he motion included exhibits sufficient to meet the narrative summary requirement of Rule 56." 659 So.2d at 27. See also *Cashion v. Torbert*, 881 So.2d 408 (Ala.2003).

\*8 The first summary-judgment motion filed by the defendants sufficiently complied with Rule 56(c)(1) so that the trial judge did not err in considering it on the merits. It set forth in clear narrative form the relevant material facts it deemed to be undisputed, attaching as exhibits the "supporting documents that are not on file," as allowed by Rule 56(c)(1). It included "citations to legal authority" in the form of citations to the provisions of the Alabama Code (and one decision of this Court) establishing statutes of limitation for claims of breach of contract, fraudulent suppression, accounting, and unjust enrichment. It clearly stated that, because the attachments established that coal-mining operations had ceased on the premises by the end of 1989, the Trust's claims relating to nonpayment of royalties were barred by the applicable statutes of limitation. That was the sole basis for the partial summary judgment entered by the trial judge on November 28, 2001, in which he found that "[t]here is no disputed material fact that no mining operations have taken place on plaintiffs' property since 1989" and concluded that because "[t]he causes of action pled in the complaint are all based on the mining operations which ceased in 1989," the applicable statutes of limitation "bar recovery or relief under any cause of action except the fraudulent suppression claim."

### II. Merits of First Motion for Summary Judgment

[3] [4] [5] [6] [7] The Trust argues that a number of its claims are not "based on" the defendants' cessation of coal-mining operations in 1989, but rather relate to "numerous breaches of the Lease (and other wrongful acts) that occurred more

recently than 1989, including many that date back only to 1999 and continue to this date." (Trust's reply brief, p. 4.) Although the Trust states in a footnote to its initial brief that it does not concede that all coal mining ceased on the premises in 1989, it offers no argument in opposition to that fact other than to note its ignorance, which it alleges is caused by the lack of full discovery.

"In reviewing the disposition of a motion for summary judgment, 'we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' *Bussey v. John Deere Co.,* 531 So.2d 860, 862 (Ala.1988), and whether the movant was 'entitled to a judgment as a matter of law.' *Wright v. Wright,* 654 So.2d 542 (Ala.1995) ; Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. *Bass v. SouthTrust Bank of Baldwin County,* 538 So.2d 794, 797-98 (Ala.1989). Evidence is 'substantial' if it is of ' such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' *Wright,* 654 So.2d at 543 (quoting *West v. Founders Life Assurance Co. of Florida,* 547 So.2d 870, 871 (Ala.1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. *Wilma Corp. v. Fleming Foods of Alabama, Inc.,* 613 So.2d 359 (Ala.1993) ; *Hanners v. Balfour Guthrie, Inc.,* 564 So.2d 412, 413 (Ala.1990)."

\*9 *Hobson v. American Cast Iron Pipe Co.* 690 So.2d 341, 344 (Ala.1997).

The defendants made a prima facie showing that there is no genuine issue of material fact as to when coal-mining operations ceased on the leased premises. The Trust did not exercise its option under the last sentence of Rule 56(c)(1), if it contended that that material fact was in dispute, of filing a statement in opposition. It sought no continuance to conduct or to compel discovery. Although the burden had shifted to it "to present substantial evidence creating such an issue," 690 So.2d at 344, it submitted no opposing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1909334
(Cite as: --- So.2d ----)

evidence-substantial or otherwise. Thus, for purposes of the application of any statute of limitation the defendants established the undisputed fact that coal-mining operations had ceased on the leased premises after January 1989. Both parties cite *AC, Inc. v. Baker*, 622 So.2d 331, 335 (Ala.1993), for the proposition that a claim alleging breach of contract must be brought within six years of the date of the breach. (Trust's brief, p. 5; Defendants' brief, page 26.) The Trust does not dispute the legal proposition asserted by the defendants that there is no "discovery rule" applicable to a breach-of-contract claim. (Defendants cite *Henson v. Celtic Life Insurance Co.*, 621 So.2d 1268, 1274 (Ala.1993), for the proposition that the "discovery rule" applies only to fraud claims.) The Trust's breach-of-contract averments were set out in paragraph 19 of its complaint as follows:

"Defendants failed and neglected to perform in material breach of the Lease by, among other things: failing to pay royalties on coal actually mined, removed, and sold from the Premises; failing to furnish true and correct statements showing the amount, dates, and selling price of coal actually mined, removed, and sold from the Premises; denying [the Trust] access to defendants' books, accounts, sales record, maps and plans for the purpose of verifying the amount and selling price of coal taken from the Premises; refusing, upon written request, to direct third parties to make available all information relating to coal mined from the Premises necessary for those same purposes; and refusing, upon written notice and within sixty (60) days, to correct said material breaches."

[8] For the reasons stated, the November 28, 2001, partial summary judgment is due to be affirmed as to the claim that the defendants failed "to pay royalties on coal actually mined, removed, and sold from the Premises." The Trust argues, however:

"If the Defendants are correct in arguing that [the Trust's] claims for nonpayment of royalties are subject to a six year statute of limitations that began running in 1989. [the Trust] may or may not be entitled to recoup the One Hundred Forty-five Thousand ($145,000) Dollars in missing royalties that all evidence suggests was not paid by Defendants as it should have been.

But [the Trust] is certainly entitled, for so long as the Lease remains in effect and for so long as Defendants continue to occupy the Premises and exploit the Premises for their own financial gain, to a full accounting of the Defendants' activities on the Premises, to the full production of Defendants' records of their mining activities on the Premises, and to the full production of Defendants' financial records of royalty payments on coal mined from the Premises."

*10 (Trust's reply brief, p. 7.)

All of the claims of breaches of the lease based on the defendants' alleged failure or refusal to provide information or access to information are dependent upon paragraphs 5 and 6 of the lease. Under paragraph 5, United Land is obligated to provide monthly statements in connection with "[a]ll payments of royalties," reflecting various information relating to the computation of royalty, including "the exact amount of coal removed during the preceding month." However, also in paragraph 5 "[i]t is agreed that Lessee shall not be required to furnish statements for months in which coal is not mined, removed and sold under this Lease." At six-month intervals, the lessee is to furnish maps showing "mining progress on the Premises during the previous six months, and ... the results of test holes and coal analysis, if any, for coal mined on the Premises during the previous six months." Paragraph 6 of the lease authorizes the Trust to inspect United Land's "books, accounts, sale records, maps and plans for the purpose of ascertaining the amount of coal taken from the Premises, and verifying the selling price of the coal sold." That paragraph also obligates United Land, upon written request from the Trust, to "authorize and direct" third persons with whom United Land " shall have had any dealings with respect to coal mined from the Premises" to make available to the Trust "all information relating to coal mined from the Premises, as may be reasonably required by [the Trust] to verify or to determine the amount of royalties due to be paid by [United Land] under this lease, or any other matter relating to performance of [United Land's] obligations hereunder."

It having been established, for the purposes of our analysis, that no coal was mined, removed, and sold under the lease after January 1989, any breach of the obligations in the lease to provide information

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ---

--- So.2d ---, 2004 WL 1909334
(Cite as: --- So.2d ---)

or access to information relating to coal mined, removed, and sold from the premises necessarily would have occurred more than six years before the filing of this action. Accordingly, summary judgment based on expiration of the statute of limitation was warranted as to those breach-of-contract claims as well, and the defendants had no duty under the lease to furnish information at later times in the absence of the renewal of coal-mining operations on the leased premises.

[9] In its demand for an accounting the Trust asserts that the defendants have failed to provide the necessary information and access to information required by the lease and that an accounting is needed so that the Trust can reconcile "the payments received by defendants for coal mined from the Premises, and the royalties paid to the plaintiff on the same." Again, it having been established for the purposes of this appeal that the defendants have not mined any coal from the leased premises since 1989, all statutes of limitation possibly applicable to an accounting for coal taken and sold have expired. Waters v. Cochran, 291 Ala. 610, 285 So.2d 474 (1973). The same is true for the Trust's claim that the defendants have been unjustly enriched by having received "royalties and income from coal mined on the premises," which they failed to remit to the Trust.

*11 [10] [11] The Trust devotes no argument in its briefs to its claim for rescission; rather, it argues persistently that the lease continues in full force and effect. Matters not argued in brief are deemed waived. Moore v. Prudential Residential Servs. Ltd. P'ship, 849 So.2d 914, 923 (Ala.2002). Accordingly, the Trust has waived any contention that the summary judgment was erroneously entered as to its claim for rescission of the lease.

Therefore, the trial court did not err in entering the November 28, 2001, partial summary judgment for the defendants as to all claims except the fraudulent-suppression claim.

III. The Second Motion for Summary Judgment

[12] [13] After the entry of the first summary judgment, certain discovery was conducted, including the depositions of JWR employee Danny Hagood and Davant. The defendants then moved

for a summary judgment with respect to the remaining fraudulent-suppression claim, arguing, among other things, that the undisputed evidence established that no suppression had in fact taken place and that the two-year statute of limitation applicable to a fraudulent-suppression claim had run. The defendants submitted Charles A. Dixon's affidavit, originally submitted with U.S. Pipe's summary-judgment motion in the Texas action, and a copy of the order and judgment in the Texas action; a copy of Davant's deposition; and copies of three letters produced by Davant from his files, written to him in 1986 and 1987 by representatives of JWR. Davant acknowledged in his deposition that the essentials of the fraudulent-suppression claim were stated in paragraph 23 of the complaint, which alleged:

"In violation of their duty to disclose, the defendants failed and omitted to inform plaintiff that they continued to mine coal from the Premises after January 1986, that they continued to sell coal from the Premises and receive payment for said coal after January 1986, and that they continued to pay royalties on this coal to the owner of the other one-half (1/2) undivided interest in the Premises. Under the pretense that no coal had been mined, defendants also failed and omitted to supply reconciliation statements from January 1986 to the present date."

In the first of the three letters the defendants submitted in support of their motion, Dixon wrote to Davant on February 7, 1986, identifying himself as "JWR's Vice President, Mining Engineering" and stating, in pertinent part, as follows:

"In response to your question concerning our plans for mining of the property leased from you and from the Davant Trust, please note the following:

"1. For the 51.75 acres in Section 3 which is leased from you and the Davant Trust:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1909334
(Cite as: --- So.2d ---)

| "Time Interval | Projected Production |
|---|---|
| Remainder Fiscal Year 1986 (Feb.-Aug.) | 60,000 Tons |
| Fiscal Year 1987 | 0 Tons |
| Fiscal Year 1988 | 60,000 Tons |

"In 1988 the initial mining will be completed and there will be several years with no projected production. Later, some secondary mining of pillars is anticipated."*12 The letter concluded, "I hope this information is sufficient for your requirements. If you need anything further do not hesitate to call me," and provided a telephone number. Davant acknowledged in his deposition that he had received the letter and that the 51.75 acres referenced was the same tract at issue in this action.

The second letter, written to Davant on January 19, 1987, by Jim Hayes, associate mine planner for JWR, enclosed "a map depicting the area from which coal has been mined during the last six (6) months of 1986" and referred to the "11.75 acres" leased from Davant and the Hortense Davant Trust. Hayes concluded his letter with the statement "[i]f you have have any questions, feel free to contact me at" and provided a telephone number. Davant acknowledged in his deposition that he had received this letter also and that he had understood it to tell him that coal had been mined from a portion of the leased premises during the last six months of 1986.

On July 7, 1987, Hayes wrote Davant again, enclosing another map, this time "depicting the area from which coal has been mined during the first six (6) months of 1987" from the area leased from Davant and the Hortense Davant Trust. Hayes closed his letter with the invitation to Davant to " feel free to contact me" at his listed telephone number, if Davant had any questions. Davant acknowledged on his deposition that he had received the letter and that it told him that coal had been mined from the 51-acre tract involved in this action during the first six months of 1987.

When asked on deposition if these three letters had served to tell him that mining was taking place on the property during the time frames specified in the letters, Davant answered "[a]pparently, there was more mining going on, and they sent me those letters. Why they didn't send me the tonnage reports, I don't know." Davant acknowledged that he had never telephoned or made any effort to contact anyone at U.S. Pipe or JWR during 1986 or 1987 to ask about his royalty checks, explaining that he had not done so "because I didn't think they wouldn't pay me." He further acknowledged that he made no inquiry at any other time until 1999. Throughout that period, however, he "had lots of contact with them." Specifically, he telephoned Danny Hagood from time to time to inquire concerning production from the Hortense Davant Trust; he simply omitted on those occasions any inquiries about the property involved in this litigation. He acknowledged that Hagood had always been very helpful and had answered any questions he had about any of the properties and conceded that "I never doubted that I could get the answers that I asked for, at any time."

Davant is a lawyer who has been licensed to practice in Texas since 1963, with ample experience in "oil and gas," and he "had dealt with oil and gas leases many times"; the lease involved in this case was the first time he had ever dealt with an underground coal-mining lease, however.

*13 In its November 16, 2001, response to the second summary-judgment motion, the Trust submitted two letters U.S. Pipe had sent to Davant in 1987. Pertinent to an understanding of the import of those letters is paragraph 4(B) of the lease, which reads:

"Lessee shall pay to the Lessor a minimum royalty of Twenty-five Dollars ($25.00) per month until termination due to term or otherwise as provided for herein. All royalty paid for coal actually mined, removed and sold during any month hereunder shall be credited upon the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1909334
(Cite as: --- So.2d ----)

Page 12

minimum royalty for such month. All royalty due for coal actually mined, removed and sold during any month during the initial term or any extended term in excess of the minimum royalty for that month shall be credited, firstly, against any previous minimum royalty payments against which excess production royalties have not been applied, and, secondly, against any future monthly minimum royalties. That is to say that all production royalties are to be credited against any minimum royalties that become due or have been paid under the terms hereof...."

In a March 24, 1987, letter to Davant, the assistant supervisor of general accounting for U.S. Pipe stated:

"According to the terms of our contractual agreement dated August 15, 1984 we are authorized to credit production royalties paid in excess of minimum payments due, firstly, against any previous minimum royalty payments to which excess production royalties have not been applied, and secondly, against any future monthly minimum royalties. Due to recoveries totaling $50.00 for the months of January and February, the balance of payments in excess of minimums recovered has been reduced to $670.23.

"If you have any questions concerning this matter, please contact me...."

An April 17, 1987, letter stated:

"Due to price and moisture adjustments recorded during the period of May 1986-November 1986, and an overpayment resulting from an overstatement in sales price per ton during November 1986, the balance of payments in excess of minimums recovered has been reduced to $435.79 as follows:

| | | |
|---|---|---|
| "Balance, March 1987 | | 670.23 |
| "Less: | Recovery April 1987 | 25.00 |
| | Amount payable due to price & moisture adjustment | 1,455.98 |
| | (we owe you) | |
| "Add: | Amount resulting from over-payment Nov. 1986 | 1,246.54 |
| | (we paid you) | |

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 1909334
(Cite as: --- So.2d ----)

"Balance, April 1987

The information in the March 24 letter is to the effect· that U.S. Pipe had paid Davant for " production royalties," i.e., "royalty due for coal actually mined," the sum of $720.23 and was electing to apply that production royalty "balance of payments" against the $25 per month minimum royalties that would otherwise have been owing for the months of January and February, as authorized by lease provision 4(B) ($670.23 + $25 + $25 = $720.23). The balance of payments in excess of minimum royalties was thus "reduced to $670.23," which U.S. Pipe was authorized under paragraph 4(B) of the lease to credit "against any future monthly minimum royalties."

*14 The April 17 letter advised that the $670.23 balance of payments from March was being further reduced by (1) a debit for the $25 April minimum royalty and (2) a debit in the net amount of $209.44 resulting from an overpayment credit. Thus, the royalty balance of payments for coal actually mined and previously paid for was reduced to $435.79, available for credit against future minimum royalties.

Davant argues that these two letters, in the absence of reconciliation statements, indicated that no coal was being mined from the property and represented "conflicting and inconsistent correspondence from Defendants," such that he "acted reasonably in assuming that Defendants were not mining the Premises." (Trust's brief, p. 42.) We disagree. The February 7, 1986, letter had advised Davant that JWR expected to mine 60,000 tons of coal under the lease during the period of February to August 1986. The January 19, 1987, letter had included a map depicting the area from which coal had been mined during the period June to December 1986. As a result, as reflected by the March 24, 1987, letter, the "balance of payments" for royalties paid for coal actually mined amounted to $720.23 at the end of 1986. The March and April letters explained adjustments to that credit balance, and reflected that there had been no coal removed and sold from the leased premises during January, February, or March 1987, at least none sufficient to generate production royalty over minimum royalty. (The two letters reflected three $25 per month minimum royalty payments debited against the balance-of-payments

435.79"

credit, and the April minimum royalty was not yet due under the terms of the lease.) The April 17 letter advised Davant that there had been an " overstatement in sales price per ton during November 1986," thereby acknowledging that coal had been sold during that month.

Finally, the July 7, 1987, letter had included a map reflecting the area from which coal "has been" mined during the first six months of 1987, thereby reflecting the coal-mining activity that had transpired, by process of elimination, during April, May, and/or June 1987. The $435.79 production royalty credit balance referred to in the April 17 letter would have been available to cover, to that extent, the royalties generated.

Thus, contrary to the Trust's claim in its complaint that "the defendants failed and omitted to inform plaintiff that they continued to mine coal from the Premises after January 1986, [and] that they continued to sell coal from the Premises and receive payment for said coal after January 1986," Davant was so informed. As noted earlier, the only uncertainty Davant expressed during his deposition was the statement, "why they didn't send me the tonnage reports, I don't know." Nonetheless, as noted, he never brought the matter up despite ongoing communications with Danny Hagood. Most telling was Davant's answer during his deposition when asked why he had not telephoned to ask where his royalty checks were: "Probably an omission on my part, thinking that if they were going to pay me and probably they didn't pay me, and I just went on with my day to day activities of carrying on and forgot about it."

*15 [14] [15] [16] To sustain a claim of fraudulent suppression a plaintiff must prove, among other elements, " 'concealment or nondisclosure of material facts by the defendant.' " *Auto-Owners Ins. Co. v. Abston,* 822 So.2d 1187, 1197 (Ala.2001) (quoting *Foremost Ins. Co. v. Parham,* 693 So.2d 409, 423 (Ala.1997)). "Where the record indicates that the information alleged to have been suppressed was in fact disclosed, and there are no special circumstances affecting the plaintiff's capacity to comprehend, the plaintiff cannot recover for suppression." *Ex parte Alfa Mut. Fire Ins. Co.,* 742 So.2d 1237, 1243 (Ala.1999). "In other words, plain disclosure to a person competent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ---, 2004 WL 1909334
(Cite as: --- So.2d ----)

Page 14

in intelligence and background to understand the disclosure is the legal antithesis of suppression, by definition." *Allstate Ins. Co. v. Ware,* 824 So.2d 739, 746 (Ala.2002).

[17] [18] Moreover, claims alleging fraudulent suppression are subject to a two-year statute of limitation. *Parham,* 693 So.2d at 417.

"[T]he limitations period begins to run when the plaintiff was privy to facts which would 'provoke inquiry in the mind of a [person] of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud.' *Willcutt v. Union Oil Co.,* 432 So.2d 1217, 1219 (Ala.1983) (quoting *Johnson v. Shenandoah Life Ins. Co.,* 291 Ala. 389, 397, 281 So.2d 636 (1973)); *see also Jefferson County Truck Growers Ass'n v. Tanner,* 341 So.2d 485, 488 (Ala.1977) ('Fraud is deemed to have been discovered when it ought to have been discovered. It is sufficient to begin the running of the statute of limitations that facts were known which would put a reasonable mind on notice that facts to support a claim of fraud might be discovered upon inquiry.')."

*Auto-Owners,* supra, 822 So.2d at 1195.

As noted, despite the information contained in the letters written him during 1986 and 1987, Davant-either in his individual capacity or subsequently in his capacity as trustee of the Trust-never inquired of the defendants about the status of coal mining on the leased property.

The Hortense Davant Trust was scheduled to terminate at the end of 1999 and Davant wanted to buy its interest in the leased premises along with its interest in other properties. He hired a geologist with whom he had previously worked, Reese Mallett, to investigate "whether there might be any value left ..., what tonnages, [and] what had actually transpired on" the 51 acres. Mallett reviewed records at JWR and conducted other investigations and reported back to Davant, who by this time was the trustee of the Trust, that about 135,000 tons of coal had been mined from the property; Davant had estimated from the royalty checks he had records of having received that only approximately 25,000 tons had been extracted. Davant followed up Mallett's report by meeting with Dixon at his office on July 29, 1999. Davant told Dixon that it appeared that JWR had mined his coal and sold it without giving him his royalty payments under the

lease. Davant testified in his deposition: "That was the first time I had ever had any concerns that I had not been paid-that I had not been treated honestly under the lease." In August 1999, he requested information from the bank acting as trustee for the Hortense Davant Trust concerning payments it had received, thinking that perhaps his share of royalties had been paid to the Hortense Davant Trust. The bank wrote Davant on August 25, 1999, and based on the information they shared, he continued to have concerns that he had not been paid all the royalties due under the lease.

*16 Considering all of these circumstances, we conclude that (1) no suppression or nondisclosure of the fact of post-January 1986 mining occurred, as alleged by paragraph 23 of the complaint, and (2) even assuming a lack of full disclosure, more than two years before the Trust filed this action it had received sufficient disclosures to trigger the running of the two-year statute of limitations for fraud. Therefore, the summary judgment entered for the defendants on May 1, 2003, based on the trial court's dual findings that "there was no fraudulent suppression and ... the plaintiffs claim is time barred by the statute of limitations" was not in error.

The summary judgments are affirmed.

AFFIRMED.

NABERS , C.J., and SEE , BROWN , and STUART , JJ., concur.

Ala.,2004.

Davant v. United Land Corp.

--- So.2d ---, 2004 WL 1909334

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
1999 WL 1267702 (N.D.Ill.)
(Cite as: 1999 WL 1267702 (N.D.Ill.))

Page 1

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.
Lou JERIK on behalf of himself and all others similarly
situated, Plaintiff,
v.
COLUMBIA NATIONAL, INC., and John Does 1-10,
Defendants.
No. 97 C 6877.

Sept. 30, 1999.

*MEMORANDUM OPINION AND ORDER*
WILLIAMS, J.

*1 Plaintiff Lou Jurik ("Jurik") brings this five count, putative class action against Defendant Columbia National, Inc. ("Columbia"), a Maryland corporation, challenging the defendant's practice of charging a $10 quote fee and a $5 fax fee for faxing payoff statements to persons other than the borrower. In Count I of his amended complaint, Jurik alleges that Columbia breached its contract with Jurik. In Counts II and III, Jurik claims that Columbia violated the federal RICO statute, 18 U.S.C. § 1962(c). Jurik makes a claim, in Count IV, for restitution and other appropriate damages. Finally, in Count V, Jurik alleges that defendant violated the Maryland Consumer Protection Act, Md. Com. Law § 13-101 et seq.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Columbia moves for summary judgment on all counts. Also Pursuant to Rule 56, Jurik moves for partial summary judgment on Count I. For the reasons set forth below, the court denies Jurik's motion and grants Columbia's motion in full.

Background
On April 14, 1993 Jurik and his wife entered into a note and a mortgage loan with Painewebber Mortgage Finance, Inc. (Pl.'s 12(M) ¶ 7.) On August 19, 1995, Columbia acquired servicing of Jurik's mortgage loan. (Pl.'s 12(M) ¶ 8.) Both Jurik's note and mortgage were written on Federal National

Mortgage Association ("FNMA" / Federal Home Loan Mortgage Corporation ("FHLMC") forms. (Pl.'s 12(M) ¶ 9.) Paragraph 4 of the Note, entitled Borrower's Right to Prepay, specifically provides for the borrower to pay off the loan prior to maturation: "I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a 'prepayment'.... I may make a full prepayment or partial prepayments without paying any prepayment charge...." (Pl.'s 12(M), App. A ¶ 4.)

The mortgage also contains language dealing with authorized and unauthorized charges. (Pl.'s 12(M), App. B.) Paragraph One, entitled "Payment of Principal and Interest; Prepayment and Late Charges", provides only for prepayment charges that are due under the Note. (Pl.'s 12(M), App. B ¶ 1.) Paragraph Four, entitled "Charges; Liens", lists charges for which the borrower is responsible. (Pl.'s 12(M), App. B ¶ 4.) The Mortgage states, in part: "Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any." (Pl.'s 12(M), App. B ¶ 4.) The mortgage obligates the borrower to make these and various other specific payments in connection with the loan. (Pl.'s 12(M), App. B.). The mortgage does not contain any provision which authorizes the mortgage holder to charge the borrower a fee for prepayment or to charge the borrower for a payoff letter. (Pl.'s 12(M) ¶¶ 13, 15, 16.)

On August 28, 1997, Jurik sold his home, and as part of this transaction, he paid off his mortgage loan with Columbia. (Pl.'s 12(M) ¶¶ 18, 22.) Attorney Stephen Newland ("Newland") represented Jurik in selling his house and paying off his loan. (Def.'s 12(M) ¶ 7.) Newland faxed a letter to Columbia on August 19, 1997 requesting payoff information on Jurik's loan. (Def.'s 12(M) ¶ 9.) Columbia faxed a payoff statement to Newland on August 20, 1997. (Def.'s 12(M) ¶ 10.) Included among the payoff statement charges were a "fax fee" of $5 and a "quote fee" of $10. (Def.'s 12(M) ¶ 10.) Jurik paid Columbia the total amount listed on the payoff statement, including the fax fee and the quote fee, (Def.'s 12(M) ¶ 15), but argues that he paid the fee under protest. (Pl.'s 12(M) ¶ 28; *but see* Def.'s 12(M) ¶¶ 15-17 (stating that plaintiff did not protest the fees)).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
1999 WL 1267702 (N.D.Ill.)
(Cite as: 1999 WL 1267702 (N.D.Ill.))

Page 2

**\*2** Columbia charges borrowers a fax fee whenever borrowers or their agents request a faxed copy of a payoff statement. (Def.'s 12(M) ¶ 11.) Columbia will send a payoff statement to the borrower at no charge, but it charges a quote fee if someone other than the borrower makes the request for a payoff statement. (Def.'s 12(M) ¶ 11.)

## Analysis

Jurik moves the court to enter summary judgment on Count 1 under Rule 56 of the Federal Rules of Civil Procedure. Columbia moves the court to enter summary judgment on its behalf for all five counts. The court will render summary judgment only if the factual record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." _Bratton v. Roadway Package Sys., Inc.,_ 77 F.3d 168, 173 (7th Cir.1996) (quoting Fed.R.Civ.P. 56(c)). This court will not render summary judgment if "a reasonable jury could return a verdict for the nonmoving party." _Sullivan v. Cox,_ 78 F.3d 322, 325 (7th Cir.1996) (citing _Anderson v. Liberty Lobby, Inc.,_ 477 U.S. 242, 248 (1986)). In ruling on a motion to for summary judgment, the court views the facts in the light most favorable to the nonmoving party. _See Bratton,_ 77 F.3d at 171 (citation omitted); _Sullivan,_ 78 F.3d at 325 (citation omitted).

On a motion for summary judgment, the moving party "bears the initial burden of showing that no genuine issue of material fact exists." _Hudson Ins. Co. v. City of Chicago Heights,_ 48 F.3d 234, 237 (7th Cir.1995) (citing _Celotex Corp. v. Catrett,_ 477 U.S. 317, 323 (1986)). Then the burden shifts to the nonmoving party, which "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); accord, _NLFC, Inc. v. Devcom Mid-America, Inc.,_ 45 F.3d 231, 234 (7th Cir.1995) (citations omitted).

_1. Breach of Contract_

Jurik argues that he is entitled to summary judgment on Count 1 for breach of contract because the fax and quote fees that Columbia charged him were prepayment penalties, which are expressly forbidden by the note. Jurik also claims that Columbia breached their contract by charging him fees that were not authorized by the mortgage agreement.

A charge is a prepayment penalty if the "charge imposed at the time of prepayment [was one] that would not [have been] imposed if the note were paid at maturity instead of at an earlier date." _Goldman v. First Fed. Sav. & Loan Ass'n,_ 518 F.2d 1247, 1252 (7th Cir.1975). Unfortunately, few cases have dealt directly with whether fax and quote fees such as the one Columbia charged Jurik constitute prepayment penalties. However, the courts in _Cappellini v. Mellon Mortgage Co.,_ 991 F.Supp. 31 (D.Mass.1997), and _Colangelo v. Norwest Mortgage, Inc.,_ 598 N.W.2d 14 (Minn.Ct.App.1999), applied the _Goldman_ test in situations similar to Jurik's.

In _Cappellini,_ the court rejected the idea that a \$15 fax fee and \$25 duplicate statement fee should be considered a prepayment penalty. 91 F.Supp. at 38. The mortgage and note in _Cappellini_ were identical to the ones that Columbia provided Jurik. _See id._ at 34-35. For example, the fax and duplicate statement fees were not enumerated in the note or mortgage. _See id._ at 35. The court ruled that prepayment penalties are charges that are "peculiarly associated with prepayment alone." _Id._ at 38. The _Cappellini_ court fax and statement fees are assessed in situations unrelated to prepayment. _See id._ Therefore, it ruled that "fax and statement fees are not prepayment charges, but are rather charges for special services outside of the basic service agreement provided to the borrower by [the lender] with respect to-_but not exclusively related to the prepayment_ of-a loan." _Id._ (emphasis added).

**\*3** Plaintiff argues that in _Cappellini_ the borrower was only charged for the second payoff request while in the instant case the borrower could be charged on the first request. The dispositive issue under _Goldman,_ however, is whether the fee is charged for prepayments but not at maturity. There is nothing about fax fees or quote fees that makes them unique to prepayments. Columbia could, and probably does, charge these fees at maturity if the borrower requests these services.

Likewise, in _Colangelo,_ the court ruled that a \$10 fax charge was not a prepayment penalty. _See_ 598 N.W.2d at 19. The _Colangelo_ court found that a mortgage could be paid off without paying the fax fee; the charge was simply a fee for special services, which is often assessed in situations

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
1999 WL 1267702 (N.D.Ill.)
(Cite as: 1999 WL 1267702 (N.D.Ill.))

Page 3

unrelated to a mortgage prepayment. *See id.* at 17. "The fact that a cost is imposed on the borrower at the time the loan is prepaid does not render the cost a penalty; a charge is a prepayment penalty if the cost 'would be imposed if the note were paid at maturity instead of an earlier date." ' *Id.* (quoting *Goldman v. First Fed. Sav. & Loan Ass'n, 518 F.2d 1247, 1252 (7th Cir.1975)*).

Jurik argues that the fax and quote fees Columbia charged him are prepayment penalties because it was necessary for him to have a written copy of the payoff statement faxed to his attorney. (Pl.'s 12(M) ¶¶ 25, 26.) Jurik asserts that using a verbal agreement would violate the statute of frauds and make it impossible for a borrower to accomplish a payoff through refinancing or sale. (Pl.'s 12(M) ¶ 21.) He suggests that it is customary to fax a payoff statement directly to the closing agent because "too many closings would be frustrated if the closing agent had to wait and receive the payoff statement by mail." (Pl.'s 12(M) ¶ 21, App. K.) Furthermore, he claims that it has become customary since the early 1990s to fax the payoff statement to the closing agent. (Pl.'s 12(M) ¶ 21; App. K.)

Jurik may be correct that a written payoff statement was necessary for him to pay off his mortgage. He may also be correct that it is customary for the payoff statement to be faxed to the closing agent. However, neither the fact that he needed a written payoff statement nor the fact that it is customary for payoff statements to be faxed to closing agents make the $5 fax fee and the $10 quote fee a prepayment penalty. These fees were not assessed to Jurik because he paid his loan prior to maturation. Instead, they are charges for the convenience of having the payoff statement faxed to Newland rather than mailed directly to Jurik. *See Cappellini, 991 F.Supp. at 38, 40* (ruling that charging a fee for a "convenience" service was not a prepayment penalty); *Colangelo,* 498 N.W.2d at 17 (finding that the fax fee was a special service because borrower could obtain, free of charge, one payoff statement by mail). The mere fact that these fees were incurred while Jurik was in the process of repaying his mortgage does not make them prepayment penalties. Furthermore, both the fax fees and the quote fees could have been charged to Jurik in relation to an activity unrelated to the prepayment of his mortgage.

*See Goldman, 518 F.2d at 1252* (ruling that a fee is not a prepayment penalty if it also assessed, for example, at maturity). Therefore, neither the $5 fax fee nor the $10 quote fee constitutes a prepayment penalty.

\*4 Plaintiff argues that the district court's opinion in *Sandlin v. Shapiro & Fishman, 919 F.Supp. 1564 (M.D.Fla.1996),* should control. In *Sandlin,* the court, in denying a motion to dismiss, ruled that a $60 payoff fee charged by a law firm in the collection of an outstanding mortgage debt could constitute an illegal prepayment penalty. *See id.* at 1569. This case is inapposite to Jurik's situation. First, *Sandlin* is a motion to dismiss, which accepts as true all allegations on the face of the complaint. Second, a payoff fee that is only charged for prepayment, or in this case for collection, is a quintessential prepayment penalty. It would not have been charged if the borrower had made all of his payments.

Jurik also relies on a maxim of contract construction, *expressio unius est exclusio alterius,* or "the mention of one thing excludes another", to argue that the fax and quote fees are not authorized under the terms of the mortgage. Under this maxim, if certain provisions are specified in a contract, an intention to exclude all other like provisions may be inferred. *See Black's Law Dictionary* 581 (6th ed.1990). Because the mortgage includes servicing-related functions and the fees for those functions, Jurik argues that any fees not listed in the mortgage are unauthorized.

Furthermore, Jurik claims that another rule of contract construction, *contra proferentum,* requires that the mortgage agreement be construed against Columbia. Under *contra proferentum,* an ambiguous provision in a written document must be construed unfavorably against the party which drafted the language. *See Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62 (1995); see also Black's Law Dictionary* 327 (6th ed.1990).

There is no need to resort to rules of construction such as *contra proferentum* or *expressio unius est exclusio alterius,* however, unless the terms of the contract are substantially and genuinely ambiguous. *See Pitcher v. Principal Mut. Life Ins., 93 F.3d 407, 418 (7th Cir.1996); see also, Baker v. America's Mort. Serv. Inc., 58 F.3d 321, 327 (7th Cir.1995).* The mere fact that the parties do not agree on the meaning

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
1999 WL 1267702 (N.D.Ill.)
(Cite as: 1999 WL 1267702 (N.D.Ill.))

Page 4

of the contract terms does not render it ambiguous. *See Bourke v. Dun & Bradstreet Co.,* 159 F.3d 1032, 1036 (7th Cir.1998). Instead, a contractual provision must be subject to more than one reasonable interpretation to be considered ambiguous. *See id.* In this case, the contract language is clear and unambiguous. The mortgage and the note simply lists some of the charges that are authorized and some of the charges that are unauthorized. Consequently, there is no need to resort to rules of contract construction.

Ironically, even if the court were to apply these rules of construction, as Jurik suggests, the court could construe the mortgage as allowing Columbia to charge fax and quote fees. In *Colangelo,* the court pointed out that the *maxim expressio unius est exclusio alterius* doctrine works "as a double edged sword" in cases such as this one. *See Colangelo,* 598 N.W.2d at 18. The mortgage not only mentions specific fees that the borrower must pay but also mentions specific charges that the mortgage-servicing company cannot collect. *See id.* If the court were to apply *expressio unius est exclusio alterius,* fees that are not specifically prohibited by the mortgage contract, such as the fax fee and the quote fee, would most likely be authorized. *See id.* The mortgage and note cannot anticipate every service request made by a borrower. *See Cappellini,* 991 F.Supp. at 39. The borrower is not entitled to services from the lender free of charge just because the lender did not anticipate the request. *See Cain v. Source One Mortgage Servs. Corp.,* No. 43041-6-1, 1999 WL 674776, at *1 (Wash.Ct.App. Aug. 30, 1999) (ruling that "[a] lender who faxes a payoff statement at the borrower's request may charge a fax fee without violating the loan contract, even though the contract does not enumerate the fax fee as a responsibility of the borrower"). Therefore, because the fax and quote fees are neither prepayment penalties nor unauthorized charges, they do not violate the terms of the contract. Therefore, Jurik's claim for breach of contract must fail.

*II. Remaining Counts: RICO, Restitution and Consumer Fraud*

*5 Once it is established that there is no breach of contract because fax and quote fees are neither prepayment penalties nor unauthorized by the mortgage agreement, Jurik's other claims must also fail. All of the other claims are predicated on the fact that Columbia committed some wrong by charging Jurik to fax the payoff statement to Jurik's attorney.

To properly state a RICO claim, Jurik would have to "show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985). Racketeering activity is defined as "any act indictable under certain specified federal statutes." 18 U.S.C. § 1961(1)(b). Jurik alleges that Columbia used the mail or the telephone to perpetrate its fraudulent scheme, violating federal mail and wire fraud statutes. *See McDonald v. Schencker,* 18 F.3d 491, 494 (7th Cir.1994) (alleging mail fraud); *Scott Int'l, Inc. v. Sifers,* No. 86 C 9233, 1988 WL 96542, at *2 (N.D.Ill. Sept. 15, 1988) (alleging wire fraud). Because this court has ruled that the fax and quote fees do not violate the contract between Jurik and Columbia, there is no fraudulent scheme; therefore, pl cannot prove wire or mail fraud. Consequently, Columbia cannot be charged under the RICO statute for charging fax and quote fees because this activity does not violate any federal statute.

Similarly, Jurik's claim for consumer fraud under the Maryland Consumer Protection Act ("Act") also fails. [FN1] The Act authorizes "any person [to] bring an action to recover for injury or loss sustained by him as a result of a practice prohibited by this [Act]." Md. Com. Law § 13-408. The Act prohibits, inter alia, "[u]nfair or deceptive trade practices includ[ing] any (1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." *Id.* § 13-301(1). Because the court has ruled that Columbia's fax and quote fees do not constitute a deceptive act or practice, this claim also fails.

> FN1. Plaintiff's amended complaint alleges that defendant violated the Maryland Consumer Protection Act. Plaintiff's response to defendant's motion for summary judgment, however, discusses the Illinois Consumer Fraud and Deceptive Practices Act. Because the amended complaint only alleges a violation of the Maryland statute, the court will not address the Illinois statute.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
1999 WL 1267702 (N.D.Ill.)
(Cite as: 1999 WL 1267702 (N.D.Ill.))

Moreover, Jurik's request for restitution damages fails because Columbia had no illegal gains. Jurik alleged that he was due restitution and other damages because Columbia "illegally obtained" the fax and quote fees. (Am.Compl.¶ 90.) The court has ruled that the fax and quote fees do not violate the contract between the parties; therefore, the fees were not "illegally obtained." [FN2]

> FN2. Furthermore, because the fax and quote fees are not prepayment penalties or unauthorized charges, it is unnecessary for the court to reach the question of whether or not the voluntary payment doctrine is applicable.

### Conclusion

For the reasons stated above, the court denies plaintiff's motion for partial summary judgment [34-1] and grants defendant's motion for summary judgment [33- 1] on all counts. The date for filing any motions or appeals runs from the date this Memorandum Opinion and Order is entered.

1999 WL 1267702 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 1:97CV06877 (Docket) (Oct. 01, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

No. 1-03-2138

IN THE APPELLATE COURT OF ILLINOIS
FIRST DISTRICT, SECOND DIVISION

| | | |
|---|---|---|
| GLADYS PEDROZA, | ) | Appeal from the Circuit Court of |
| | ) | Cook County, Illinois |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 01 CH 19483 |
| | ) | |
| WASHINGTON MUTUAL BANK, FA | ) | Honorable Sophia H. Hall, |
| | ) | Presiding |
| Defendant-Appellee. | ) | |
| | ) | |

## ORDER

This matter coming before the Court on Defendant-Appellee Washington Mutual

Bank, FA's Motion to Have Order Published as an Opinion,

IT IS HEREBY ORDERED that Defendant-Appellee's Motion to Have Order

Published as an Opinion is ~~GRANTED~~ / DENIED.

ORDER ENTERED

JAN 1 2 2005

APPELLATE COURT, FIRST DISTRICT

Order prepared by:
Brian D. Hansen
Jenner & Block LLP (#05003)
One IBM Plaza
Chicago, IL 60611
(312) 222-9350

NOTICE
The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

SECOND DIVISION
DECEMBER 14, 2004

No. 1-03-2138

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| GLADYS PEDROZA, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellant, | ) Cook County. |
| | ) |
| v. | ) |
| | ) No. 01 CH 19483 |
| WASHINGTON MUTUAL, | ) |
| | ) The Honorable |
| Defendant-Appellee. | ) Sophia H. Hall, |
| | ) Judge Presiding. |

## O R D E R

In November 2001, the plaintiff, Gladys Pedroza, sued the defendant, Washington Mutual Bank, for breach of contract after it charged her a $60 fee for a written payoff statement. In January 2003, Washington Mutual, filed a motion for summary judgment. The trial court, relying on the holding in Krause v. GE Capital Mortgage Services, Inc., 314 Ill. App. 3d 376, 731 N.E.2d 302 (2000), granted the motion. Pedroza appeals, arguing the court erred in granting summary judgment. Specifically, Pedroza argues Krause does not control because (1) a prepayment charge is different from a prepayment penalty, (2) her mortgage note did not specifically authorize Washington Mutual to charge a fee for a written payoff statement, and (3) written payoff

1-03-2138

statements are customarily required by title companies at closing.    We affirm.

## I. Background

In 1998, Pedroza executed a mortgage note payable to the United Savings of America.    The note provided that Pedroza could "make a full payment or partial payments without paying any prepayment charge."    At some point, which is not clear from the record, Washington Mutual became the servicer of Pedroza's note.

Washington Mutual is a federally chartered savings association that, among other things, services mortgage loans. As a servicer, Washington Mutual provides certain administrative and record-keeping services, including collecting loan payments from borrowers and maintaining an escrow account to pay taxes and property insurance.    Washington Mutual also responds to inquiries from borrowers requesting payoff statements, which are quotations of their outstanding loan balances.

In February 2001, Maurice Grimes, Pedroza's attorney, accessed Washington Mutual's automated interactive voice response system (IVRS) to inquire about payoff procedures and fees.    After being informed that Pedroza would be charged $60 for the preparation and issuance of the payoff statement, Grimes ordered a payoff statement.    The statement was good through February 28, 2001, and provided daily interest amounts if the payoff amount was not paid in full by that date.    Pedroza's loan account was charged $60 for the statement at the time it was issued.    Grimes

2

1-03-2138

later contacted Washington Mutual and indicated that he did not believe that Washington Mutual could charge the fee for providing the statement.

In March 2001, Grimes requested that a second updated payoff statement, good through March 20, 2001, be faxed to him. Washington Mutual did not charge Pedroza for the second statement because the request was made within 60 days of the first statement. On April 6, 2001, Pedroza paid her mortgage in full. Under protest she paid the $60 payoff statement fee.

In November 2001, Pedroza filed a complaint against Washington Mutual for breach of contract. Her complaint alleged that the payoff statement fee was a prepayment charge. The payment of the fee constituted economic duress and the fee was not authorized under the terms of her mortgage note. Pedroza also sought class certification, but that issue has not been raised on appeal.

In January 2003, Washington Mutual filed a motion for summary judgment, arguing that the payoff statement fee was not a prepayment charge but instead was a fee charged for an identified and valuable service provided to Pedroza. Washington Mutual supported its motion with an affidavit from Debra A. Robbins, a team manager for the Consumer Direct Fulfillment Center with Washington Mutual, and previously a section manager for the payoff department in the loan servicing division of Washington Mutual.

3

1-03-2138

In her affidavit, Robbins stated Washington Mutual responds to inquiries from borrowers requesting a payoff statement. The requests are often made when borrowers are planning to pay off their mortgage loans before maturity, but are also requested for overall financial planning, to update financial statements, for divorces and bankruptcies, for general information purposes, and when borrowers are considering whether to sell or refinance their homes.

Robbins stated that Washington Mutual does not require a borrower who wants to prepay the full principal balance of her loan to obtain a written payoff statement. Washington Mutual only requires that the borrower tender the principal balance owing together with any other outstanding interest, fees, or charges. Additionally, Washington Mutual processes prepayments where payoff statement fees are incurred but not tendered at the time of payoff.

Robbins also stated that Washington Mutual does not charge borrowers for verbal quotes of their payoff statements that are given over the telephone. It does not charge for written payoff statements (1) if the request is in connection with the borrower's refinancing of an existing Washington Mutual mortgage loan, (2) if the request is for a second payoff statement and that statement was generated within 60 days of the original payoff statement request, and (3) if the borrower's loan originated in Florida, Georgia, Iowa, North Dakota, New York,

4

1-03-2138

Virginia, or West Virginia. In certain circumstances, such as when a payoff statement is requested in connection with a Federal Housing Administration or a Veterans Administration loan, Washington Mutual may adjust or waive the fee. In all other circumstances, Washington Mutual charges a fee for providing a written payoff statement. The payoff statement fee is incurred at the time the statement is issued.

Robbins explained that the purpose of the payoff statement fee is to compensate Washington Mutual for the cost of providing the special service of calculating and transmitting the written payoff statement at the borrower's request. Additionally, because a payoff statement can act as an estoppel letter against Washington Mutual, it charges the fee as consideration for the risk of error that it assumes upon the issuance of the statement.

Additionally, Robbins explained that payoff statements can be ordered either (1) through a telephone call to a customer care representative, (2) through the IVRS, and (3) by a written request. The IVRS discloses the payoff statement fee before a caller determines what method of shipment, mail or fax, he wants.

Robbins also reviewed the computer and business records maintained by Washington Mutual on Pedroza's account. On December 26, 2000, Washington Mutual provided Pedroza with a letter setting forth the terms of her loan as of March 1, 2001, which included the principal balance due as of that date and the interest rate of the loan. Washington Mutual did not charge a

1-03-2138

fee for this information. On February 14, 2001, Pedroza or her agent accessed the IVRS and ordered an expedited payoff statement. The caller was informed, in advance, of the $60 payoff statement fee. That day, Washington Mutual faxed the payoff statement to Grimes and Pedroza's loan account was charged $60 for the statement. On March 7, 2001, Pedroza or an agent ordered a second updated payoff statement. That statement was also faxed to Grimes. Pedroza was assessed a $60 fee at the time the second payoff statement was ordered, but Washington Mutual waived the fee because the request was made within 60 days of the first request. On April 6, 2001, Pedroza paid off her loan in full and paid the $60 payoff statement fee. Robbins states that Pedroza did not pay any prepayment penalties or charges.

In response to Washington Mutual's motion, Pedroza maintained that the payoff statement fee was a prepayment charge that was prohibited by her mortgage note. Pedroza attached the affidavit of one of her attorneys, Russell Green, that stated that all major title insurance companies conducting real estate closings with a loan payoff require a written payoff statement. Pedroza also attached numerous documents that were filed under seal pursuant to an agreed protective order. While we will not divulge the contents of that information, we have reviewed it for this appeal. See <u>Skolnick v. Altheimer & Gray</u>, 191 Ill. 2d 214, 228, 730 N.E.2d 4 (2000).

After hearing arguments on Washington Mutual's motion for

6

1-03-2138

summary judgment, the trial court granted the motion simply stating that <u>Krause</u> governs. This appeal followed.

## II. Analysis

On appeal, Pedroza argues that <u>Krause</u> does not control the outcome of this case because (1) a prepayment charge is different from a prepayment penalty, (2) her mortgage note did not specifically authorize Washington Mutual to charge a fee for a written payoff statement, and (3) written payoff statements are customarily required by title companies at real estate closings.

### A. Summary Judgment

Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2002). Summary judgment should only be granted where the right of the moving party is clear and free from doubt. <u>Horwitz v. Holabird & Root</u>, 212 Ill. 2d 1, 8, 816 N.E.2d 272 (2004). We review the grant of summary judgment <u>de novo</u>. <u>Horwitz</u>, 212 Ill. 2d at 8.

### B. Payoff Statement Fee

In <u>Krause</u>, the court considered a case that was legally and factually very similar to the case before this court. The plaintiffs sued the defendant, GE Capital Mortgage Services, Inc., for breach of contract, restitution, and unfair and

7

1-03-2138

deceptive practices under the Consumer Fraud and Deceptive Business Practices Act (Fraud Act) (815 ILCS 505/1 et seq. (West 1998)). Krause, 314 Ill. App. 3d at 377. Like Washington Mutual, the defendant serviced the plaintiffs' home mortgage loans. The plaintiffs' mortgage notes contained language nearly identical to the language in Pedroza's note: "I may make a full prepayment or partial prepayment without paying any prepayment charges." Krause, 314 Ill. App. 3d at 377.

The plaintiffs entered into contracts to sell their homes and sought to payoff their mortgage loans before maturity. To fulfill their contracts, the plaintiffs were required to obtain written payoff statements. On September 17, 1996, the plaintiffs Phillip and Tammy Lindbergs ordered an initial payoff statement and requested that it be sent by facsimile. The Lindbergs were charged a $10 fax fee that was included in the statement. Krause, 314 Ill. App. 3d at 379. On June 23, 1997, the Lindbergs ordered a second payoff statement and requested that it be sent by mail. The second statement included the earlier $10 fax fee and a new $15 quote fee. In the next couple of months, the Lindbergs ordered three more payoff statements and requested that two of those be sent by facsimile. In total, the Lindbergs were charged a $15 quote fee and $30 fax fees for the three faxed statements. Krause, 314 Ill. App. 3d at 380.

On June 4, 1997, the plaintiffs Steven and Patricia Krause

8

1-03-2138

requested an initial payoff statement and requested that it be
sent by facsimile. The statement included the $10 fax fee. On
July 17, 1997, the Krause's requested a second payoff statement
to be sent by facsimile. The statement included a second fax fee
of $10 and a $15 quote fee. Krause, 314 Ill. App. 3d at 379.

The defendant moved for summary judgment and relied in part
on the affidavit of Diane Graf, a vice president of its customer
service department. Graf stated that the quote and fax fees were
not prepayment charges but were charges for authorized services.
Borrowers requested payoff statements not only for prepayment
purposes, but also for overall financial planning, to update
financial statements, for divorce or bankruptcy, and for general
informational purposes. Krause, 314 Ill. App. 3d at 378.

Graf also stated that the defendant charged the $10 fax fee
for only those payoff statements sent by facsimile.
Additionally, the defendant charged a $10 quote fee if more than
one written payoff statement on an account was requested. The
fees were charged to the borrowers accounts when the services
were rendered, but were not paid until the loan was paid off.
Fax and quote fees were not required for prepayment of a loan
because a loan could be paid off even though the borrower did not
order a payoff statement and where the borrower only ordered one
written payoff statement to be sent by mail. Graf also explained
that the defendant fully disclosed the quote and fax fees to any

9

1-03-2138

party who requested a payoff statement. <u>Krause</u>, 314 Ill. App. 3d
at 379.

In response to the defendant's motion for summary judgment,
the plaintiffs argued "that there were genuine issues of material
fact that the quote and fax fees were prepayment penalties, were
not authorized by the mortgages or notes, and were unfair
practices under the Fraud Act." <u>Krause</u>, 314 Ill. App. 3d at 380.
The trial court granted the defendant's motion and the appellate
court affirmed the trial court's decision.

Initially the <u>Krause</u> court held that the quote and fax fees
were not prepayment penalties. "A charge is a prepayment penalty
if the 'charge imposed at the time of prepayment [was one] that
would not [have been] imposed if the note were paid at maturity
instead of at an earlier date.'" <u>Krause</u>, 314 Ill. App. 3d at 381,
quoting <u>Goldman v. First Federal Savings & Loan Ass'n of
Wilmette</u>, 518 F.2d 1247, 1252 (7th Cir. 1975). The court relied
on <u>Cappellini v. Mellon Mortgage Co.</u>, 991 F. Supp. 31 (D. Mass.
1997) and <u>Colangelo v. Norwest Mortgage, Inc.</u>, 598 N.W.2d 14
(Minn. App. 1999), two cases that also examined whether fax and
quote fees constituted prepayment charges. <u>Krause</u>, 314 Ill. App.
3d at 381-82.

The <u>Krause</u> court held that the fax and quote fees did not
constitute prepayment charges because (1) the fees were not
exclusively related to the prepayment of a loan and could be

10

1-03-2138

charged for reasons other than prepayment, and (2) a borrower did not need to obtain a payoff statement to prepay the loan, or the borrower could pay off the loan after requesting only one statement. The "charges would be imposed whether the notes were paid at maturity or at an earlier date and therefore fail to satisfy the definition of a prepayment penalty under Goldman." Krause, 314 Ill. App. 3d at 382. The court held that "[f]ees that could be imposed in connection with a payment in full at maturity, fees that are an addition to the loan principle [sic], or fees that must be paid regardless of whether the loan is prepaid do not constitute prepayment penalties." Krause, 314 Ill. App. 3d at 383.

The Krause court also held that even assuming the plaintiffs' attorneys required written payoff statements to close on the sale of the plaintiffs' homes, the fees were not prepayment penalties because the defendant did not assess the fees because the plaintiffs prepaid their loans. The fees were incurred because the plaintiffs requested more than one payoff statement and requested that they be sent by facsimile. Krause, 314 Ill. App. 3d at 383-84. The court held that the fees represented compensation for special services that the plaintiffs requested. Additionally, the plaintiffs could have obtained the information without incurring a fee. Krause, 314 Ill. App. 3d at 385.

11

1-03-2138

In this case, Pedroza attempts to distinguish <u>Krause</u> because that court used the terms prepayment charges and prepayment penalties interchangeably. Pedroza contends that a prepayment charge is any expense or charge made in conjunction with a loan prepayment other than a prepayment penalty.

Although the <u>Krause</u> court did use the terms interchangeably, the court considered a contract provision <u>identical</u> to the provision in Pedroza's contract and it considered charges for the exact same service of providing a written payoff statement. The court also relied on <u>Cappellini</u>, in which the court considered identical contract language, <u>i.e.</u>, "I may make a full prepayment or partial prepayments without paying any prepayment charge," and fees charged for providing written payoff statements. <u>Cappellini</u>, 991 F. Supp. at 34.

The <u>Cappellini</u> court explained:

> "Historically, a borrower was not permitted to prepay a loan. When practices changed to allow borrowers to prepay loans in part or full, <u>prepayment</u> <u>penalties</u> <u>or</u> <u>charges</u> were developed in order to compensate lenders for costs associated with the unanticipated reinvestment of principal, presumptively at less favorable rates. These charges deterred borrowers from prepaying and afforded lenders

12

1-03-2138

> more predictable returns during periods of
> fluctuating interest rates.  These <u>prepayment</u>
> <u>charges</u> <u>were</u> <u>usually</u> <u>calculated</u> <u>in</u> <u>relation</u>
> <u>to</u> <u>the</u> <u>amount</u> <u>and</u> <u>timing</u> <u>of</u> <u>prepayment</u>."
> (Emphasis added.)  <u>Cappellini</u>, 991 F. Supp.
> at 36.

Accordingly, "[p]repayment charges are those which are <u>peculiarly</u>
<u>associated</u> <u>with</u> <u>prepayment</u> <u>alone</u>."  (Emphasis added.)
<u>Cappellini</u>, 991 F. Supp. at 38.

In this case, Washington Mutual's payoff statement fee is
not contingent solely on a borrower's prepayment of a loan.  The
record indicates that a borrower may request a payoff statement
for any number of reasons that are not related to prepayment.
The fees are incurred at the time Washington Mutual provides the
statement and not at prepayment.  Additionally, once a borrower
requests a statement, the fee would be imposed whether the note
was paid at maturity or at an earlier date.  See <u>Krause</u>, 314 Ill.
App. 3d at 382.  Washington Mutual did not require a written
payoff statement before a borrower was permitted to payoff a
loan, and it accepted prepayment even in those cases where a
payoff statement fee was not charged.

Therefore, even if we were to accept Pedroza's definition of
a prepayment charge, the payoff statement fee would not fit
within that definition.  The fee is not peculiarly associated

13

1-03-2138

with prepayment alone but is associated with a special service provided by Washington Mutual at the request of one of its borrowers. See <u>Krause</u>, 314 Ill. App. 3d at 385.

Like the plaintiffs in <u>Krause</u>, Pedroza also argues that because written payoff statements are customarily required to complete a real estate closing, the fees constitute prepayment charges. Again we agree with the <u>Krause</u> court that this fact does not make a payoff statement fee a prepayment charge. See <u>Krause</u>, 314 Ill. App. 3d at 383-84. The fact that the <u>Krause</u> plaintiffs were charged a quote fee for the second, but not the first payoff statement does not affect our analysis. The payoff statement fee that Washington Mutual charged Pedroza was a fee assessed for a special service at the time the service was rendered. It was not assessed because Pedroza paid off her loan early. Additionally, the record reflects that a borrower's ability to complete a real estate closing would not be hampered by his failure to pay that fee when he paid off his loan. In her affidavit, Robbins stated that Washington Mutual processes prepayments where payoff statement fees are incurred but were not tendered at the time of payoff.

In <u>Krause</u>, the plaintiffs also argued that even if the fees did not constitute prepayment penalties, their mortgages and notes did not authorize the defendant to charge the fees. That court held that the plaintiffs' mortgages and notes were not

14

1-03-2138

ambiguous; they listed certain fees that were permitted and certain fees that were prohibited. The language of the contracts did not, however, prohibit the imposition of a charge for services provided outside the contracts. <u>Krause</u>, 314 Ill. App. 3d at 386. The court explained that "[w]e do not believe that plaintiffs' mortgages and notes entitled them to receive free of charge any service not specifically referenced in the contract." <u>Krause</u>, 314 Ill. App. 3d at 387.

In this case, Pedroza also argues that Washington Mutual was not permitted to charge a statement fee because the fee was not specifically authorized in the mortgage or note. Pedroza contends that as the loan servicer, Washington Mutual was an assignee and was subject to the terms of the contract and could not require the payment of new fees or charges.

As we noted earlier, Washington Mutual did not require a written payoff statement before a borrower could prepay a loan. Instead, the fees relate to "special services outside of the scope of the basic services provided by a mortgage servicer." <u>Cappellini</u>, 991 F. Supp. at 39. Although Pedroza's mortgage did not specifically permit payoff statement fees, it did not prohibit them either. See <u>Cappellini</u>, 991 F. Supp. at 39 ("[i]t would be difficult for form notes and mortgages that cover long time periods to anticipate and include each and every such incidental special request made by a borrower"). We agree with

15

1-03-2138

the <u>Krause</u> court that Pedroza is not entitled "to receive free of charge any service not specifically referenced in the contract." <u>Krause</u>, 314 Ill. App. 3d at 387.

Washington Mutual disclosed that it would charge Pedroza a $60 payoff statement fee for providing a payoff statement at her request. The fee was not a prepayment charge and was not prohibited by her mortgage note. Based on the record in this case, we find no issue of material fact regarding Pedroza's breach of contract claim and that Washington Mutual is entitled to judgment as a matter of law.

### III. Conclusion

For the reasons stated, we affirm the judgment of the trial court.

Affirmed.

GARCIA, J., with WOLFSON and HALL, JJ., concurring.

16