IN THE CIRCUIT COURT OF LOWNDES COUNTY, ALABAMA

| | | |
|---|---|---|
| KENNETH & DEBRA SCOTT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV 05-10 |
| | ) | |
| WASHINGTON MUTUAL BANK, F.A., | ) | |
| | ) | |
| Defendant. | ) | |

<u><b>PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS</b></u>

Come now the Plaintiffs, Kenneth & Debra Scott ("the Scotts" or "Plaintiffs"), and hereby file and submit this Response in Opposition to the Motion to Dismiss of Defendant Washington Mutual Bank, F.A. ("WAMU"). For the reasons discussed herein, the Motion should be denied.

<u>INTRODUCTION</u>

As millions of consumers entered the mortgage refinancing market in the past few years, lenders began searching for ways to recoup the revenue streams lost in the so-called "Refi-Boom." It began in the late 1990s, as interest rates began to reach historic lows. Lenders whose loans were being paid off stood to lose substantial future streams of interest income. So, those lenders who serviced loans began charging back-end fees. One fee which became popular among lenders was the so-called "Payoff Fee" – a fee charged by the lender to send a payoff statement, either by mail or by facsimile or electronically (or otherwise) to a closing attorney or new lender. These "Payoff Fees" were often imposed only when the payoff statement was sent by fax or electronically,

rather than by mail; they usually ranged from $10 to $20; and they were added to the payoff amount on the loan.

In those early years, several class actions were filed to challenge the lender's entitlement to charge any such "Fax Fee." In Alabama, the Supreme Court's 2000 decision in <u>Stone v. Mellon Mortgage Co.</u>, 771 So. 2d 451 (Ala. 2000), signaled (at that time) an end to such cases, at least for purposes of challenging a "fax fee." In <u>Stone</u>, the Court held that the "voluntary payment doctrine" precluded (at the summary judgment stage of the case) the borrowers from pursuing recovery of a $15 fax fee, because they could have gotten the payoff statement by mail for free.

Emboldened by <u>Stone</u>, and facing a near-frenzied pace of refinancings in the early 2000s, lenders began more aggressive efforts to charge fees to mortgagees at payoff time. The story of Plaintiffs Kenneth and Debra Scott is a swatch in this wider industry fabric of revenue-recoupment. Plaintiffs had a loan on their house which was either acquired by or serviced by WAMU.[1] The loan agreement between Plaintiffs and the original lender (the loan was actually a retail installment contract between a contractor and the Plaintiffs) provided that the Plaintiffs could pay off the loan without any penalty or fee before maturity. But when Plaintiffs paid off their loan, **WAMU charged the Plaintiffs a**

---

[1] Since this is a Motion to Dismiss, Plaintiffs have not had the opportunity to take any discovery. The original loan was not with WAMU. At some point in time, WAMU began servicing the loan. Plaintiffs do not know (and have made no allegations concerning) what entity owned the loan at the time of the payoff. Ownership of the loan could be significant issue with regard to the claims being asserted. If WAMU was not the holder of the loan (it is common for loans to be securitized or syndicated and sold in the secondary market, sometimes with servicing rights sold separately), then WAMU was servicing the loan only (i.e., collecting payments for the holder and remitting them for a fee). These facts could impact whether, for example, the claim against WAMU is in quasi-contract or in contract, or perhaps both.

**whopping $180.00 for a "Payoff Statement Fee" ("PSF")**.[2] Since Plaintiffs owed just over $22,000.00 in principal at the time, the PSF amounted to nearly one percent of the total principal amount then owing. Plaintiffs have brought this lawsuit against WAMU for damages resulting from the imposition of the unauthorized and (in any event) grossly excessive PSFs. Plaintiffs' claims are for breach of the loan agreement (Count One), fraudulent suppression (Count Two), violation of the Alabama Mini-Code, Ala. Code § 5-19-4(g) (Count Three), and Unjust Enrichment (Count Four).

WAMU has moved to dismiss the Complaint. WAMU primarily contends that the Homeowners Loan Act of 1933, 12 U.S.C. § 1461 et seq. ("HOLA"), and the regulatory framework promulgated thereunder by the Office of Thrift Supervision ("OTS"), 12 C.F.R. § 560.2, preempt all of Plaintiffs' claims, thus allowing WAMU to charge any PSF it chooses – be it $180.00, $500.00, $5,000.00, or anything else(!). WAMU also contends that Plaintiffs have not stated a cause of action under Alabama law under any of the four counts, primarily due to Stone.

As we discuss herein, WAMU's arguments are without merit – with one exception. Plaintiffs concede that their Mini-Code claim should be dismissed because WAMU is entitled to invoke the exemption in Ala. Code § 5-19-31. But as to all remaining claims, the Motion to Dismiss should be denied.

---

[2] WAMU's Motion to Dismiss claims that the $180.00 charge on the payoff statement issued to Plaintiffs actually represents three separate $60.00 charges – because Plaintiffs (so says WAMU) ordered three payoff statements. WAMU's Motion to Dismiss at 3 n.2. WAMU's statements are not properly before the Court. This is a Motion to Dismiss, and therefore the only issue is whether Plaintiffs have stated viable causes of action on the face of the Complaint. And, regardless of WAMU's attempt to gussy up the facts, three separate $60.00 charges for payoff statements are just as unauthorized and grossly excessive as one $180.00 charge.

## STANDARD OF REVIEW

"The appropriate standard of review under Rule 12(b)(6) is whether, when the allegations of the complaint are viewed most strongly in the pleader's favor, it appears that the pleader could prove any set of circumstances that would entitle her to relief." Nance v. Matthews, 622 So. 2d 297, 299 (Ala. 1993), citing Raley v. Citibanc of Alabama/Andalusia, 474 So. 2d 640, 641 (Ala. 1985); accord Alabama A & M Univ. v. Jones, 895 So. 2d 867, 878 (Ala. 2004). Thus, the Court "must accept the allegations of the complaint as true." Ex parte Ala. Dept. of Youth Servs., 880 So. 2d 393, 397 (Ala. 2003). The Court "does not consider whether the plaintiff will prevail, but only whether she may possibly prevail." Nance, 622 So. 2d at 299, citing Fontenot v. Bramlett, 474 So. 2d 640, 641 (Ala. 1985), and Rice v. United Ins. Co. of America, 465 So. 2d 1100, 1101 (Ala. 1984). Thus, a "Rule 12(b)(6) dismissal is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." Nance, 622 So. 2d at 299.

## ARGUMENT

### I. The HOLA and OTS Regulations Do Not Preempt Plaintiffs' Claims

WAMU's primary argument is that the HOLA and the OTS Regulations preempt Plaintiffs' claims. The HOLA regulates the affairs of federally-chartered thrifts, such as WAMU. 12 U.S.C. § 1461. And unquestionably, Congress has granted to the OTS the authority to promulgate regulations which, once promulgated, preempt state law. Fidelity Fed. Sav. & Loan Ass'n. v. de la Cuesta, 458 U.S. 141, 161-62 (1982). And so, as the Supreme Court has noted, the OTS, generally speaking, occupies the field with respect to the regulation of the lending activities of a federal thrift.

4

A. The Regulations Themselves Do Not Support a Finding of Preemption.

WAMU's brief ignores the express savings provision in the OTS regulations, which exempts from preemption the very type of contract claims and tort claims which are in issue in this case. So we begin this analysis by laying out the complete and relevant OTS regulations which concern preemption. There are three, and they are as follows –

- *12 C.F.R. § 560.2(a)* – **_HOLA and OTS Preemption in General._** This is the regulation on which WAMU principally relies in arguing for preemption. Subsection (a) states in relevant part:

  > **OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when deemed appropriate** to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA. To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), **OTS hereby occupies the entire field of lending regulation for federal savings associations. OTS intends to give federal savings associations maximum flexibility to exercise their lending powers** in accordance with a uniform scheme of federal regulation. Accordingly, federal savings associations may extend credit as authorized by federal law, including this part, **without regard to state laws purporting to regulate or otherwise affect their credit activities**, except to the extent provided in paragraph (c) of this section or § 560.110 of this part. For purposes of this section, "state law" includes any state statute, regulation, ruling, order or judicial decision.

12 C.F.R. § 560.2(a) (emphasis added).

- *12 C.F.R. § 560.2(b) – <u>Illustrative Examples of Preempted Laws</u>.* Subsection (b) then gives a series of examples of the types of state laws which could be subject to preemption. It states in relevant part as follows –

  > Except as provided in § 560.110 of this part, the types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding:
  >
  > . . . .
  >
  > (5) Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;

  12 C.F.R. § 560.2(b) (emphasis added).

- *12 C.F.R. § 560.2(c) – <u>Savings Provision for State Laws Not Preempted</u>.* This provision, which WAMU understandably does not highlight, expressly saves from preemption a variety of state-law claims against a federal thrift. The section reads in relevant part –

  > State laws of the following type are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section:
  >
  > (1) **<u>Contract and commercial law</u>**;
  >
  > (2) Real property law;
  >
  > (3) Homestead laws specified in 12 U.S.C. 1462a(f);
  >
  > (4) **<u>Tort law</u>** . . . .

  12 C.F.R. § 560.2(c) (Emphasis added).

The seminal question is how we are to harmonize the "preemption" provisions of section 560.2(a) and (b) with the "savings" provision in section 560.2(c). Where is the

6

line between a preempted claim (under section 560.2(a) & (b)) and a non-preempted claim (section 560.2(c)) in the context of this case? We submit that the claims in this case are saved from preemption under the express provisions of section 560.2(c).

- *The breach of contract claim is not preempted.* Plaintiffs in this case are claiming that WAMU breached its contractual obligations under the loan agreement by charging a payoff fee, when the contract documents prohibited any such fee. <u>Section 560.2(c) expressly saves breach of contract claims from preemption.</u> So Count One is not preempted.

- *The suppression claim is not preempted.* Likewise, Count Two claims fraudulent suppression – Plaintiffs claim that WAMU had a duty to disclose to the Plaintiffs, at the time WAMU acquired the loan,[3] of its fees and charges for obtaining a payoff statement. We're simply claiming that WAMU should have disclosed its fees to the borrowers at the time it either acquired or began servicing Plaintiffs' loan. (And, as we discuss below, there is no federal regulation under HOLA which caps or places any restriction on the amount of a PSF, or imposes

---

[3] WAMU claims that the disclosure example in 12 C.F.R. § 560.2(b)(9) applies to the suppression claims. Subsection (b)(9) preempts state laws on "[d]isclosure and advertising, including laws **requiring** specific statement, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants[.]" 12 C.F.R. § 560.2(b)(9) (emphasis added). That section does not preempt the suppression claim for two reasons. First, a common-law duty to disclose which is breached, and a jury verdict and judgment for damages on that issue, does not impose a "requirement" that a lender make disclosures – while it may have the practical effect of causing the lender to disclose, it does not constitute a "requirement." Additionally, the plain language of subsection (b)(9) makes no reference whatsoever to disclosure of fees and costs, especially with respect to a downstream assignee or servicer with whom the borrower has never dealt and from which the borrower did not obtain the loan. To the contrary, the section addresses only types of disclosure obligations which are already covered under both HOLA and other federal laws (for example, Truth in Lending type disclosures).

7

any disclosure requirements regarding PSFs, so there would be no conflict between any state law and a federal standard.)

- ***The unjust enrichment claim is not preempted.*** And Count Four – for unjust enrichment – is pleaded in the alternative to the breach of contract claim. To the extent that WAMU was merely servicing the loans (rather than owning the loans), WAMU's relationship (as servicer only) with Plaintiffs may not be governed by the loan agreement. To that extent, WAMU's imposition of the PSF in the amount of $180.00 (or for $60.00, for that matter) is so grossly excessive in relation to the reasonable value of the "service" (such that it is) of generating the payoff statement that the charges should be refunded.

B.   <u>WAMU's Preemption Arguments Are Not Persuasive</u>.

WAMU's Motion to Dismiss ignores the "savings" provision in section 560.2(c), focusing (understandably) its entire argument on subsections (a) and (b). But WAMU's arguments in favor of preemption are unpersuasive for at least four reasons --

1.   ***If WAMU is correct, there is no limitation on what a thrift could charge for PSFs – either under state or federal law.*** WAMU argues that any claim relating to a federal thrift's charging a customer for a PSF is preempted because OTS has "occupied the field" under section 560.2(a), and because "state laws purporting to impose requirements regarding . . . prepayment penalties" are one specific example of a preempted claim under section 560.2(b). The first problem with WAMU's argument is that it ignores the <u>vacuum</u> of OTS regulation concerning PSFs. The OTS regulations do not contain any provision specifically regulating a federal thrift's charging of PSFs. There is no OTS regulation, for example, stating that a federal thrift can even charge a

8

PSF, let alone setting an amount for such a charge. In that light, it's clear that WAMU is claiming that our state-law claims are preempted <u>even where there is no federal standard in place to regulate PSFs</u>. WAMU curiously admits this. WAMU's Motion to Dismiss at 7 ("Federal law does not place any restrictions on a federal savings association's ability to impose payoff statement fees, outside of requiring compliance with the terms of the particular note.").

Thus, if WAMU is correct, there is no state-law limitation, <u>and no federal-law limitation</u>, on what a federal thrift can charge for a PSF. If WAMU is correct, it can charge any amount it wishes to a borrower for a PSF: it can charge $15.00 (the much more reasonable amount in issue in <u>Stone</u>), or $25.00 (pushing the line of reasonableness), or $75.00 (clearly excessive and unreasonable), or $180.00 (absolutely outrageous - as in this case), or even $5,000.00 – there is no limit whatsoever! This scenario would suit WAMU just fine – but it cannot possibly be the law.

2. ***The one OTS Regulation which could apply would <u>prohibit</u> the imposition of PSFs on these Plaintiffs.*** WAMU's argument is even more implausible when we examine how the OTS regulates prepayment or payoff fees generally. The only OTS regulation which could be related to PSFs specifically limits a federal thrift to charging a prepayment fee which is "subject to the terms of the contract." 12 C.F.R. § 560.34. That section states –

> Any prepayment on a real estate loan must be applied directly to reduce the principal balance on the loan unless the loan contract or the borrower specifies otherwise. <u>Subject to the terms of the loan contract</u>, a Federal savings association may impose a fee for any prepayment of a loan.

9

12 C.F.R. § 560.34 (emphasis added). In other words, the only OTS regulation which could apply states that if a thrift is going to charge a prepayment fee, that fee has to be charged "subject to the terms of the contract." If the PSF is authorized by the parties' loan agreement, then it's lawful; and if it's not authorized, then it's unlawful. In this case, we submit, there is no provision in the loan agreement – none whatsoever -- authorizing the charge for a PSF; in fact, the loan agreement <u>prohibits</u> any prepayment fee. So if section 560.34 applies to a PSF, the PSF imposed in this case was unlawful because it was not imposed "subject to the terms of the contract[,]" 12 C.F.R. § 560.34 – indeed, it was imposed in derogation and violation of the terms of the contract.

In an odd slip-up, WAMU's brief admits that its imposition of PSFs is governed by and subject to the terms of the loan contract in issue. WAMU's Motion to Dismiss at 7 ("Federal law does not place any restrictions on a federal savings association's ability to impose payoff statement fees, <u>outside of requiring compliance with the terms of the particular note.</u>") (emphasis added). So WAMU has **admitted** that its right to charge a PSF is "subject to the terms of the contract." That's an odd admission, since the loan documents in this case contain no authorization to charge a PSF and, in fact, the parties' contract prohibits any prepayment fee.

3.      *If WAMU is correct, a federal thrift cannot be sued for any breach of contract.* Perhaps the most obvious problem with WAMU's argument is that, if it is correct, a federal thrift cannot be sued for breach of contract – as long as the contract term allegedly violated is in the category of items enumerated in section 560.2(b). Let's take an example. Suppose a federal thrift, such as WAMU, buys a loan which carries an interest rate of six percent (6 %). When it acquires the loan, WAMU unilaterally changes

10

the rate to 10 percent. If WAMU's argument is correct, then the borrower cannot sue for breach of contract, because the term in issue (interest rate) is one of the enumerated examples of state-law claims which are preempted under section 560.2(b)(4).

"That's different!" WAMU will undoubtedly protest. "In that case, there is a breach of the contract to charge interest at a certain percentage, and a breach of contract claim is not preempted under section 560.2(c)!" <u>Precisely.</u> In this case, we're claiming that there is a contract term which prohibits the imposition of prepayment penalties or fees, whether named a payoff fee, or payoff statement fee, or anything else, and that charging a PSF – especially for $180.00 (which bears no relation whatsoever to the cost of one, or three, or five, or ten one-page payoff statements which are computer-generated and probably never even required human hands to create) – is a violation of that contract term.

  **4.**  ***In the event the Court believes that section 560.2(a) would preempt these claims, section 560.2(a) is invalid as arbitrary and beyond the Congressional delegation of authority conferred on OTS.*** In the last alternative, if the Court is of the opinion that notwithstanding the specific contractual prohibition on prepayment fees, Plaintiffs' claims are nonetheless preempted by section 560.2(a) and (b), then Plaintiffs submit that sections 560.2(a) and (b) are invalid, as they are applied to the PSFs in this case, because those PSFs are <u>unregulated</u> by the OTS. As we explain below, as applied to PSFs which are wholly unregulated by the OTS, the OTS's promulgation of its "occupation of the field" regulations (sections 560.2(a) and (b)) exceed the grant of authority given the OTS by Congress in the enabling provision of HOLA.

The preemption doctrine, as the Court knows, finds its origin in Article VI, cl. 2 of the United States Constitution. Whether federal law preempts state law "requires us to examine congressional intent." Fidelity Fed. Savings & Loan Ass'n. v. de la Cuesta, 458 U.S. 141, 152 (1984). And while "[f]ederal regulations have no less preemptive effect than federal statutes[,]" id. at 153, a federal agency's regulations are subject to judicial review "to determine whether he has exceeded [its] statutory authority or acted arbitrarily." Id. at 154. So the seminal question is whether sections 560.2(a) and (b) exceed the delegation of authority conferred by Congress in the OTS's enabling legislation. We submit that they do so.

Section 5(a) of HOLA is the sole statutory authority on which the OTS has promulgated the regulations. In Section 5(a) of HOLA, Congress indeed confers broad powers on the OTS to promulgate regulations which govern the operations of federal thrifts. de la Cuesta, 458 U.S. at 160. However, Section 5(a) of HOLA <u>does not vest,</u> and <u>Congress</u> itself has not otherwise vested, the OTS with authority to occupy the field <u>with respect to matters on which it has not in fact promulgated any regulations</u>. The text of section 5(a) is as follows –

> In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as 'Federal Savings and Loan Associations', or 'Federal mutual savings banks' . . . , and to issue charters therefor, giving primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States.

12 U.S.C. § 1464(a)(1). <u>Nowhere</u> in this provision is the OTS given authority to "occupy the field," much less occupy the field without actually regulating conduct. Although

12

Congress gave the OTS the authority to enact regulations which could occupy the entire field of thrift regulation, Congress did not give the OTS authority to enact an "occupation of the field" regulation while at the same time leaving substantial areas unregulated. How does OTS's failure to enact any regulation governing PSFs, for example, advance the goal of OTS's encouraging that federal thrifts engage in uniform "best practices?" Simply put, the OTS cannot claim to "occupy the field" where large portions of the field are vacant – particularly where the field in which this case is planted is barren.

Nothing in de la Cuesta suggests to the contrary. In de la Cuesta (the United States Supreme Court's sole case on preemption under HOLA), the Court held that California's limitation on "due on sale" clauses in lending contracts was preempted by a contrary provision in the HOLA OTS regulations, 12 C.F.R. § 545.8-3(f) – a provision which expressly allowed federal thrifts to have such clauses and enforce them. The Court held that the state-law restriction was preempted because it was in direct conflict with the federal regulation on the issue. de la Cuesta, 458 U.S. at 159. The Court expressly declined to rule on the issue of whether the OTS's regulations occupied the field of lending regulation of federal thrifts. Id. at 159 n. 14.

Thus, to the extent that the Court determines that the claims in issue would otherwise be preempted, we submit that the OTS regulations on this point exceed the scope of authority conferred on the agency by Congress.[4]

---

[4]   WAMU touts its victory in Illinois in Moskowitz v. Washington Mutual Bank, F.A., 768 N.E..2d 262 (Ill. App. 2002), in which it convinced the court that similar claims to those involved here were preempted by section 560.2(a) and (b) of the OTS Regulations. Moskowitz did not involve a challenge to section 560.2(a) and (b) – the Court simply applied the regulations and concluded that the claims were preempted. Nevertheless, Moskowitz is not binding on this Court.

C.  The OTS Informal Opinion Letters Are Not Entitled To Any Deference And Are Not Persuasive At All At the Motion to Dismiss Stage

WAMU's preemption argument largely relies on two informal opinion letters issued by the General Counsel of OTS – one from 1999 and one from 2000. Those opinions are not helpful to WAMU's position for three reasons.

First, in yet another glaring omission, WAMU does not discuss the legal weight to be given to these opinion letters – blithely assuming that the letters settle the question. The law, however, is otherwise: the opinion letters are not entitled to deference. The United States Supreme Court has made clear that an agency's opinion of the law through an opinion letter is not entitled to Chevron-type deference[5] – the type of deference courts customarily give to an agency's interpretation of statutes or regulations under their purview. Christensen v. Harris County, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, **all of which lack the force of law** – do not warrant Chevron-style deference") (emphasis added); United States v. Mead Corp., 533 U.S. 218, 235-37 (2001) (holding that letter rulings – something more formal than an opinion letter -- are not entitled to Chevron-style deference but are to be analyzed under the "sliding scale" of Skidmore v. Swift & Co., 323 U.S. 134 (1944)).

Second, the opinions do not address the issues presented in this case. Let's take the 2000 letter, which deals with a New York statute purporting to 'cap fees for payoff statements. The lender is asking for an opinion as to whether the statute is preempted by the OTS Regulations. The author concludes that the fee for faxing the payoff statement is

---

[5]  Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).

a loan-related fee and, as such, any state statute purporting to cap that fee is preempted. Nowhere in the opinion letter is there any indication as to what the terms of the loan agreements provide. Nowhere is there any hint as to what the conclusion would be if the claim was not based on a cap imposed by state statute, but rather was based on a contractual provision prohibiting the imposition of any fee – for example, where the loan agreement prohibited payoff fees and the borrower was charged $180.00 for a payoff statement (the facts of this case). And the 1999 letter suffers from the same problem – there is no indication that the contracts in issue contained prohibitions on payoff fees.[6]

Third, the opinions both make clear that they are based on the specific facts presented to the OTS's office of counsel – and at the Motion to Dismiss stage of this case, we do not know whether those facts are the same here. See OTS Opinion Letter P-99-3 at 19; OTS Opinion Letter P-2000-6 at 3 (both attached to WAMU's Motion to Dismiss). The second opinion letter, for example, assumed that the lender (the federal thrift) did not charge at all for a PSF if one were sent by mail; the lender charged for the

---

[6] The Plaintiffs' unjust enrichment theory is also viable because a preemption finding as to that claim does nothing to advance any "uniform scheme of federal regulation" – which is the OTS's goal of preemption as stated in section 560.2(a). The 1999 letter addressed whether preemption precludes a claim, brought under (the now-infamous) section 17200 of California's Business and Professions Code, that payoff statement fees are excessive, unreasonable, or unfair in amount. The letter concluded that preemption applied because the application of state law "is inconsistent with one of the objectives of the HOLA and § 560.2(a), namely to allow federal savings associations to exercise their lending powers 'in accordance with a uniform scheme of federal regulation.'" OTS Opinion Letter P-99-3 at 16, quoting 12 C.F.R. § 560.2(a).

That is wholly unpersuasive reasoning (and thus if Skidmore's sliding-scale even applied, which we do not concede, the court should disregard it). As discussed supra in the text, there are no OTS Regulations which govern a federal thrift's charging for PSFs. In other words, a federal thrift can charge whatever it wants to for a PSF for purposes of federal law. Thus if a state-law challenge to an excessive PSF is preempted, the result is no regulation under either state or federal law -- which is what WAMU wants, of course. No regulation whatsoever does not make a "uniform scheme of federal regulation."

PSF only if it were faxed and the Opinion Letter does not indicate what amount was charged – but we seriously doubt it was $180.00 per fax). Since we are at the Motion to Dismiss stage, it is impossible to compare facts or to attempt to distinguish facts – we do not know what WAMU's practices are. In short, the Opinion Letters from OTS are not persuasive, particularly at the Motion to Dismiss stage of this case.

Based on the foregoing, the claims in issue are not preempted. Thus, the Motion to Dismiss should be denied.

## II. Plaintiffs Have Stated Viable Claims Under State Law

### A. The Breach of Contract Claim Is Viable

WAMU contends that Stone v. Mellon Mortgage Co., 771 So. 2d 451 (Ala. 2000), defeats Plaintiffs' claims at this stage. As noted in our introductory comments, Plaintiffs in Stone were charged a $15 "fax fee" for lender's "service" (such that it was) in faxing the payoff statement to the closing attorney. The Court, reasoning that the lender would have sent the payoff statement by mail free of charge, concluded that the Plaintiffs' receipt of the fax and payment of the fee constituted a "voluntary payment" for the ancillary service of receiving the statement by fax, and thus concluded that the voluntary payment doctrine barred contract and quasi-contract claims. Stone, 771 So. 2d at 456-57. The Court also concluded that, since the payoff statement could have been obtained free of charge by mail, there was no breach of the contract's prohibition on prepayment penalties by charging for the ancillary service of sending the statement by fax. Id. at 456.

Stone is distinguishable and does not apply at this stage for several reasons –

1. ***Stone is distinguishable on its facts.*** In Stone, the critical fact for the Court was that the lender (Stone was decided on summary judgment, not a Motion to

16

Dismiss) provided the payoff statement free of charge by mail, and charged only for the ancillary service of providing the statement by fax. In this case, we do not know (at the Motion to Dismiss stage) whether WAMU charges for the PSFs only when by fax or not – the nomenclature it uses (a "Payoff Statement Fee"), however, indicates that it charges for the statements whether they're sent by fax or mail. If WAMU charges for the statement whether sent by fax or mail, then we can prove some set of facts which could sustain a claim, notwithstanding the Stone case.

2. ***The rationale of Stone is not even applicable here.*** Stone relied on a decision from Massachusetts, Cappellini v. Mellon Mortgage Co., 991 F. Supp. 31 (D. Mass. 1997), which reasoned that some services were unanticipated at the time the mortgage loan was executed, and faxing payoff statements would have been one of those unanticipated charges. Stone, 771 So. 2d at 455. Here, a payoff statement is clearly contemplated when a mortgage loan needs to be paid off – because refinancing lenders require borrowers to have a written payoffs before agreeing to close loans. So the Alabama Supreme Court's conclusion in Stone (that no breach of contract claim could lie on the facts because the contract prohibition on prepayment fees did not apply to the fax fee, which was imposed for an ancillary service independent of procuring the statement itself) would not apply in this case, if we can show that the borrower's right to make a prepayment requires, in the ordinary course, that the borrower obtain a written payoff statement (whether faxed or not). WAMU understandably wants to ignore the fact that in Stone, the lender was not charging for sending payoff statements by mail (WAMU is apparently charging for the statement regardless of the method of transmission).

17

3.  ***The Alabama Supreme Court has recently emphasized that the rule of Stone requires a "colorable" legal claim to payment.*** In Stone, the Court noted that the voluntary payment doctrine requires a showing that the party receiving payment does so under a "colorable legal claim." Stone, 771 So. 2d at 456, citing Mt. Airy Ins. Co. v. Doe Law Firm, 668 So. 2d 534, 537 (Ala. 1995). The Alabama Supreme Court has emphasized in cases since Stone that the voluntary payment doctrine does not apply where there is not a "colorable" legal claim to entitlement to payment, or where the conduct in issue violates public policy. U-Haul Co. of Alabama, Inc. v. Johnson, 893 So. 2d 307, 312 (Ala. 2004). In this case, there is a contractual prohibition on prepayment fees. We have alleged that WAMU has no right to charge a fee for obtaining the written statement necessary to make a full repayment of the loan when the contract does not provide for any such fee.

4.  ***Voluntary payment is an affirmative defense, which is not appropriate for disposition on a Motion to Dismiss.*** Stone and other voluntary payment cases relied on by WAMU are summary judgment cases. None of those cases rejected and dismissed a contract claim on a Motion to Dismiss. Even WAMU acknowledges that issues of duress, mistake of fact, and the like are relevant to the application of the doctrine. These are factual matters. We submit that the doctrine is an affirmative defense, requiring development of certain facts, and that dismissal is inappropriate at this time.

5.  ***The Illinois cases touted by WAMU are not binding or persuasive.*** WAMU relies on two Illinois cases -- Krause v. GE Capital Mortgage Servs., 731 N.E.2d 302, 310 (Ill. App. 2000) and WAMU's own unpublished victory in Predroza v. Washington Mutual Bank, F.A., Case No. 1-03-2138 (Ill. App. Dec. 14, 2004) are not

binding on this Court. See Stone, 771 So. 2d at 456 n.1 (opinions from other state courts are not binding). Nor are they persuasive. Krause involved a $10 fee for faxing the payoff statement – like the facts in Stone, Krause involved a charge for the fax, not the statement itself. We do not allege (or believe) those are the facts in this case: WAMU appears to be charging the fees (be they $60 or $180) for the payoff statements, regardless of the form of transmission. Nor is Pedroza persuasive. In Pedroza, the Court concluded that the $60 PSF imposed by WAMU was not a "prepayment fee" under the terms of the contract because the PSF fee was not imposed due to fact of prepayment, but rather was a charge for procuring the statement itself. That is wholly unpersuasive reasoning. Under that analysis, WAMU could charge a PSF of $200.00 (nearly what the Scotts were charged in this case), or $1,000.00, or even $5,000.00, or whatever amount it wished, and simply calling it a payoff statement fee (rather than a prepayment fee) would immunize the charge from a finding that it was in fact a prepayment fee. That reasoning elevates form over substance; nomenclature over reality.[7] And, we should also note that even the Pedroza court does not appear to be so confident about its holding -- that court denied WAMU's own motion to have the opinion published (as in Alabama, unpublished opinions in Illinois are not precedential at all; see Ill. S. Ct. Rule 23(e) (unpublished orders are not precendential and may not be cited)).

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss should be denied.

---

[7] When we proceed into discovery and present facts to the Court, we will show that WAMU's own public filings and annual shareholder reports talk of ways in which they have attempted to enhance revenues in the wake of the loss of loans in the refinancing boom of the past years.

19

Respectfully submitted this the 21 day of June, 2005.

*[signature]*

Wilson F. Green
One of the Attorneys for Plaintiffs

**OF COUNSEL:**
Bozeman & Bozeman
P.O. Box 337
Hayneville, Alabama 36040-0337
(334) 548-2233

Wilson F. Green
Michael J. Clemmer
Battle Fleenor Green Winn & Clemmer LLP
The Financial Center
505 N. 20th Street, Suite 1150
Birmingham, Alabama 35203
(205) 397-8163
FAX (205) 397-8179
wgreen@bfgwc.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by United States Mail, first-class, postage prepaid and properly addressed, on this the 21 day of June, 2005, on the following:

P. Richard Hartley
Hartley & Hickman
415 East Commerce Street, Ste. 101
P.O. Box 583
Greenville, Alabama 36037-0583

Matthew M. Neumeier
Scott T. Schutte
Jenner & Block LLP
One IBM Plaza
Chicago, Illinois 60611

*[signature]*

Of Counsel